IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

FILED
MAILROOM
DEC 2 9 2023
CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

Jason Steuart Hihn
Petitioner
v.
United States of America
Respondent

No: 1:21-cr-167

The Honorable Rossie D. Alston Jr.

PETITIONER'S RESPONSE TO THE UNITED STATES' MOTION
REQUESTING CLARIFICATION FROM PETITIONER AND TO EXTEND TIME TO RESPOND TO
PETITIONER'S MOTIONS RELATED TO 28 U.S.C. 2255

The United States has suggested to the court that it seek clarification from petitioner on two issues: 1) whether petitioner claims to have filed a timely §2255 motion on April 7, 2023 or 2) whether peitioner asks for equitable tolling to be applied tohis three motions. The United States also requests an extension of time to respond to petitioner's claims after clarification.

To clarify the petitioner supplies the following statement of facts:

**STATEMENT OF FACTS**

1. Petitioner executed a §2255 Form on March 31, 2023.

2. Petitioner mailed the §2255 Form and supporting conent on April 3, 2023 as indicated on the Certificate of Service, dated April 3, 2023. The package was sent via USPS Priority Mail. The package contained:
   1. §2255 Form
   2. 13 typed pages referenced in the form
   3. Petitioner's exhibits 1 and 2
   4. Certificate of Service dated April 3, 2023

3. Petitioner operated under the belief that the filing has been filed on April 7 because no message was recieved from the court that it could not be filed and the USPS did not return the package.

4. Petitioner's intent was logical and risk-mitigating:
   1. To file a timely §2255 with as many claims as possible
   2. To amend the filing with additional claims by invoking equitable tolling.

5. Petitioner is in possession of the following hand-written documents:

| DATE | PAGES | TITLE |
|---|---|---|
| 12/15/2022 | 32 | Memorandum in Support of 2255 |
| 2/ 3/2023 | 4 | Brady Violations Claims 20, 21, 22 |
| 3/ 7/2023 | 21 | 5th V2 2255 Claims (minor rewording) |
| 3/ 9/2023 | 13 | 2255 Claims - Refector I |
| 3/13/2023 | 19 | 2255 Grounds |
| 3/18/2023 | 20 | Claims 1-5 [mailed, postmarked 3/28, rx'd 4/3] |
| 3/22/2023 | 20 | 2255 Claims 1 to 5 |

6. Petitioner is in possession of an electronic "cop-out" complaining to the mailroom about the lack of USPS Priority Mail tracking numbers. The reply from the mailroom states "The USPS is no longer providing the free tracking numbers for priority mail."

7. Inmates for not have access to PACER and are prohibited from having a copy of their docket sheet.

8. Petitioner did not yet know about the self-addressed envelope return filing service to obtained a "filed" stamp of the document(s).

ANSWER TO THE UNITED STATES' QUESTION

With the above statement of facts it is now possible to answer the question posed by the government. Petitioner **does** claim to have filed a timely §2255 motion on or before April 7, 2023. As such his subsequent motions attempt to augment the original timely filing and justify why it should be allowed. This is the only logical conclusion since petitioner would like his §2255 claims heard by the court, but does not know the liklihood of the court granting an extension of time for equitable tolling is, since he is a pro se layman with no experience in such matters. This filing strategy shows that petitioner was diligently pursuing his rights but that the extrordinary circumstances were impeding his efforts. The revision history of his draft documents listed in fact #5 above show that he was diligently working leading up to his filing.

OFFER TO THE COURT

Fact #5 lists seven documents and shows his drafts started in December of 2022. If the court would need more than the April 3, 2023 Certificate of Service to find petitioner's filing timely and that he was diligently pursuing his

rights, petitoner offers these documents for inspection. Each document shows iterative convergence to what was filed in the April 3 mailing. The March 18, version was mailed out and the envelope has a March 28 postmark and an April 3 delivery date. That may also be provided.

## THE ORIGINAL §2255 FILING

A copy of the original filing is accompanying this response. It consists of the following elements:

1. Petitioner's §2255 Form dated March 31, 2023
2. 13 typed pages referenced in the form
3. Petitioner's exhibits 1 and 2
4. Certificate of Service dated April 3, 2023

## PETITIONER'S RESPONSE FOR AN EXTENSION OF TIME

Petitioner does not object to the motion for more time.

## CONCLUSION

Petitioner requests that his §2255 motion is decided on the merits and is not denied due to someone else's or a machine error between the prison mailbox and the docket.

Respectfully submitted,

Jason Steuart Hihn, Pro Se
Reg. No. 52188-509
Federal Correctional Complex - LOW
P.O. Box 1031
Coleman, Florida 33521-1031

## CERTIFICATE OF SERVICE

I, Jason Steuart Hihn, sui juris, proceeding pro se, certify that the foregoing is true and correct, and made with my firsthand knowledge pursuant to the penalty of perjury, pursuant to 28 U.S.C. §1746(1), that on the date affixed below, I did forward to the prison authorities for mailing,[1] my

Petitioner's Response to U.S. Motion Requesting clarification & to extend time to respond

for forwarding to the Albert V. Bryan U.S. Courthouse 401 Courthouse Square, 2nd Floor, in Alexandria, VA 22314-5704. Said mailing was properly addressed and did contain the proper amount of pre-paid postage affixed thereto.

It appears that the parties to this action are registered with the CM/ECF Electronic Docketing System, therefore as I am proceeding Pro Se, I aks for service by that means also.

Respectfully submitted this 22 day of November, 2023.

9589 0710 5270 0443 1489 15
Certified Mail Receipt

By: [signature]
Jason Steuart Hihn, Pro Se
Fed. Reg. No. 52188-509
Federal Correctional Complex - LOW
P.O. Box 1031
Coleman, Florida 33521-1031

1 Under the Prison Mailbox Rule, a pro se petitioner's pro se filing is deemed filed when it is delivered to the prison authorities for forwarding to the Clerk of the Court. Huston v. Lack, 487 U.S. 266, 268 101 S. Ct. 2379, 101 L.Ed.2d 245 (1988)

h

AO 243 (Rev. 09/17)

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | | District | |
|---|---|---|---|
| Name *(under which you were convicted)*: Jason Stevart Hihn | | | Docket or Case No.: 1:21-CR-167 |
| Place of Confinement: Coleman FCL-Low, Coleman FL 33521 | | Prisoner No.: 52188-509 | |
| UNITED STATES OF AMERICA | V. | Movant *(include name under which convicted)* Jason Stevart Hihn | |

**MOTION**

1. (a) Name and location of court which entered the judgment of conviction you are challenging: U.S. District Ct. for Eastern District of VA Alexandria Division

   (b) Criminal docket or case number (if you know): 1:21-CR-167

2. (a) Date of the judgment of conviction (if you know): ____

   (b) Date of sentencing: April 8, 2022

3. Length of sentence: 132 months

4. Nature of crime (all counts):
   Count 1: 18 USC 2422 (b) Attempted Enticement
   Count 2: 18 USC 2252 Possession of Child pornography

5. (a) What was your plea? (Check one)
   (1) Not guilty ☐ (2) Guilty ☒ (3) Nolo contendere (no contest) ☐

6. (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, what did you plead guilty to and what did you plead not guilty to?

   N/A

6. If you went to trial, what kind of trial did you have? (Check one) N/A Jury ☐ Judge only ☐

7. Did you testify at a pretrial hearing, trial, or post-trial hearing? Yes ☐ No ☒

8. Did you appeal from the judgment of conviction? Yes ☐ No ☒

9. If you did appeal, answer the following:
   (a) Name of court: ______
   (b) Docket or case number (if you know): ______
   (c) Result: ______
   (d) Date of result (if you know): ______
   (e) Citation to the case (if you know): ______
   (f) Grounds raised:

   ______

   (g) Did you file a petition for certiorari in the United States Supreme Court? Yes ☐ No ☐
   If "Yes," answer the following:
   (1) Docket or case number (if you know): ______
   (2) Result: ______
   ______
   (3) Date of result (if you know): ______
   (4) Citation to the case (if you know): ______
   (5) Grounds raised:

   ______

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications, concerning this judgment of conviction in any court?
   Yes ☐ No ☒

11. If your answer to Question 10 was "Yes," give the following information:
   (a) (1) Name of court: ______
   (2) Docket or case number (if you know): ______
   (3) Date of filing (if you know): ______

(4) Nature of the proceeding: ______________________

(5) Grounds raised:

______________________

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐ No ☐

(7) Result: ______________________

(8) Date of result (if you know): ______________________

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: ______________________

(2) Docket of case number (if you know): ______________________

(3) Date of filing (if you know): ______________________

(4) Nature of the proceeding: ______________________

(5) Grounds raised:

(6) Did you receive a hearing where evidence was given on your motion, petition, or application?

Yes ☐ No ☐

(7) Result: ______________________

(8) Date of result (if you know): ______________________

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your motion, petition, or application?

(1) First petition: Yes ☐ No ☐

(2) Second petition: Yes ☐ No ☐

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly why you did not:

______________________



L

12. For this motion, state every ground on which you claim that you are being held in violation of the Constitution, laws, or treaties of the United States. Attach additional pages if you have more than four grounds. State the facts supporting each ground. Any legal arguments must be submitted in a separate memorandum.

**GROUND ONE:** For all Grounds see supplemental typed pages 1 to 13 (Grounds 1 to 5)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐ N/A

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☒

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND TWO:** For all Grounds see Supplemental typed pages 1 to 13 (Grounds 1 to 5)

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Two:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☐ N/A

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition:

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND THREE:** ______________________________

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐ N/A

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☒ ~~N/A~~

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: ______________________________

Name and location of the court where the motion or petition was filed:

Docket or case number (if you know): ______________________________

Date of the court's decision: ______________________________

Result (attach a copy of the court's opinion or order, if available):

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

Docket or case number (if you know):

Date of the court's decision:

Result (attach a copy of the court's opinion or order, if available):

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

**GROUND FOUR:** See supplemental pages for Grounds 4 and 5, Same answers for Ground 5 as Ground 4

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

(b) **Direct Appeal of Ground Four:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐ No ☐ N/A

(2) If you did not raise this issue in your direct appeal, explain why:

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐ No ☒

(2) If you answer to Question (c)(1) is "Yes," state:

Type of motion or petition: ______________________

Name and location of the court where the motion or petition was filed:

______________________

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available):

______________________

(3) Did you receive a hearing on your motion, petition, or application?

Yes ☐ No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

Yes ☐ No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise the issue in the appeal?

Yes ☐ No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed:

______________________

Docket or case number (if you know): ______________________

Date of the court's decision: ______________________

Result (attach a copy of the court's opinion or order, if available):

______________________

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue:

______________________

13. Is there any ground in this motion that you have not previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them:

______________________

14. Do you have any motion, petition, or appeal now pending (filed and not decided yet) in any court for the you are challenging? Yes ☐ No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised.

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At the preliminary hearing:

(b) At the arraignment and plea:

Plesant Brodnox 1701 Pennsylvania Ave. NW STE200 WDC 20006

(c) At the trial:

Same as above

(d) At sentencing:

Same as above

(e) On appeal:

(f) In any post-conviction proceeding:

(g) On appeal from any ruling against you in a post-conviction proceeding:

16. Were you sentenced on more than one court of an indictment, or on more than one indictment, in the same court and at the same time? Yes ☐ No ☒

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging? Yes ☐ No ☒

(a) If so, give name and location of court that imposed the other sentence you will serve in the future:

(b) Give the date the other sentence was imposed:

(c) Give the length of the other sentence:

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future? Yes ☐ No ☐



HI

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not bar your motion.*

---

* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C. § 2255, paragraph 6, provides in part that:

A one-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of –

(1) the date on which the judgment of conviction became final;

(2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making such a motion by such governmental action;

(3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Therefore. movant asks that the Court grant the following relief:

Vacature of the convictions and sentence.

or any other relief to which movant may be entitled.

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on April 3 2023 (month, date, year).

Executed (signed) on March 31 2023 (date)

Signature of Movant
Pro Se

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion.

**Ground 1: Counsel's Performance Was Constitutionally Deficient When He Advised Hihn To Plead Guilty.**

Claim 1.1: Counsel Provided Ineffective Assistance of Counsel When He Failed To File An Esculpatory Forensic Report As Promised To Hihn.

**FACTS:**

When Hihn learned that he was being charged with possessing illicit files of Count 2, he denied it and demanded to see the evidence. Hihn never wanted to possess any illicit files and did not beleive he did. Hihn and counsel were given a day to review the files. During the review several facts became apparent:

1) The government had used specialized forensic tools to extract the contents of Hihn's phone. As a result they recovered files that Hihn did not have access to. The forensic tool bypassed access control mechanisms on the phone.

2) Hihn did not know, much less have access and control of the majority of the files alleged to be illicit on the phone.

3) The government's criteria of illicit was broader than the statutory definition found in 18 U.S.C. §2256.

4) The files were cataloged in a folder structure of the government's design thereby depriving Hihn of the knowledge of where on the phone they had been found. It was not possible to discern which files were in a cache, otherwise inaccessible, or intentionally saved.

During the meeting after these facts had become apparent Hihn directed his counsel to obtain the "full paths, permissions, and checksums" for the files in question from the government as they would provide esculpatory evidence by showing that Hihn never had custody or control of the contraband. Counsel refused to ask the government for the information. Hihn explained that the government had to provide esculpatory information and that the "full paths" to

show where the files had come from on his phone. For example if it was in a cache or a "downloads" folder. Hihn then explained that the file permissions are needed because Android smartphones use the Linux operating system which is multi-user to the core and that includes file ownership and access permissions. Just because a file is on the phone does not mean that all users of the phone have access or control of the file. It could be owned by another user, the system itself, or an application account. Android uses these permissions to protect itself from viruses, to preent applications from stealing or modifying another application's data, or damaging the systems on the phone. "Checksums" are a file's "fingerprints" where two files having the same checksum are considered to be the same file, like matching fingerprints to a person. Counsel still refused, stating that they would need to commission their own report to contain the technical explanations of the operating system concepts of file paths, permissions, and checksums. Hihn wanted this done immediately because if there was a single file that he could be shown to have knowingly possessed Hihn wanted to review it before deciding to plea. The trial date was less than two months away. Counsel advised that they would take the issue up at sentencing. This was bad advice because counsel was effectively prioritizing adhering to the existing schedule rather than delay the proceeding to take the time to conduct the forensic investigation. Counsel could have gotten the data from the government immediately for review to make a plea decision and have the report with explanitory information come later. Not obtaining the facts from either the government or their own investigation held Hihn in the dark about esculpatory information going into the plea decision. It then follows that telling your client to gamble on the results of an as-of-yet nonexistent forensic report is not a knowing plea. This is not just bad advice

but it breaks into constitutionally deficient performance as the facts must be known before the plea. Advising to plea then get the facts is plainly backwards.

Counsel chose the forensic report company Sensei Enterprises Inc of Fairfax Virginia. Sensei issued a statement of work* on January 12, 2022 for a written report. Fees were paid and the contract executed on February 1. The on-site data collection was on March 17, just weeks before sentencing. Counsel took a trip to South Africa during this time to visit his fiance. Hihn heard nothing about the report until April 7, the day before sentencing. Hihn and counsel were both briefed by telephone while Hihn and counsel were in a video session.

The results were substantially in Hihn's favor. Hihn only possessed 22 of the 144 files alleged, the difference being files in various cashes on the phone and not under his control. A breakdown by folder was supplied. Several folders were identified including one, for example, called "SHC" which was for "virtual" images only. This folder had multiple files identified by the government as illicit. This proves that the government was using a broader definition of illicit than what is statutorily defined because "virtual" images can never be illicit. So the true number is even less than the 22 after removing the virtual images. (The forensic report was not to characterize the images, only to provide the information on the files identified by the government, expert testimony, and a summary.) Additionally, 17 of the 22 files were from a site called BDSMLR.com whose terms of use* prohibit illicit content:

"BDSMLR.com abides by a ZERO TOLERANCE policy relating to any illegal content. Child pornography, bestiality, rape, torture, snuff, death and/or any other type of obscene and/or illegal material will not be tolerated by BDSMLR.com. BDSMLR.com will report and cooperate with all government agencies that seek those who produce child pornography." Therefore Hihn had the belief that the

*Exhibit 1
*Exhibit 2



61

files from BDSMLR.com were legal. The files from that site were saved as named by that site, which all have a "bdsmlr-" prefix on the name. Hihn claims that these files were also miscategorized. Subtracting 17 from 22 gives 5, subtract the virtual images, and its less than 5, possibly zero. Any remaining images are miscategorized as illicit.

However this report explaining that Hihn did not knowingly possess 122 of the 144 images never got completed. Hihn and his counsel were both surprised to learn on the call that it was not typed up yet nor ready to be filed. The time to complete it was in excess of the filing deadline with the court. Counsel had failed in his promise to Hihn to file the report with the court.

**PREJUDICE:**

By failing to file the report as promised Hihn was deprived of esculpatory evidence by his own counsel. This allowed the government's allegations to stand unchallenged resulting in undue sentecning enchancements. If Hihn had this report prior to pleading he would have proceeded to trial.

Claim 1.2: Continuing From Claim 1.1, Counsel Provided Ineffective Assistance Of Counsel When He Failed To Monitor The Progress Of The Forensic Report And Request A Continuation So That the Report Could Be Completed,Proofed,And Filed As Promised.

**FACTS:**

Claim 1.1 facts are included in this claim in entirety. On April 4 Counsel filed the Positioning on Sentencing including 4 attachments. None of these are the forensic report by Sensei Enterprises Inc., and there is no request for a continuation in the record. Counsel should have at an appropriate time requested a continuation so that the report could be among those attachments. Four days before sentencing and he did not know the readiness of this key piece of evidence. Reasonable counsel would have known the state of completion and

ensured it would be complete before sentencing in time for filing.

**PREJUDICE:**

By not requesting a continuation Hihn was deprived of esculpatory evidence by his own counsel. This allowed the governments allegations to stand unchallenged resulting in additional undue enhancements.

Claim 1.3: Counsel Provided Ineffective Assistance Of Counsel When He Failed To Secure The Privacy Of Their Communications As Guaranteed By Constitutionally Protected Attorney Client Privlege And Other Constitutional Amendments.

**FACTS:**

While Hihn was held at the detenction center he and his counsel used the "video visit" service offered by the detention center to counsel and clients. Initially, Hihn would be searched and escorted to a room labeled INT-4 where he was sat in front of a computer. His escort carried a computer mouse into the room and used it to start the video session.

However, after a few sessions he would be sat in the room and his escort would depart and then some time later the moust cursor on the screen would start moving with no one else in the room. Hihn recognized that his computer was being controlled through a technique called "screen sharing." This technology captures the screen of one computer (the remote computer) and displays it on another computer (the local computer) and allows the local keyboard and mouse to control the remote computer. Hihn immediately alerted his counsel to the change and stated that he was not comfortable with the change because it would allow the government to eavesdrop on their sessions. Counsel dismissed his concerns. Hihn never waived his rights to use the service. Then two incidents happened that demonstrated eavesdropping.

The first incident occured prior to pleading during plea negotiations.



21

Counsel started to share a particularly sensitive defense-generated document protected by Attorney Client Privilege. As soon as the document appeared on Hihn's screen the mouse cursor started moving. Hihn exlaimed "Take it down! Take it down!" which counsel did. The mouse stopped moving when the document was removed from the screen. This was the first time that the mouse had moved in the middle of a session.

Backing up to add context to the situation, at the start of the case Hihn requested a copy of the chats to review in his cell. Counsel advised against keeping any evidence in his cell because it could be discovered by inmates or staff, which could lead to Hihn becoming a victim of vigilantism by inmates or staff. The classification department at the detention center also advised against discussing his case with anyone. Counsel had also made statements at Hihn's bond hearing about vigilantees. Hihn was terrified every day that someone would find out and target him. Hihn was also worried about the government finding out the content of their sessions. Once the computer screen is replicated in another room any number of observers may be present, or the computer can record the session, or a video camera could be pointed at the screen and it could be recorded that way. The mere possibility that the government had the means and could be watching had a chilling effect on Hihn and his communication with counsel which caused Hihn to use evasive language, speak imprecisely by substituting terms, using hand gestures and other vagueries.

The second incident was during an in-progress sesssion when a "microphone error" popped up and the mic stopped working. Without prompting and within seconds the mouse started moving, dismissed the pop-up, stopped the session and restarted it. This proved to Hihn that he was being monitored. Counsel was concerned enough to call the detention center and ask what had happened. He

told Hihn that he was told it was an accidential bumping of the mouse and counsel accepted this explanation. Hihn did not. Hihn had seen the microphone error, the moust move with precision to dismiss the pop up, and restart the sessions. However this is implicit admission that they were using screensharing technology in violating Hihn's privacy rights. Hihn protested to his counsel, but counsel did nothing to ensure their privacy.

It is no accident to remotely control another computer. Screen sharing is considered a security vulnerability so it ships disabled by default. It takes specific technicaly steps to connect to enable it. Once enabled, it takes additional steps to connect to the remote computer. These are deliberate actions that the detention center took to enable their convenience over Hihn's privacy rights.

Additionally, privacy was impossible in INT-4. The door to the room had a window. Across the hall was a cell with a full-size window that could see the occupant of INT-4. At multiple times another inmate was in that cell during Hihn's sessions. There was no sound privacy as Hihn could hear conversations in the hall and on one occassion Hihn had a conversation with the occupant of the cell in normal conversational tones. In an effort to gain more privacy Hihn filed an Inmate Request Form asking for permission to use his earbuds with the computer. The form was returned to Hihn with the verbal response that it would be up to the person searching and escorting him to INT-4. Some officers would allow it, most would not. Earbuds would at least secure the privacy of counsel's words to Hihn. Hihn still had to choose his words carefully. At times Hihn would use gestures or write notes and flash them to the camera for counsel to see since he did not feel safe saying certain things in that environment. Hihn was not able to speak frankly with counsel. Hihn requested assistance

from counsel to get earbuds and a magnetic blind for the door window approved. (Magnetic blinds were on other door windows on the floor.) Counsel declined to advocate for Hihn's privacy and safety.

**PREJUDICE:**

Hihn had a right to privacy with counsel and the detention center violated it in multiple ways. Meanwhile his counsel did nothing to secure his Constitutionally protected rights thus risking his personal safety and allowing his rights to be violated and his communication with counsel fouled. Had counsel been diligent in securing the privacy of their communications, Hihn would have proceeded to trial.

**Ground 2: The Convictions Are Unconstitutional Because The Plea Was Not Knowing And Voluntary. Hihn Was Deprived Of Evidence In His Favor Leading Him To Make An Uninformed Plea Decision**

Claim 2.1: As Described In Claim 1.1, Hihn Was Deprived Of The Filepaths, Permissions, And Checksums By Both The Government And His Counsel Before Accepting The Plea Agreement.

**FACTS:**

The government had a duty to provide this esculpatory information, it did not. Hihn's own forensic report that was to include this information was not completed prior to pleading even though Hihn requested it for the purposes of making an informed plea decision. If Hihn had received this report prior to pleading he would have proceeded to trial.

**PREJUDICE:**

Hihn was not able to make an informed plea decision because this evidence was withheld from him until the day before sentencing. Had Hihn had this evidence he would have proceeded to trial.



H.T.

Claim 2.2: Hihn Was Deprived Of Information Relevant To The Knowingness Of The Plea When Te Government Provided A Redacted And Doctored Version Of The Chats And Counsel Provided Ineffective Assistance Of Counsel When He Did Not Seek To Remedy The Document.

**FACTS:**

The government provided a version of the chats to the defense, however this was not the best evidence because 1) it had redactions and 2) it had errors.

The first issue is that it was defective because it contained redactions. All images except one sent by the agent were redacted by blacking out the message. Similarly all the images Hihn had sent except those of himself were redacted as well. The agent never sent an illicit image, so what is the justification for the redactions of her images? Hihn knows he sent some cartoon images which cannot be illicit, so what is the justification for those images? The government only supplied Hihn with partial evidence and as a result Hihn was deprived of the ability to review it with counsel.

The second defect with the document is that it is doctored. Page 28 appears again as pate 103 but with a different date. Page 32 appears again as pages 101 and 104 with different dates. Page 48 appears again as page 102 with a different date. It is unknown what is the specific nature of the error. Are they redundant, replacing other pages, potentially esculpatory or otherwise inconvenient to the government? Hihn informed counsel of those defects prior to pleading. He stated he wanted the document suppressed or at least corrected. Counsel dismissed the evidential integrity issues stating that the government would be allowed to just drop the offending pages.

**PREJUDICE:**

Hihn was forced to make a plea decision based on a redacted, demonstrably



52

defective document that was supplied by the government. Therefore he was unable to make an informed plea.

Hihn was also provided ineffective assistance of counsel when his counsel declined to have the document suppressed or corrected, which also prevented Hihn from making an informed plea.

Claim 2.3: Hihn Was Deprived Of Information Relevant To The Knowingness Of The Plea When The Government Failed To Identify And Provide Esculpatory Evidence On Hihn's Phone.

**FACTS:**

The agent had sent Hihn images of artificial human analogues (also known as dolls) in the chats. These were most of the 23 of 24 redacted images the agent had sent, all redacted by the government. However, Hihn had also saved those images to his device for continued analysis. It is important to note that the chat application being used and chosen by the government agent has a sender-specified message expiration timer. When the timer expires the message is removed from the screen and the chat history. However any images saved to the device will remain. Hihn saved as many as he could to his phone but the government never provided them. These were not illicit images, they were esculpatory, and Hihn was deprived of reviewing them and discussing them with his counsel in plea deliberations.

There was other esculpatory content as well on his phone. Hihn knows for a fact that he had at least one image and one video of dolls on his phone. The government did not provide them so Hihn was likewise unable to discuss them and their meaning with counsel.

**PREJUDICE:**

Since the government failed in its disclosure obligations Hihn did not

know the balance of evidence, neither did his counsel, when making the plea decision. Therefore the plea was not knowing.

**Ground 3: Counsel Was Constitutionally Deficient At Sentencing**

Claim 3.1: Counsel Failed To Argue The Number Of Images At Sentencing.

**FACTS:**

Counsel had planned to use the expert testimony from the forensics report to argue either actual innocence, or for several points of enhancement reductions. It then follows that without this report his claims were unsupported or unpersuasive to the court. Counsel was ill-prepared for this possibility. Counsel cited no authorities on how the images were to be counted, on what the content is required to qualify as illicit.

**PREJUDICE:**

Because counsel was ill-prepared, Hihn's sentencing enhancements were larger than they should have been.

Claim 3.2: Counsel Was Deficient At Sentencing When He Allowed The Government's Numbers To Be Embodied In The Presentence Report.

**FACTS:**

Counsel had planned to object to and plea the number of images at sentencing. However, he did not object to the government's number in the presentence report. This created a presumption of correctness that he was not able to overcome. This agreement to work out the numbers was not stated in the presentence report.

**PREJUDICE:**

By not securing the number of images and enhancements before the pre-sentence report was finalized, counsel allowed flawed information to become embodied in the presentence report and then failed to object to it. This

enlarged the scope beyond the statement of facts which contained no numbers for images and videos.

Claim 3.3: Counsel Was Deficient At Sentencing When He Failed To Object To The Government's Citation Of "500 Pages"

**FACTS:**

As explained in Claim 2.2 counsel allowed numerous defects to go uncorrected in the document. Prosecution cited the length of the document at sentencing. Counsel knew of the duplicated pages but did not object. Counsel also failed to object to the metric itself. The document presents the chat as a series of screenshots. In many cases there is just one new message per page and so there is significant overlap. Additionally, the screenshot does not take up the entire page width. As a result the "500 pages" metric is categorically flawed and bears no relation to the strength of evidence or degree of criminality in the case.

**PREJUDICE:**

By allowing a known defective document to go uncorrected and unredacted, then failing to object to the faulty metric about its size, counsel provided deficient performance at sentencing. Hihn was given a sentence above the mandatory minimum despite similar cases having received the minimum.

**Ground 4: Counsel Provided Ineffective Assistance Of Counsel When He Misadvised Hihn Of His Appeal Rights**

Claim 4.1: Counsel Provided Ineffective Assistance Of Counsel When He Misadvised Hihn Of His Appeal Rights

**FACTS:**

After sentencing Hihn was returned to the detention center where counsel then called Hihn. Hihn stated that he was shell shocked during sentencing and wanted to review his sentence to understand it and verify the modification

they were granted had been made. Hihn was very interested in the conditions of supervised release. Counsel stated it would take "10 to 14 days" for the document to appear (in reality it was only 3 days later). Hihn was not told that those 10 to 14 days would exhaust his notice of appeal period. Hihn stated that he was likely to be moved in those 10 to 14 days. Counsel replied "Don't worry, I will find you." Counsel never did. Hihn was transferred 4 days later to another facility for 10 days. Despite Hihn's family messaging counsel, nothing was heard from him until July 21, 2022, when he sent an email to Hihn's family requesting more money for the forensic report that was never completed. Hihn himself has heard nothing from counsel since April 8, 2022. Counsel again failed to do something he promised to Hihn.

**PREJUDICE:**

If Hihn had known or been advised that his appeal period was only 14 days, he would have ordered counsel to file a notice of appeal to preserve his appeal rights while he reviewed the details of his sentence.

**Ground 5: Elements Of The Sentence Are Unconstitutional Or Violate Federal Law**

Claim 5.1: The Special Conditions Of Supervised Release Are In Violation Of The Constiution Or Federal Law

**FACTS:**

Hihn's special condition 4 requires Hihn to waive his health privacy rights afforded to him by the Healthcare Insurance Portability and Accountability Act (HIPAA). The court lacks the ability to compel Hihn to waive those rights under threat of another 10 years of incarceration.

**PREJUDICE:**

Hihn would suffer immediate harm by having to disclose protected health information to a non-healthcare provider who is not bound to HIPAA laws.



29