UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

| | |
|---|---|
| **ANDRES FERNANDO CABEZAS** | ) |
| | ) |
| | ) **Case No. 6:22-cv-65-PGB-LHP** |
| **PETITIONER,** | ) |
| | ) **Affidavit of Bonnie Burkhardt** |
| | ) |
| **v.** | ) |
| | ) |
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| | ) |
| **RESPONDENT.** | ) |

State of Virginia
County of Fairfax

BEFORE ME, the undersigned authority, this day personally appeared BONNIE BURKHARDT who first being duly sworn, deposes and says:

1. I am over the age of eighteen (18) years, a resident of Virginia and have personal knowledge of the fact set forth below.

2. I was hired by Andres Cabezas and his father Moris Cabezas in or around April of 2023 to examine Andres' discovery and provide my technical analysis of it. Moris then provided me discovery and forwarded letters and comments from his son Andres who was incarcerated.

3. At the time when I analyzed Cabezas' case, I only had copies of the Internet Crimes Against Children Operational and Investigative Standards for various years that I found online. These are the versions that are apparently provided to law enforcement. These copies were rather uninteresting, so I did not find a need to reference them. I did not receive the whistleblower versions of these documents

until December 2023. The whistleblower versions were internal to the DOJ and not publicly available. As such, I did not have or know of Section 13, Mandated Proper Tactics and Rules of Engagement, when I analyzed his case. The new information contained in Section 13 is relevant to Cabezas' case.

**Background**

4. I am a software engineer with a Top Secret security clearance who builds interception systems for the DoD. I have been a certified operator on such systems. I have also done targeting, which is analyzing intercepted communications of foreigners on foreign soil who are possible bad people and potential targets of the DoD. Because of my job, I take about 30 classes each year on Fourth Amendment privacy laws and directives, provided by NSA and other federal agencies. These classes emphasize Executive Order 12333 (EO-12333) and the laws of the Electronic Communications and Privacy Act, ECPA.

5. As a targetter, any communication between a foreign bad person and a U.S. person was considered off limits and had to be turned over to the FBI so they could obtain a warrant. All phone numbers of U.S. persons had the last 4 digits masked out. Email addresses, account names, and IP addresses were also masked out. If it was necessary to unmask the identity of the person owning the phone number or account, a request had to be submitted to government management to determine if it was associated with a true U.S. person, therefore requiring a warrant. As a targetter, I was not permitted to use publicly available phone books to look up a U.S. phone number to unmask the owner's name without government management approval or a warrant.

6. The tactics of ICAC officers violate what I have been taught about protecting the Fourth Amendment rights of U.S. persons. I have briefed staff members of the

House Judiciary Committee on three separate occasions on how I believe ICAC officers are violating federal and state laws. I also described my opinion of these ICAC tactics in my first book, "Manufacturing Criminals, Fourth Amendment Decay in the Electronic Age." It was published in December 2020. The updated version, "Manufacturing Criminals, 2nd Edition, Wiretapping and Planting Evidence," was published in March 2024.

7. I am a faculty member of the National Association of Criminal Defense Lawyers, NACDL. I presented lectures for CLE credit at two of their national conferences in Las Vegas. These lectures were based on the content presented in my books. I have also lectured at the Louisiana chapter of NACDL and at the Michigan Professional Investigator's conference. I have testified as an expert witness in Virginia, Louisiana, and Florida. I have assisted attorneys in several other states by writing suggested content for their motions. My CV is attached, Exhibit A.

8. Recently, I filed whistleblower reports with over 60 offices of the U.S. Congress and Senate who were on the Judicial Committees, Oversight Committees, or Budget Committees. Some received a 2-page summary and over a dozen received the summary plus three 35-page reports detailing the accusations. This complete report was also mailed to the Inspector General of the Director of National Intelligence under Tulsi Gabbard. I also included the 2018 documents for the ICAC Operational and Investigative Standards, with and without Section 13. That IG requested more information. After I replied with more information, that IG then forwarded my complaint to the Inspector General of the DOJ, Exhibit B. One of the three detailed whistleblower reports is relevant to Cabezas and is included, Exhibit C.

## New Information

### Origin of the Documents

9. There are three subtly different copies of the Internet Crimes Against Children (ICAC), Operational and Investigative Standards document that seem to be produced every 2-3 years. **The important difference is the inclusion or omission of the last page, Section 13, "Mandated Proper Tactics and Rules of Engagement".** In the 2012 version, the last page is Section 9 with this same title. The trio of documents for 2014 and 2017 are included, and the DOJ internal copy is included for 2012. Section 13 and other sections became longer as the years went on. The 2014 version is relevant because it is also included in the ICAC training materials from an ICAC class held in Bellevue, Washington on June 15-19, 2015. It is logical to assume that SA Kaufman was trained using similar material. When the last page is omitted, a table of contents is added on the second page, so the total page count is consistent between the versions. The three versions of the documents are as follows:

- Internal DOJ copy with the last page having Section 13, "Mandated Proper Tactics and Rules of Engagement". 2014 is Exhibit D. 2017 is Exhibit E. 2012 version (Exhibit F) has fewer pages and sections, with the last section numbered Section 9.
- Unredacted copy provided to Law Enforcement (LE) with Section 13 removed. 2014 is Exhibit G. 2017 is Exhibit H.
- Redacted copy of the LE copy with Section 13 removed, obtained by FOIA. 2014 is Exhibit I. 2017 is Exhibit J. FIOA letter is included as Exhibit K.

10. Around January 2022, I found the Unredacted LE versions online on a few different websites. The classroom materials, ICAC Undercover Concepts and Techniques, were also found online around that same time. I wanted to validate the

content of these documents, so I submitted a FOIA request around May 8, 2022. The DOJ replied almost a year later on April 21, 2023. They provided the redacted copies for 2014, 2017, and one version which was very old and undated.

11. On March 23, 2023, I was contacted by Moris Cabezas on behalf of his son, requesting me to provide expert witness support for his son's case. Andres had read my first book, "Manufacturing Criminals, Fourth Amendment Decay in the Electronic Age." His father provided copies of discovery for me to analyze. On May 7, 2023, I finished my analysis and suggested content for him and his attorney to consider.

12. Around December 2, 2023, I received an email with the third variation of these documents, the whistleblower copies for 6 different years. These apparently were obtained from within the DOJ and are internal DOJ copies. I asked for the identity of the whistleblower, but the second party refused to provide his name. This whistleblower copy is not publicly available, and has never been produced in response to any FOIA request that I have submitted. It is this version that is relevant because it includes the last page, Section 13.

13. I compared the FOIA LE version with the unredacted LE version that I found online. The unredacted sections are identical in content. Even the text placement and pixels appear to be identical. The rectangles used to redact the material perfectly overlay the unredacted text. This gives credibility to the unredacted copies I found online.

14. I then compared the unredacted LE version to the Internal DOJ copy that included Section 13. All of the text of the LE version appears to be verbatim in the Internal DOJ copy, although it is a smaller font. The LE version has the last page with Section 13 removed and a table of contents added on page 2. So, all the other pages are shifted. The internal DOJ copy has no table of contents and has Section 13 as the last page. The whistleblower copy also has some small references to

Section 13 added to a few locations within the document, such as those in Section 8.5 and 8.6. This added text may explain the smaller font. It is also notable that the footnote on the bottom of each page is different. The internal DOJ copy has the line:

**"Certified Under: Title 34 U.S.C. § 21101-21131".**

This implies that the copy given the Law Enforcement is NOT "Certified Under" federal code.

**Relevance of Section 13 (Exhibit D)**

15. Section 13, which, again, I did not receive until December of 2023 and did not share with Andres Cabezas until June of 2025, contains a list of several items that must be followed by officers, and the laws officers violate if these Rules are not followed. Many of these items appeared to be relevant to Cabezas' case. The laws specified therein are applicable and officers should not be ignorant of these laws. Here are some items that appear to be violated by officers in Cabezas' case:

16. Section 13.1 – "Officers Shall not use and are Prohibited from using Online Dating Applications/Websites for Consenting Adults … ." The online adult dating site Craigslist was used by the agents who were targeting Andres Cabezas.

17. Section 13.3 – "Law Enforcement Officers Shall not use and are Prohibited from using Adult Profiles of the Age of 18 Years Old and Older … ." The character SA Kaufman created and impersonated on Craigslist was an adult female.

18. Section 13.5 – "Law Enforcement Officers when Setting Up an Online Internet Undercover Sting Operation are Mandated to ask for Permission in Writing via a Cooperative Agreement to said Social Media/Social Networking Application's/Website's Legal Counsel/Legal Team for the Express Purpose of Conducting said Online Internet Undercover Sting Operation." Apparently, no such permission was obtained.

19. Section 13.5 continued – "Law Enforcement Officers Shall not Violate and are Prohibited from Violating the Terms and Conditions of the Online User Service Agreement of any and all Adult Only Oriented Applications/Websites because then they would be in violation of Title 18 U.S.C. § 1030 the Federal Computer Fraud and Abuse Act." The woman SA Kaufman pictured as a mom on Craigslist was not him, so SA Kaufman was an impostor. While impersonating this fake mom, SA Kaufman pandered the fake mom's child which violated the Terms of Use for Craigslist. Exhibit L.

20. The Craigslist Terms of Use, TOU, states:

> If you agree to the TOU and (1) are of sufficient age and capacity to use CL and be bound by the TOU .. we grant you a limited, revocable, non-exclusive, non-assignable license to use CL in compliance with the TOU; unlicensed use is unauthorized.

21. From my understanding, impostors cannot enter into a legally binding contract, like a user agreement. In addition, Craigslist strictly prohibits:

- Misleading, unsolicited, and/or unlawful postings / communications / accounts are prohibited. (SA Kevin Kaufman posted an ad for a mother pandering her daughter)
- Content that is prohibited by any of CL's policies or rules reference above ("Prohibited Content"). (SA Kaufman's ad included Prohibited Content).

22. Prohibited content on Craigslist includes:

- Offers, solicitation, or facilitation of illegal prostitution and/or sex trafficking. (SA Kaufman was pandering a child for sex).
- Exploitation or endangerment of minors; (SA Kaufman was pandering a child for sex).
- False, misleading, deceptive, or fraudulent content; bait and switch; (Kaufman's ad was for a woman interested in a man. The first reply Kaufman sent was a bait-and-switch, "This is not about me!!! Mom with 12 yo daughter looking to gain new life experiences for my daughter.")
- Any good, service, or content that violates the law or legal rights of others; (Kaufman was intending to intercept private communications of anyone

sending a response to his ad – without any known court authorization to intercept communications using impersonation.)

23.Section 13.7 – "Law Enforcement Officers are Prohibited from Committing and Shall Not Commit Egregious-Outrageous Conduct, Entrapment by Cajoling, Compelling, Convincing, Enticing, Inducing, Luring, Persuading, Seducing, Tempting a person who Is Not Predisposed to Commit the Crime Nor Premeditated to Commit the Crime and if not complied with would be in Violation of Title 18 U.S.C. § 373 the Solicitation of Commit a Crime of Violence Act and in Violation of Title 18 U.S.C. § 2422 the Coercion and Enticement Act and in violation of the Federal Elements of Entrapment from the United States Department of Justice Archives Manual Criminal Resource Manual Section 645." Cabezas went to an adult-only dating site, Craigslist, seeking to date an adult, not a child. That seems to question premeditation or being predisposed to solicit a child. After reading the text message exchanged between SA Kaufman and Cabezas, SA Kaufinan appears to have violated several items listed in Section 13.7, thereby violating law.

**The Training Manual**

24. The 2014 unredacted LE version of the ICAC Operational and Investigative Standards WITHOUT Section 13 is included in the ICAC training materials from an ICAC class held in Bellevue, Washington in June of 2015. Exhibit M, starting on page 79 matches Exhibit G. Several items taught in this class appear to violate the missing Section 13 Mandated Proper Tactics and Rules of Engagement for 2014, the last page of Exhibit D. Look at the front cover of the training material. It is produced and/or sponsored by the DOJ OJJDP, Officer of Juvenile Justice and Delinquency Program, and the Fox Valley Technical College in Wisconsin. These logos imply that these are national training materials.

25. Nowhere in this training can I find instructions directing officers to read and adhere to the Terms of Use for the website or dating app they are going to use. Nowhere in this class can I find instructions to get written permission from the legal counsel of the website which would permit the officer to conduct a sting operation. Nowhere in this training material is there any reference to EO-12333 which defines electronic surveillance. This definition implies that a lawful party to an electronic communication must be capable of having a similar conversation while visibly present, otherwise it requires a warrant. SA Kauman, a man posing as a mother, could not be visibly present with Cabezas and have the same dating conversation.

26.Nowhere in this training material is there any reference to ECPA laws such the interception law, 18 U.S.C. § 2511, which protects private electronic communications including those on dating sites like Craigslist. Nor is there any reference to the pen register laws, 18 U.S. Code § 3121, which protects the privacy of electronic addresses such as email addresses or IP addresses and requires warrants to unmask the owner's identity. I could not find any warning to not impersonate someone else, or any reference to identity theft laws, 18 U.S. Code § 1028(d)(7)(B), which prohibits the use of someone else's photos as a means of identification.

27. Page 35-36 is a sample "Florida Department of Law Enforcement Consent to Use Picture" form. Page 49 is the "Consent to Assume Online Presence" form. No man who goes to a dating site looking for an attractive woman would click on an ad showing a burly male officer. Using photos of attractive females as the male officer's identity is seduction and luring men to answer the ad, which is prohibited in Section 13.7. Nowhere on these forms does it state that the photo will be used as a means of identification for some other officer. Nowhere on these forms does it state that other officers will impersonate the person pictured. Nowhere on these forms does it authorize other officers to send out messages or intercept private communications intended for the person pictured. Nowhere does it state that sending

out text messages as if they came from someone else might be considered manufactured evidence. Nowhere does it state that an officer can use these signed forms as authorization to impersonate and intercept private electronic communications intended for the person pictured, all in violation of the Terms of Use. I can find no provision under 18 U.S.C. § 2511 which authorizes officers to intercept communications based on these signed forms. These sample forms appear to teach officers to violate 18 U.S.C. § 2511, 18 U.S.C. § 1028 (d)(7)(B), 18 U.S.C. § 273, and 18 U.S.C. § 2422.

28. Pages 23-34 have sample chat content where the officer is impersonating a young female. The sample uses Craigslist, just like what was used against Cabezas. It teaches officers to conduct a chat which violates the Craigslist Terms of Use by impersonating someone else and pandering a child. SA Kaufman's chat with Cabezas appears to follow this example. Pages 39-40 give sample chat texts for officers to improve their impersonation techniques and entice the suspect to meet. These scenarios appear to teach officers to violate the Terms of Use and therefore teaches them to violate Title 18 U.S.C. § 1303 the Federal Computer Fraud and Abuse Act.

29. Page 73 is a spreadsheet where officers can keep track of their character and how they impersonated her. There is a spot for male officers to keep track of their bra size and menstrual cycle. Page 71-72 is a handy graph so officers can be consistent with their imaginary character's height, weight, and clothing sizes. This is enticement and seduction, prohibited in Section 13.7.

30. I wrote a summary of the missing Section 13 and included it in my book, "Manufacturing Criminals, 2nd Edition, Wiretapping and Planting Evidence." This book was published on March 15, 2024. This is the first time that Section 13, "Mandated Proper Tactics and Rules of Engagement," became publicly available. A few months later, I sent copies of my book to two inmates in Florida. Somehow,

Andres came upon a copy of my second book and discovered my writeup on Section 13.

31. On June 9, 2025, Moris Cabezas contacted me on behalf of his son, requesting my copies of the ICAC manual from the whistleblower that included Section 13. I provided him the 2014, 2017 and 2018 whistleblower versions.

FUTHER AFFIANT SAYETH NAUGHT.

Bonnie Burkhardt
Bonnie Burkhardt

Before me on this 9 day of December, 2025, appeared Bonnie Burkhardt, who is personally known to me or produced VA DL as identification and being first duly sworn, acknowledged that the foregoing is true and correct.

Signature

AMANPREET KOCHHAR
Print Name
Notary Public, State of VA
My Commission Expires: NOV-30-2029

AMANPREET KOCHHAR
NOTARY PUBLIC
COMMONWEALTH OF VIRGINIA
MY COMMISSION EXPIRES NOV. 30, 2029
COMMISSION # 7961757

# Exhibit "A"

# Bonnie G. Burkhardt

8402 Gambrill Lane, Springfield, VA 22153
Bonnie.burkhardt@blueridge-sw.com
(703)505-2793 (cell)

## Education

MS Computer Science and Engineering, University of Santa Clara, 1988.
BS Applied Mathematics, University of Colorado, 1984.

**Certifications:**

| | |
|---|---|
| 1985-present | Top Secret clearance, current SSBI and polygraph. |
| 2014-present | Other classified certificates for targeting. |
| 2000-present | Certified system administrator for classified government computers. |
| 1990-1994 | Certified operator of a classified interception system. |

**Specialized Training:**

Annual DoD training and re-certification (about 30 per year)
on Privacy Law, Signals Intelligence Authorities and Intelligence Oversight.

## Professional Experience

Ms. Burkhardt has over 40 years of software engineering and network protocol experience, building software tools to intercept communications and to analyze intercepted communications. She trains analysts from the U.S. and our allies on new tools and techniques she develops. Ms. Burkhardt has also done targeting. Since the DoD was interested in foreign targets and not U.S. Persons protected by Fourth Amendment rights, no warrants were required by the Electronic Communications and Privacy Act of 1986 (ECPA) or Executive Order 12333.

Ms. Burkhardt provides expert witness support to attorneys on how Fourth Amendment ECPA laws apply to cases having electronic communications as evidence. This includes texts, emails, recorded phone calls, and electronic file transfers. She wrote two books explaining how law enforcement and prosecutors violate ECPA law. She trains defense attorneys on this topic.

**Expert Witness / Senior Software Engineer / President** **1/2007 - present**
Blue Ridge Software Consulting, Inc.

- Provides expert witness support to attorneys.
- Faculty member of the National Association of Criminal Defense Lawyers, NACDL.
- Guest lecturer at the Louisiana Association of Criminal Defense Lawyers, LACDL.
- Provided software development and maintenance for her tool, Bit Buster Graphics. Bit Buster provides interactive forensic analysis for digitized communication signals.
- Worked as a signals analyst to developed new techniques using these tools.
- Developed curriculum and taught signal analysis classes to the military and others.
- Founded her own consulting company.

**Intelligence Analyst and Software Engineer** **1/2020 – present**
Verite / GRVTY
- Did targeting and contributed to reports on potential targets of interest.
- Analyzed intercepted electronic communications.
- Supported development of client-server software tools to analyze metadata.
- Developed new software tools to track missiles. Trained analysts on new tactics.

**Senior Software Engineer** **4/2002 – 1/2007**
BIT Systems
- Software development of Bit Buster Graphics adding pattern match to find syncs, headers, text, or data in files of 100 Gigabytes.
- Led a team of 4 other software engineers.

**Senior Software Engineer** **1/1995 - 3/2002**
Coleman Research Corporation/ AEGIS Engineering
- Created the interactive digital signal forensic tool, Bit Buster Graphics, delivered to 40 locations worldwide.

**Senior Software Engineer** **10/1994 - 1/1995**
SAMCO (Subcontracting to Hughes)
- Performed software maintenance on a secure electronic mail and data transfer system.

**Software Engineer** **7/1984 - 8/1994**
GTE Government Systems (General Telephone and Electronics)
- Developed software for a real-time signal processing and interception system.
- Certified as an operator for that interception system.
- Wrote network protocol including a hash code calculator.
- Became the technical manager of approximately 10 people.
- Developed a SQL database for tracking parts.

## Expert Witness Experience:

**2024** – *New Mexico v. Telfah,* Case No: 2024-013394, NMDOJ# 202410-00186
Hired by the defense attorney to provide technical support in applying ECPA law to officers impersonating a female online on a dating site without a warrant.
Defense attorney: Jack Mkhitarian. Second Judicial District, Albuquerque, New Mexico

**2024** – *Florida v. Tidwell,* Case No: 2021 CF 1831
Hired by the defendant to provide technical support and assistance applying ECPA law to officers monitoring Freenet communications without a warrant. Subpoenaed and testified in a deposition, April 11, 2024. Testified at a Motions Hearing on July 11, 2024. Testified at trial, February 19, 2025.
Defense attorney: Randy Etheridge. Escambia County Court, Florida

**2024** – *Louisiana v. Koury*, Case No: 240,564
Hired by the defendant to provide technical support and assistance applying ECPA law to Yahoo monitoring content of emails it services without a warrant. Analyzed hash codes, file sizes, file timestamps, and timing of the electronic evidence.
Certified by the Bossier Parish Court as an expert witness in the area of software engineering and computer programming on May 21, 2024. Testify at a Motions Hearing on that day.
Defendant was *pro se* with attorney Mark Rogers advising. Bossier Parish Court, Louisiana.

**2024** – *U.S. v. Williams*, Case No: 21-mj-2035 (AMD)
Hired by the defendant and public defender with the approval of the Court to provide technical support and assistance applying ECPA law to officers impersonating other people online without a warrant to intercept their private communications.
Defense attorney: Mark Catanzaro. U.S. District Court, District of New Jersey

**2023 - 2024** - *U.S. v. Looney*, Case No: 220CR06009 (CJS)(MJP)
Hired by the defendant to provide technical support and assistance applying ECPA law to officers monitoring Freenet communications and network traffic without a warrant.
Defense attorney: Jim Napier. U.S. District Court, Western District of New York

**2023** – *Virginia v. Rehm,* Case No: FE-2020-000365 and FE-2020-0000466
Provided technical support applying ECPA law to an officer impersonating someone else online without a warrant to intercept their private communications. Certified by the Fairfax County Circuit Court to testify regarding how and when email evidence was obtained.
Defense attorney: Toni Fay. Fairfax County Circuit Court, Virginia.

**2018 - 2020** - *Virginia v. Pick*, Case No. CR18001018-00 thru -04
Hired by the defendant to provide technical support and assistance interpreting ECPA law as applied to officers animating a realistic female online without a warrant to intercept private communications. Defense Attorneys: Vaughan Jones and Paul Galanides
Hanover County Circuit Court, Appellate Court and Supreme Court of Virginia.

**2018 - 2020** - *Virginia v. Achin,* Case No: FE2018-1497
Hired by the defendant to provide technical support and assistance interpreting ECPA law as applied to officers impersonating other people online without a warrant to intercept their private communications. Defense Attorneys: Stephen Sheehy, III (since deceased) and Paul Galanides
Fairfax County Circuit Court, Appellate Court and Supreme Court of Virginia.

## Publications and Briefs:

April 2024: *Manufacturing Criminals, 2nd Edition - Wiretapping and Planting Evidence*
December 2020: *Manufacturing Criminals, Fourth Amendment Decay in the Electronic Age*
Amicus Brief filed *pro se* with permission of the court: Appellate Court of Virginia Criminal, *Virginia v. Achin*, CAV Record No: 1950-19-4
Amicus Brief filed *pro se* with permission of the court: Appellate Court of Virginia Criminal, *Virginia v. Pick,* CAV Record No: 1945-19-2

**Presentations:**

September 2025: Featured Speaker
Michigan Council of Professional Investigators, Annual Conference
*How Fourth Amendment Rights are Eroding in the Electronic Age*

December 2024: Guest Lecturer
Louisiana Association of Criminal Defense Lawyers, LACDL, Conference
*Fourth Amendment Rights in the Electronic Era and the Intersection with Individuals Charged with Sex Crimes*

November 2024: Faculty Speaker
National Association of Criminal Defense Lawyers, NACDL, National Conference
*Fourth Amendment Rights in the Electronic Era and the Intersection with Individuals Charged with Sex Crimes*

April 2023: Faculty Speaker
National Association of Criminal Defense Lawyers, NACDL, National Conference
*Fourth Amendment Rights in the Electronic Era and the Intersection with Individuals Charged with Sex Crimes*

2015-2023: Speaker
Telemetry, Ephemeris, Beacon, and Analysis Community
*Digital Signal Forensic Techniques using Bit Buster Graphics*
International Bi-annual Conference (classified)

# Exhibit "B"

Office of the Inspector General of the Intelligence Community

Center for Protected Disclosures

September 26, 2025

Ms. Bonnie Burkhardt
bonnie.burkhardt@blueridge-sw.com

Re: IC IG Contact Number: 25-0011-CD

Dear Ms. Burkhardt:

Thank you for your recent submission to the Office of the Inspector General of the Intelligence Community (IC IG) pursuant to the Intelligence Community Whistleblower Protection Act, 50 U.S.C. § 3033(k)(5). The IC IG reviewed your submission in accordance with the statutory requirements and on September 24, 2025, determined that the allegation(s) in your submission do not meet the statutory definition of an "urgent concern" under 50 U.S.C. § 3033(k)(5)(G)(i).

As a result, the statute does not require IC IG to transmit your complaint to the congressional intelligence committees. Nevertheless, given the nature of the allegation(s), IC IG intends to refer your complaint to the United States Department of Justice Office of the Inspector General for review and any action they deem appropriate.

We appreciate you bringing this matter to our attention. The IC IG Hotline remains a confidential and accessible avenue for reporting allegations of misconduct related to programs, personnel, and activities within the IC IG's purview. If you would like to discuss this notification further with IC IG representatives, you may schedule a call by contacting the IC IG Hotline at 855-731-3260 or via email at ICIGHOTLINE@odni.gov.

Sincerely,

IC IG Hotline Program

# Exhibit "C"

**Whistleblower Report**

**False Claims Act, 31 U.S. Code § 3729**

# Manufacturing Criminals

**Criminal Violations of the**

**Electronic Communications and Privacy Act, ECPA and**

**Racketeer Influenced and Corruption Organizations Act, RICO**

**By: Bonnie Burkhardt**

Contents

Contents ........ 2
**I. INTRODUCTION** ........ 3
**II. THE CONSPIRACY** ........ 4
**A. Scenario 1: Online Sting Operation** ........ 4
**B. Scenario 2: Parent Reports Suspicious Messages to their Child** ........ 6
**III. ICAC IS LIABLE** ........ 8
**IV. ALLEGATIONS** ........ 10
**A. COUNT ONE – Illegal Interception** ........ 10
**1. Federal Law and the Fourth Amendment** ........ 10
**2. Meaning of *Person*** ........ 12
**3. Electronic Surveillance without a Warrant** ........ 14
**4. Sixth Amendment Violated** ........ 16
**5. Illegal use of 180-day Stored Communication Criteria** ........ 16
**B. COUNT TWO – Disclosing and Using** ........ 16
**C. COUNT THREE – Identity Theft** ........ 17
**D. COUNT FOUR – Entrapment** ........ 18
**E. COUNT FIVE – Illegal use of a Pen Register / Trap and Trace Device** ........ 19
**F. COUNT SIX – Falsifying Evidence** ........ 20
**G. COUNT SEVEN – Destruction of Evidence** ........ 20
**H. COUNT EIGHT – Extortion** ........ 20
**I. COUNT NINE – Fraud** ........ 21
**J. COUNT TEN – RICO** ........ 22
**K. COUNT ELEVEN – Involuntary Manslaughter** ........ 25
**L. COUNT TWELVE – Electronic Warfare** ........ 25
**M. COUNT THIRTEEN – Misprision** ........ 26
**N. COUNT THIRTEEN – Denying Access to the Grand Jury** ........ 27
**V. UNINTENDED CONSEQUENCES** ........ 28
**VI. CONCLUSION** ........ 29

## I. INTRODUCTION

Bonnie Burkhardt, acting pursuant to the provisions of the False Claims Act, 31 U.S. Code § 3729, et seq, brings this complaint on behalf of the United States of America and for her own benefit, alleging that Internet Crimes Against Children Task Force (ICAC), knowingly submitted false claims to the United States Government to obtain almost $1,000,000,000 in grants from the Department of Justice, Office of Juvenile Justice and Delinquency Prevention, OJJDP. A spreadsheet listing the grants is available upon request. ICAC offices like the Broward Sheriff's Office in Florida label these operations "proactive investigations" and readily acknowledge they are funded by federal OJJDP grants. DHS has recently become involved in these cases.

The federal government is also paying the salaries of FBI agents to manufacture criminals, and the salaries judicial officials to prosecute and judge these cases. In addition, there has probably been over $50,000,000,000 expended by DOJ to incarcerate those illegally arrested and convicted. This does not include a similar amount for states' expenses for their prosecutions of manufactured crimes based on this same federally funded ICAC training and federal grants, or the states' cost of incarceration.

ICAC used federal grant money to train over 675,700 federal, state and local officers to violate law.[1] This allows ICAC branches to also obtain state and local grant moneys. Local law enforcement also obtains state funds to house inmate in local jails while awaiting trial or awaiting transport to prison. Therefore, local judges deny bond for these manufactured crimes to get millions of state dollars sent to their county. This violates the defendant's Eighth Amendment rights.

Burkhardt's information is "independent of and materially adds" to the publicly disclosed information, such as court documents and public grant records. Burkhardt is the "original source" who gave the information to the government before filing this complaint, 31 U.S. Code § 3730. She filed numerous reports to state and federal government agencies notifying them of illegal ICAC activity. She also notified them of grant moneys and other funds used for illegal purposes.

ICAC's stated purpose is twofold: 1) To conduct pro-active sting operation to find pedophiles who intend to harm children. 2) To proactively seek those who may trade child pornography. This complaint deals with fraud that occurred during item 1) pro-active sting operations and investigations. Allegations that law enforcement violated law during investigations of child pornography will be discusses separately.

This Complaint alleges that ICAC criminally violated federal law and used entrapment to manufacture criminals to increase ICAC's favorability rating when obtain grants. ICAC officers violated the criminal statues of the Electronic Communications and Privacy Act, ECPA, when

[1] *Home*. (2013). Icactaskforce.org. https://www.icactaskforce.org/

obtaining evidence used to arrest and prosecute defendants. These tactics violate the defendant's rights guaranteed by the First, Fourth, Sixth, Eighth, and Fourteenth Amendments. ICAC has grown into a nationwide organization with 61 branches in all 50 states. These branches are fraudulently obtaining federal grant money using similar techniques. This vast criminal organization buried within the justice system violates the Racketeer Influenced Corrupt Organizations Act, RICO.

## II. THE CONSPIRACY

ICAC was founded in Bedford, Virginia, but now has locations in every state. Bedford has functioned as ICAC's headquarters. Federal courts have jurisdiction over all causes of action asserted against ICAC pursuant to 28 U.S. Code § 1343(a)(1-4) and § 1346(b). Federal grant money was used to train federal, state, and local officers to violate the law and is cited in the Dallas CAC Undercover Chat Training documents. This gives the federal government jurisdiction over state and local cases that were conducted based on this federal training. Federal grant money was also expended by state and local ICAC branches on other resources. Additionally, Federal courts have jurisdiction over all other claims pursuant to 28 U.S. Code § 1402(b), § 2401(b), and § 2671-2680 FTCA, because grants to all ICAC agencies arise from a common training, tactics, and facts that are so intertwined that they cannot be reasonably separated. ICAC grant applications submitted from across the country are almost carbon copies of each other.

### A. Scenario 1: Online Sting Operation



This is not picture of a child. It is not a picture of a male FBI agent or male ICAC detective wearing a disguise. It is a picture of an adult woman. Pictures like this are posted as part of an adult profile on an adult-only dating site by male FBI agents or local male detectives. The dating ad may even list the age of the person pictured as "age 19". This photo was used in ads created by an officer with the Chandler Police Department, Chandler, Arizona.

Ads are created in such a way that all replies are routed to the officer, not the person pictured. Male officers then impersonate the woman pictured (or a young man on gay dating sites), sending text messages as if they were her and intercepting all private electronic communications sent to her, without a warrant. The woman pictured is not party to any conversation. Interception begins at the word "Hi" sent by an anonymous man. If the officer is going out of town for a day or

so, he will hand-off his character and his phone to a second officer who takes over impersonates the female, exchanging "her" text messages.

This scenario is how ICAC officers conduct pro-active sting operation, supposedly to find pedophiles who intend to harm children. Officers use adult-only dating sites instead of websites where children are actually trafficked or where real pedophiles may go to find children. There is no report of criminal activity to start the sting operation. There is no written agreement with legal counsel of the dating site company authorizing officers to conduct sting operations or permitting officers to violate their Terms of Use. The advertisement and its photo are bait. The officer then waits for some unwitting anonymous man looking for an adult date to answer the ad. Once a conversation begins, the officer claims to be 14-years-old, even though the photo shows an adult. The officer uses entrapment techniques to cause the suspect to talk dirty, request a meeting, or to send a picture or video of his private parts. All texts sent by the "child" are manufactured evidence since a child did not send them. Manufacturing evidence violates the defendant's right to due process under the Fourteenth Amendment. Seduction, luring, enticing, inducing, and guilt trips are common tactics. Inducement and entrapment are used to manufacture the crime of soliciting a minor.

LinkedIn



**Rhonda McKay**
Selection and Assessment Team at Wells Fargo
Jacksonville, North Carolina Area | Human Resources

Current Wells Fargo
Previous Wells Fargo Home Mortgage
Education Coastal Carolina Community College

Send Rhonda InMail

**Administrative Assistant**
Wells Fargo
February 2014 – Present (2 years 11 months)

Part of the Selection and Assessment team providing quality products and resources to assist in the hiring process.

**Mortgage processor**
Wells Fargo Home Mortgage
April 2004 – February 2014 (9 years 11 months)

Processing and underwriting conventional, VA and FHA mortgages. Managing to change and a natural leader.

Rhonda McKay is not a child. Officer Robert S. Martin, Hillsville Police Department, VA, posted an ad on adult-only dating site Craigslist using Rhonda's photo and her true name, *Virginia v. Darius Foran*, Carroll County, VA Case No. 16-1590. Darius Foran answered the ad and began to converse. Officer Martin impersonated Rhonda, sending messages to Foran and receiving all messages from Foran as if he was Rhonda. Rhonda was not party to the conversation. Officer

Martin stated that he was 15-years-old. Since the photo did not agree with the age, Mr. Foran researched Rhonda McKay and found her on LinkedIn with the same name and a photo that matched to the person in the ad. Mr. Foran is currently serving year 10 of a 25-year sentence for soliciting a minor.

In *Virginia v. Ryan Thomas Pick*, Hanover County Case No. CR18001081, Det. Troy Payne impersonated a female he named Lilly. Payne told the suspect (Pick) to use Dropbox and to send a video "from the neck down." Pick did not know how to use Dropbox from his phone and did not know how to post a video to it. Officer Payne had to giving step-by-step instructions on which buttons to push to teach Pick how to commit the crime of putting a risqué video in Dropbox.[2]

Occasionally, the suspect demands a phone call with the person pictured as in *Virginia v. Achin*, Fairfax County Case No. FE2018-1497. Officer Robert Bauer then procured the younger-sounding Officer Gadell to be the voice actor on recorded phone calls, violating 18 U.S. Code § 2511(1)(a). Without a warrant, Officer Gadell used Bauer's phone which was specially equipped to record phone calls, violates 18 U.S. Code § 2511(1)(b). Recording was done without a warrant or court authorization violates 18 U.S. Code § 2511(1)(a).

In *New York v. St. Pierre*, Jefferson County Case No. D311-11076123, one male officer and two females were involved impersonating a fake mom pimping her stepdaughter. The male officer exchanged text messages, and the females were voice actors on recorded phone calls. Analysis shows there were about 51 federal crimes, 7 New York felonies, and 6 misdemeanors committed by officers and government officials against St. Pierre. The Jefferson County Circuit Court of New York refused my *pro se* motion requesting permission to submit my analysis which detailed these allegations. St. Pierre was forced to sign a plea deal.

Many times, the officer unmasks the identity of the suspect before the meeting, or if the suspect refuses to meet. This is also done without a warrant. The suspect's unmasked name is written on the application for the arrest warrant and the suspect's home address is written on the application for the search warrant. A summary of communications is written on the warrant applications to justify the arrest and search of the defendant's home and property. This conversation includes the illegally intercepted communications sent by the defendant and the manufactured text messages supposedly sent by a child but actually sent by an adult officer.

**B. Scenario 2: Parent Reports Suspicious Messages to their Child**

A parent notices suspicious text messages sent to their teen. They report this to law enforcement and bring the teen's phone so officers can examine the messages on the phone. In *Virginia v. Laurence Einus*, Fairfax County Case No. GC14115829 and JA415154, Mr. Einuis had not committed any criminal act with this teen. Det. Nicholas Boffi then had a parent sign a form

---

[2] Burkhardt, B. (2024). *Manufacturing Criminal, 2nd Edition - Wiretapping and Planting Evidence*. Chapter 9.

similar to the FBI form number FD-1086, "Consent to Assume Online Presence." There is no statute making this form legal or giving any legal substance once the form is signed. Det. Boffi then took control of the teen's phone, impersonated the teen, and exchanged text messages with Mr. Einuis as if Boffi was the teen. The teen's phone was used so the caller ID would match when Einuis read Boffi's text messages. Det. Boffi changed the tone of the conversation and used entrapment to manufacture the crime of soliciting a minor. All other charges against Einuis are fruit of the poisonous tree and are derived from this illegal interception and Boffi's manufactured text messages supposedly sent by the teen.

I have seen other cases where FBI form FD-1086 or an equivalent local form was signed by a parent and used by officers to impersonate a child. FBI form FD-1086 includes the content:

> *I, [name], hereby voluntarily authorize [agency] to take control of and use my "online presence." This online presence includes the following screen names(s), nick name(s), and/or e-mail addresses, as well as the passwords associated with the accounts: [fill in list].*
>
> *I consent to the use of my online presence for any purpose relating to an official investigation by the above law enforcement authority, including (but not limited to) sending and receiving e-mail or conducting any other electronic communications, accessing stored information, and using and disclosing such communications or information. I understand and acknowledge that by signing the consent form, I relinquish all present and future claims to the use of these accounts. I understand that law enforcement authorities will change the password(s) to this account so that I will no longer have access.*
> *I give this consent freely and voluntarily without fear, threats, coercion, or promises of any kind. I have been advised of my right to refuse to allow the assumption of my online presence, and I hereby voluntarily waive this right.*
>
> *Signed and witnessed.*

An officer then takes control of the child's phone, email, texting, and online accounts. The child is no longer party to the conversations. Without a warrant, the officer impersonates the child, sending and receiving messages as if he is the child. The child's phone number and account names are used by the officer as a means of identification to allow the officer to successfully impersonate the child. The officer creates messages and sends them to the suspect. This is manufactured evidence since the child did not send them. All private electronic messages sent by the suspect to the child are intercepted by the officer controlling the child's phone. The officer uses entrapment techniques to cause the suspect to talk dirty, request a meeting, or to send a picture or video of his private parts. Seduction, luring, enticing, inducing, and guilt trips are common tactics.

**Common for Both Scenarios:**

The manufactured texts sent by officers posing as the "child" and content from the illegally obtained text messages and phone calls are used as justification for an arrest warrant of the suspect and for a search warrant for the suspect's home, phone, and computers. Illegally obtained content is disclosed to the grand jury to get an indictment, and disclosed in court to force a plea deal or a conviction by the jury. Bond may be as high as $20,000,000 for text messages to a fictitious character, or it is denied altogether. This violates the defendant's Eighth Amendment rights.

## III. ICAC IS LIABLE

Internet Crimes Against Children trains officers to violate the law. Fox Valley Technical College puts on training for ICAC and OJJDP using federal grant money, including their logos on the cover page of training material.[3] I obtained one such training manual, 2015 June 15-19 ICAC Training and Technical Assistance Program Undercover Concepts and Techniques. Page 73 gives a handy spreadsheet form for detectives to use to keep track of each character they have created and each suspect they are conversing with. Page 71-72 gives a size chart for clothing to match the height/weight of the imaginary character created so every detail officers invent about their character appears consistent.

Page 49 includes a sample form "Consent To Assume Online Presence" where a parent lists all the accounts of their child and authorize law enforcement to take over their child's phone and accounts. Parents sign the form on behalf of their child, authorizing law enforcement authorization for "sending and receiving e-mail or conducting any other electronic communications, accessing stored information, and using and disclosing such communications or information." There is no legal substance behind this piece of paper. Nothing under 18 U.S. Code § 2511 authorizes anyone, including law enforcement, to send messages while impersonating someone else or to receive messages intended for someone else. This signed form is equivalent to getting written permission from a mother to rob a bank – it does not make it legal.

Page 79 begins the ICAC Operational and Investigative Standards document. There appears to be two subtly different versions of this document produced every year. The first seems to be the original DOJ copy prior to being scrubbed. It contains Section 13, "Mandated Proper Tactics and Rules of Engagement," and a few earlier references to Section 13 material. The items listed in Section 13 are critical and necessary for officers. This version was obtained indirectly through an anonymous whistleblower, so it was unable to be validated. The second version is the scrubbed version with the Section 13 page removed. A table of contents is added so the page count matches the original. This second version is the one provided to law enforcement in their

[3] *Government grant award search*. (2024). DataRepublican. https://datarepublican.com/award_search/?keywords=icac

training and used to create the redacted versions given out in FOIA requests. The document evolved over time from 2014 and 2018 with small additions each year. Items from Section 13 across the years that officers must know (but removed from their copy) are as follows:

1. Law Enforcement Officers Shall not use and are Prohibited from using Online Dating Applications/Websites for Consenting Adults nor Escorting Applications/Websites for Consenting Adults nor Prostitution Applications/Websites for Consenting Adults
2. Law Enforcement Officers Shall not use and are Prohibited from using Online Instant Messaging Chatrooms for Consenting Adults.
3. Law Enforcement Officers Shall not use and are Prohibited from using Adult Profiles of the age of 18 Years Old and Older on Online Social Media/Social Networking Applications/ Websites
4. Law Enforcement Officers are Allowed to use and Shall only use Profiles of the Age of 17 Years Old and Younger on Online Social Media/Social Networking Applications/Websites.
5. Law Enforcement Officers, when Setting Up and Online Internet Undercover Sting Operation, are Mandated to ask for Permission in Writing via a Cooperative Agreement to said Social Media/Social Networking Application's/Website's Legal Counsel/Legal Team for the Express Purpose of Conducting said Online Internet Undercover Sting Operation. Law Enforcement Officers Shall not Violate and are Prohibited from Violating the Terms and Conditions of the Online User Service Agreement of any and all Adult Only Oriented Applications/Website because then they would be in Violation of Title 18 U.S. Code § 1030 the Federal Computer Fraud and Abuse Act.[4]
6. If Law Enforcement Officers Violate and Do not Honor the Liability Clause of the Internet Crimes Against Children Task Force Memorandum of Understanding and Violate and Do not Honor the Oversight Clause of the Internet Crimes Against Children Task Force Operation and Investigative Standards then they would be in Violation of Title 18 U.S. Code § 1961-1968 the Racketeer Influenced and Corrupt Organization Act.[5]
7. Law Enforcement Officers are Prohibited from Committing and Shall Not Commit Egregious-Outrageous Conduct, Entrapment by Cajoling, Compelling, Convincing, Enticing, Inducing, Luring, Persuading, Seducing, Tempting a person who Is Not Predisposed to Commit the Crime Nor Premeditated to Commit the Crime and if not complied with would be in Title 18 U.S. Code § 373 the Solicitation to Commit a Crime of Violence Act and in Violation of Title 18 U.S. Code § 2422 the Coercion and Enticement Act and in Violation of the Federal Elements of Entrapment from the United States Department of Justice Archives Manual Criminal Resource Manual Section 645.[6]

---

[4] ICAC Program Operational and Investigative Standards. (2008, 2011, 2012, 2014, 2017, 2018). *Operational and Investigative Standards.* Office of Justice Programs (OJP).
[5] ICAC Program Operational and Investigative Standards. (2011, 2012, 2014, 2017, 2018). *Operational and Investigative Standards.* Office of Justice Programs (OJP).
[6] ICAC Program Operational and Investigative Standards. (2014, 2017, 2018). *Operational and Investigative Standards.* Office of Justice Programs (OJP).

Crowe and Valley Undercover Chat presentation dated June 17, 2019 by Dallas CAC is another class for ICAC officers. Page 2 instructs officers to "follow all local, state and federal laws," then proceeds to teach them how to violate these laws. This class teaches officers to obtain a photo of a real, adult person and use it as their own. Page 3 tells how to use someone else's photo "to represent yourself online" noting that the person pictured must be 18-years or older when signing the form and must be a current member of law enforcement. It discusses how these male officers should establish a profile and keep track of "age/weight/eye color/hair color/bra size/panty hose size".

FBI Det. Michael Russo also gave a class discussing how to conduct undercover sting operations using someone else's identity using model photos. His opening comments state that he is a Task Force Officer with the FBI. His contact information is marusso2@fbi.gov. Agent Russo was the primary federal agent in *U.S. v. Mark Baker* (Montana DOJ Case No. T2 22-07-02). Mark Baker was a FEMA whistleblower. This case started with Det. Toby Baukema of the Montana Division of Criminal Investigation creating and impersonating his female character on Escort Alligator. I was hired by Baker to provide suggestion content about illegal interception to the defense attorney that he could use in a motion to suppress. The defense attorney refused to use my information and the attorney refused to submit Steven Coker's Digital Forensic analysis of Baker's phone showing evidence was planted on his phone after seizure.

Law enforcement publishes their tactics in news reports of the arrest. News reports claim that "the alleged offenders used online platforms to initiate explicit conversations and solicit sex from police officers posing as children."[7] [8] Simply do a Google search for "arrested officer posing as children" and you will find hundreds, if not thousands of cases across the country where officers criminally violate ECPA law, then publicize it.

## IV. ALLEGATIONS

### A. COUNT ONE – Illegal Interception

### 1. Federal Law and the Fourth Amendment

The Electronic Communications and Privacy Act of 1986 (ECPA) expanded Fourth Amendment rights to cover wire, oral, and electronic communications equally. It broadened the definition of illegal interception so it is illegal to impersonate someone else and intercepting private communications intended for them. There is no exception for police, even with written permission. Impersonation not only violates the rights of the one impersonated, it also violates

[7] *Local Men Charged with Soliciting Minors*. (2025). Fairfaxconnection.com. https://www.fairfaxconnection.com/news/2020/apr/23/local-men-charged-soliciting-minors
[8] O'Connell, M. (2020, April 21). *Internet Predator Sting Operation Snares 30 Suspects In Fairfax*. Herndon, va Patch; Patch. https://patch.com/virginia/herndon/internet-predator-sting-operation-snares-30-suspects-fairfax

the rights of the other who believes he is having a private conversation and sharing personal information with one specific person, not an impostor. The federal statute states:

> 18 U.S. Code § 2511 - Interception and disclosure of wire, oral, or electronic communications prohibited
> (1) Except as otherwise specifically provided in this chapter any person who—
> (a) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication; ...

*Intercept* "means the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device," 18 U.S. Code § 2510(4). The detectives use a cell phone to acquire the content of private text messages that the defendant sent to the female pictured.

Federal ECPA law details a specific list of authorized persons who may intercept communications and precise methods they may use. All other interception is illegal. 18 U.S. Code § 2516 contains some verbiage that authorization might be granted for suspected sex trafficking of "children." However, the meaning of the word "children" refers to real children as defined in 1 U.S. Code § 8. The word "children" does not include an adult male (or female) officer impersonating a woman, then pretending to be a child. Detectives do not obtain, nor even request, court authorization before intercepting the defendant's private communications.

Probable cause is required prior to obtaining Court authorization to intercept. Here, the agents began to intercept when a stranger said, "Hi." What probable cause exists when a stranger utters, "Hi," that would justify intercepting and recording the defendant's private conversation?

The defendant had an assumption of privacy. He was alone using his personal cell phone or computer. In *Katz v. United States,* 389 U.S. 347 (1967), police attached a listening device to the outside of a public telephone booth. The Supreme Court ruled this a search and seizure of one's private communications. Here, the defendant used a passcode-protected cell phone to exchange private text messages with another person. See *Riley v. California,* 573 U.S. 373 (2014). Text messages are private electronic communications exchanged between two people using cell phones. The law grants text messages the same right to privacy as land-line phone calls, because "wire, oral, or electronic communications" are all afforded the same protections under 18 U.S. Code § 2511(1)(a). An adult has a First Amendment right to free speech on an adult-only dating site engaged in a private conversation.

If Congress intended to grant law enforcement authority to impersonate someone else in this way, it would have expressly stated it. In Washington State, a drug dealer was arrested; the detective then impersonated the dealer. The detective sent text messages from the dealer's confiscated phone, impersonating the dealer to arrange meetings with buyers Hinton and Roden. They each met the officer. Both were arrested. Washington Supreme Court overturned the

convictions of Hinton and Roden reasoning that text messages are a "private affair" and are protected against warrantless intrusion via impersonation. *See State v. Hinton,* 87663–1 (Wa. 2014) and *State v. Roden*, 87669–0 (Wa. 2014).

U.S. Supreme Court Justice Holmes wrote the majority opinion in *U.S. v. Thayer*, 154 F. 508, (June 17, 1907), clarifying that solicitation crimes via mail only occur "if it takes place in the intended way." "If the letter has miscarried" (delivered to someone else), "the defendant would not have accomplished a solicitation." The detective and Durham were not the addressee or intended receiver. "Nothing less than bringing the offer to the actual consciousness of the person addressed would do" (emphasis added). Animated characters have no consciousness. "An offer is nothing until it is communicated to the party to whom it is made." This decision has stood the test of time. The female pictured never read the messages. A child never read the messages, so "the offense was not complete, but, when it had been read." No solicitation occurred.

In *U.S. v. Szymuszkiewicz*, — F.3d —, 2010 WL 3503506 (7th Cir. September 9, 2010), Szymuszkiewicz was convicted for being a recipient, though not the intended recipient, of emails sent to his boss. Szymuszkiewicz was a system administrator who secretly setup auto-forwarding on his boss's account so copies of emails would also be sent to him. Old-fashioned wiretaps are not the only way to intercept communications. Here, the detective set up the ad so all messages would be routed to his phone or computer instead of the female's, same as *Szymuszkiewicz*.

The use of technology to survey the interior of a private space is considered a search protected by the Fourth Amendment. In 1978, Congress codified 50 U.S. Code § 1821, expanding 'physical search' to include *"examination of the interior of property by technical means."* Here, detectives used technology to mask their true identity so they can 'search' the content of private messages composed on, or received by, the defendant's cell phone. These text messages were the defendant's private papers and stored within it. The defendant could only read or write messages stored within his phone. The detective was examining the contents of the defendant's private messages from the outside using technology of online impersonation.

In scenario (1), detectives placed an ad online. By placing the ad, the detective was endeavoring to intercept private communications sent to the fictitious female. In scenario (2) the detective had a parent sign a "Consent to Assume Online Identity" form, then turn over the child's phone and electronic devices to be used by the officer(s). By having a parent sign the form, the detective was endeavoring to intercept private communications sent to the child. Not only is unauthorized interception a crime, but also any "endeavor to intercept," 18 U.S. Code § 2511(1)(a). This is the first crime committed with almost no exceptions.

**2. Meaning of *Person***

An impostor or impersonator is not a lawful *person* under ECPA, 18 U.S. Code § 2510(6). The exception to the criminal statute states that it is not unlawful to intercept wire or electronic

communications "where such person is a party to the communication or where one of the parties to the communication has given prior consent to the interception," 18 U.S. Code § 2511(2)(c) and (d). A regular *person* and a *person* acting under color of law are bound by the same statutory verbiage that prohibits impersonation. Proper procedures are documented in the Department of Justice, DOJ Office of Justice Programs, National Institute of Justice *Report on Investigations Involving the Internet and Computer Networks.*[9]

In scenario (2) where the officer takes over a child's phone, the child is no longer party to the communications. It is the adult officer who intercepts all text messages sent to the child. All messages sent by the officer using the child's phone to the suspect is evidence manufactured by the officer and planted into the electronic conversation. This may even be documented on the arrest warrant.

In scenario (1) where the officer created an imaginary female (or male) character, the female was not party to the conversation and could not consent to the interception. The detective was an impostor and did not meet the legal definition of *person,* so he was not a lawful person party to the conversation. The defendant was the only lawful *person* party to the conversation. The defendant did not consent to his communications being intercepted by the detective. Therefore, the detective intercepted private electronic communications of the defendant in violation of 18 U.S. Code § 2511(1)(a). The defendant's Fourth Amendment rights were violated. Most state statutes prohibit impersonation and mirror the federal law, like Virginia. When *Virginia v. Pick* was appealed, the Virginia justices cherry-picked the words of the Virginia statute to get the result they wanted in their ruling regarding Officer Payne impersonating his character "Lilly" on Omegle:

> Hence, Payne was a "person party to the communication[s]." Code §19.2-62(B)(2). As such, he was protected by the consent exception and therefore did not criminally violate Code §19.2-62(A) by recording the contents of the Omegle chats.

A *person* has one birth certificate. The detective's imaginary character is brought to life with person pictured and one or more officers acting the part of the female through texting or even phone calls. This totals two or more birth certificates. The legal definition of *person* is not a composite of multiple humans formed to give the illusion of one human. Black's Law Dictionary, 9th ed. gives several definitions relevant to this case:

- **person** - *a human being or the living body of a human being;*
- **impersonate** - *the act of impersonating someone;*
- **impostor** - *one who pretends to be someone else to deceive others;*
- **persona** - *an individual human being.*

---

[9] DOJ, National Institute of Justice. *Report on Investigations Involving the Internet and Computer Networks* (January, 2007) *at 24-25, 75.*

The character is not a *person* with rights, but a *thing* created and animated by the detective. Law enforcement cannot use *things* to intercept private communications without a warrant. Precise definition is of such importance that, "Even trained lawyers may find it necessary to consult legal dictionaries," *Rose v. Locke*, 423 U.S. 48 (1975). The one and only flesh-and-blood *person* and true legal party to the conversation was the defendant, and he did not consent to any interception.

ECPA uses the term *person* to define who has rights and can be "a party to the communications." Both federal and state statutes refer to *"a person"* singular, *"such person" (not "such people"), and "is a party"* (not *"are parties").* Impersonation violates the meaning of a singular person being a party to a conversation, so impersonation violates this statute. Nowhere does this statute refer to animated characters. Animated characters cannot give legal consent to anything.

The officers' impersonation of a female is not a real child by any standard. The U.S. Supreme Court ruled that statutes can only be applied to images of "real" children. The provision that an image "is, or appears to be, of a minor" was ruled overbroad and may not even indicate exploitation of real children, *Ashcroft v. Free Speech Coalition*, 122 S. Ct. 1389 (2002). This statutory or Common Law crime is restricted to actual minors. There is no indication that the person pictured is actually a minor. 1 U.S. Code § 8 states, "the words 'person', 'human being', 'child', and 'individual', shall include every member of the species homo sapiens who is born alive and at any stage of development." The detective's impersonation of the female is not a real child by any standard. Unbeknownst to Congress, the Sentencing Commission changed the meaning of "minor" victims of sex crimes to include fictitious characters and adults impersonating a child.[10] The criminal code remains unchanged, but now it is intentionally misinterpreted according to the Sentencing Commission guidelines. This should be re-examined since the Supreme Court overturned the Chevron Doctrine, *Loper Bright Enterprise v. Raimondo*, 603 U.S. __ (2024).

In *U.S. v. George*, No. 19-4125 (4th Cir. 2020), the court held that the definition of "person" includes those living and deceased. Nowhere does the definition of "person" include impostors or impersonators. The female pictured was alive. Therefore, the interception of private communications sent to her was unlawful.

**3. Electronic Surveillance without a Warrant**

In 1981, President Reagan signed Executive Order 12333, EO-12333. This is a governing authority cited in the "Attorney General's Guidelines for Domestic FBI Operations" and the

[10] Sentencing Commission Amendment # 664, November 1, 2004

"Domestic Investigations and Operations Guide for the FBI" available on their website.[11] EO-12333 defines "electronic surveillance" as:

> ***Electronic Surveillance*** *means acquisition of a nonpublic communication by electronic means without the consent of a person who is a party to an electronic communication or, in the case of a nonelectronic communication, without the consent of a person who is* ***visibly present*** *at the place of communication, ...* Executive Order 12333, *United States Intelligence Activities* (1981) *at 15, sec. 3.5(c).* (emphasis added)

The meaning of *person* comes from 1 U.S. Code § 8, "every infant member of the species homo sapiens who is born alive and at any state of development." The term *"a person"* is singular, meaning one human.

Though derivative laws, a *person* must be capable of satisfying the *visibly present* criteria in order to be a lawful party to an electronic communication, 18 U.S. Code § 2511(2)(d). The *"visibly present"* criteria thereby prohibit impostors and characters animated by others. This criterion is critical to differentiate between an officer wearing a disguise (which is legal), and an officer unlawfully impersonating someone else. An officer wearing a disguise can be visibly present for an oral conversation to make a drug deal, therefore the disguised officer can be a lawful party to private electronic communications arranging the drug deal, *Sorrells v. United States*, 287 U.S. 435 (1932). Here, the detective does not wear a disguise – he impersonated the female pictured. The person pictured plus the detective(s) equals two or more people, which does not satisfy the definition of *"a person."* So, the detective is conducting electronic surveillance without a warrant, 50 U.S. Code § 1801(f)(3).

EO-12333 influenced the wording of the Electronic Communications and Privacy Act of 1986 (ECPA). The EO-12333 phrase, *"a person who is a party to an electronic communication"* is reflected in federal code, *"where such person is a party to the communication,"* 18 U.S. Code §§ 2511(1)(c) and 2511(1)(d). ECPA afforded electronic communications the same privacy protections as phone calls. If Congress intended to grant law enforcement authority to impersonate someone else in this way, it would have expressly stated it.

Sampling of other cases to examine:

1. *New Mexico v. Mahmoud Telfah*, NMDOJ # 202410-00186 with Det. Joshua Dennison.
2. *U.S. v. Andres Cabezas*, M.D.FL. Case No 6:17-cr-00148-PGB-TBS, with FBI SA Rodney Hyre.
3. *U.S. v Jason Hihn*, E.D.VA. Case No 1:21-mj-00222-JFA (I believe that is the correct case number) with FBI Agent Schur.
4. *Colorado v. Allen Bright, Colorado v. Avery Wood, Colorado v. Frank Behnke, and Colorado v. Michael Houchins*, all with Det. Marc Ramey

[11] *FBI Domestic Investigations and Operations Guide (DIOG)*. (2011). FBI. https://vault.fbi.gov/FBI%20Domestic%20Investigations%20and%20Operations%20Guide%20%28DIOG%29

5. *U.S. v. Chip Hollingsworth.* E.D.N.C. Case No. 5:29-cr-231-1FL with FBI Agent Tyson J. Hanish, Prosecutor Jake Pugh, and Judge Louise Flanagan.

**4. Sixth Amendment Violated**

The Sixth Amendment guarantees a defendant the right "to be confronted with the witnesses against him." This cannot happen when the "victim" or true witness, i.e. the "child," either does not exist as in scenario (1), or the child being impersonated by an adult officer as in scenario (2). The online "child" is animated by the detective. The defendant's Sixth Amendment rights were violated.

**5. Illegal use of 180-day Stored Communication Criteria**

In *Virginia v. Pick*, the prosecutor, Assistant Attorney General Alexandra Williams, apparently sent an order to Snapchat to preserve Pick's communications. This order was not included in the Discovery but it was referenced in Snapchat's replies. Communications stored 180 days or fewer have the highest level of protection under ECPA.[12] Obtaining these private, electronic communications from Snapchat requires a court authorization to intercept. However, AAG Williams could not get authorization because Pick's crime was not one included on the list of crimes where the Court could grant it. So, AAG Williams waited over 180 days before issuing a written statement certifying that the information is relevant to an investigation. But, 18 U.S. Code § 2703(a) only applies if the communications were never read and were abandoned. Pick read all his messages. Therefore, these communications were illegally intercepted by AAG Williams, then disclosed in a motion filed in court and used to prosecute Pick.

**B. COUNT TWO – Disclosing and Using**

The illegally intercepted conversations are disclosed to the Court and used on the application for the arrest warrant of the defendant and on the applications for the search warrant of the defendant's home. The intercepted conversations are disclosed to the grand jury and used an indictment. The conversations are disclosed to the press and used to publicly disgrace the defendant and to get good publicity for the agency handing the investigation.

Disclosing or using these illegally intercepted violates 18 U.S. Code §§ 2511(1)(c) and 2511(1)(d). It is also considered "fruit of the poisonous tree," *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 (1920) and *Wong Sun v. United States,* 371 U.S. 471 (1963). Using any evidence from illegally intercepted communications in any proceeding or any evidence derived therefrom, is prohibited, 18 U.S. Code § 2515. This statute covers wire and oral communications. Courts have ruled that *wire* communications include, *inter alia,* telephone conversations, *Rassoull v. Maximus, Inc.* 209 F.R.D. 372 (D. Md. 2002); cellular telephones, *U.S. v. Carr*, 805 F. Supp. 1266

[12] DOJ, National Institute of Justice. *Report on Investigations Involving the Internet and Computer Networks* (January, 2007) at 80 ¶4 and 81 ¶2.

(E.D.N.C. 1992); and text messages, *Sharpe v. State*, 350 P.3d 388, 391 (Nev. 2015). Therefore, the defendant's text messages sent from his cell phone are covered by this statute.

Even if the interception occurred beyond the statute of limitations (typically 5 years), these illegally intercepted communications are still being disclosed and used against the defendant. The defendant may still be incarcerated with some sentenced to over 35 years in prison for texting an animated character, not a real child. This is excessive punishment violating his rights under the Eighth Amendment. The defendant's home and property may have been confiscated and sold. The defendant still has a felony on his record and may still be on the sex offender registry. Their professional licenses have been revoked and cannot be reinstated with the felony or because the defendant is on the registry.

Being on the sex offender registry inhibits their ability to go to college, get a job, live near a school daycare center, or obtain subsidized housing. It is used in the civil courts to take away custody of their children or cause their spouse to divorce him. Investment companies refuse to do business with them and cash out all the defendant's investments. The defendants spent tens of thousands on defense attorneys, then they lose their ability to earn income while out on bond awaiting trial, while incarcerated, or on the registry. Many lost their homes, their businesses, and their profession. Their reputation is in shambles. About 5% have committed suicide, based on a small sampling in Washington state.

**C. COUNT THREE – Identity Theft**

ICAC officers use photos of young, attractive adults in their sting operations. Sometimes an officer just grabs a PG-rated photo from a legal website advertising adult porn. Normally, it is a person employed by law enforcement in some fashion and asked to be a model, such as the police secretary or a cadet. The model signs a "Consent to Use Picture" form, such as the one signed by Kellie Whitehouse on September 12, 2024, for the Albuquerque Police Department. No where on this form does it authorize others to impersonate her online. No where on this form does it authorize police to intercept private electronic communications sent to her. Even if she authorized law enforcement to intercept her private conversations, both state and federal law require that she is the one who is party to the communications and she is doing the conversing, not an impostor.

For example, Ms. Vega was a cadet in Richmond, VA around 2007. Ten years later, Det. Troy Payne of the Hanover County Police Department near Richmond used this 2008 photo to create his character "Lilly", *Virginia v. Pick*. Payne's sting operation with "Lilly" nabbed Ryan Pick a hundred miles away in Prince William County, VA, where Officer Vega now worked. The audio recording of the arrest shows that Prince William County police recognized "Lilly" as the woman in their office. Ms. Vega quit the police force just a few weeks later. I presented the photos to her, and she claimed a bit too vehemently that the photo of "Lilly" was not her. Officer Payne

testified that "Lilly" was a geo-morph, or computer-generated image. Such geo-morph technology did not exist in 2008. Did Officer Payne tell the truth in his testimony, or did he violate 18 U.S. Code § 1621 – perjury?



"Lilly", 2008




Officer Yesli Vega, 2018

Identity theft is another way in which law enforcement actions are far from simple investigative techniques, but a serious violation of law. "Whoever … knowingly … uses, without lawful authority, a means of identification of another person … in connection with, any unlawful activity" violates 18 U.S. Code § 1028(a)(7). A photo is a "means of identification" showing unique physical characteristics of a person, *see* 18 U.S. Code §§ 1028(a)(7) and 1028(d)(7)(B), which is why there is a photo on driver's licenses and passports. The detective's MALE physical attributes do not match the female pictured. The detective procured the female's "means of identification" solely to use on the dating site so he could intercept communications of others and induce people to commit a crime. The detective assigned the character traits to the female pictured, not to himself. The defendant's replies, intended for the female pictured, were intercepted by the detective and used to further the conversation.

**D. COUNT FOUR – Entrapment**

I spoke with Josiah who was trafficked online starting at age 11. None of the websites he listed where real children are actually trafficked seem to be used by law enforcement. Sting operations do not occur in a Disney chatroom or a "boy love" website. Instead, the profile created are for an adult female (or male) on an adult-only dating website.

The defendant answered an advertisement for an adult. Then, the detective does a bait-and-switch, claiming to be around 15-years-old. Control and animation of the character is done by the detective who lured, seduced, and enticed the defendant. The defendant then engages in leud conversion, agrees to meet the fake child, and/or sends an image of their private parts. The prosecution does not show that the defendant had any predisposition or premeditation to commit the crime. The detectives' actions appear to be in violation of Title 18 U.S. Code § 373 the Solicitation to Commit a Crime of Violence Act and in Violation of Title 18 U.S. Code § 2422

the Coercion and Enticement Act and in Violation of the Federal Elements of Entrapment from the United States Department of Justice Archives Manual Criminal Resource Manual Section 645.

This form of entrapment is strictly prohibited. The Ninth Circuit overturned the conviction of Poehlman because the agent's conduct constituted entrapment, *U.S. v. Poehlman*, 217 F.3d 692 (9th Cir. 2000). The ruling states, "Prior to his unfortunate encounter with Sharon, he [Poehlman] was on a quest for an adult relationship with a woman who would understand and accept his proclivities, which did not include sex with children."

**E. COUNT FIVE – Illegal use of a Pen Register / Trap and Trace Device**

Typically, officers unmask the suspect's identity without a warrant, even if the suspect later drives to a location to meet the fake child. Dating apps and other private chat applications protect the privacy of their customers by hiding their true identity and geographic location, including their IP address. Officers have devised tactics to obtain this information without the necessary pen register / trap and trace warrant.

The suspect's identity is unmasked by obtaining their underlying IP address, then officers use that IP address to submit a series of administrative subpoenas to obtain the identity of the suspect. One technique is for an officer to transmit the female's photo to the suspect through Dropbox instead of sending it in a text message. Dropbox is used because once the suspect removes the photo from the officer's Dropbox, the IP address of the suspect is available to the officer through Dropbox. The officer is using Dropbox as a pen register / trap and trace device specifically to obtain the suspect's IP address without a warrant. Other times the officer asks the suspect for their phone number, email, or other account name. The suspect provides this information in chat which is illegally intercepted by the officer. Sometimes the ad lists a phone number which is attached to the officer's phone. Anyone texting the female will have their telephone number displayed in caller ID on the officer's phone when the officer had no warrant to get this information. Note, if it was the female's personal phone that received the text, then the caller ID would be considered ordinary and not considered illegally intercepted information. Sometimes one main police phone number is used in the ads. Then the collected phone numbers are distributed to other officers who return the call with their own number, *U.S. v. Baker*, 2022R00405 – CR 22-102-BLG-DLC (MT).

Pen register / trap and trace law protect the privacy of addresses and routing information. 18 U.S. Code §§ 3127(3) and 3127(4). A pen register is any process which records dialing information transmitted by an instrument from which an electronic communication (text message) is transmitted. A trap and trace device is similar, just for a message going the other direction. An email address is an address. An IP address is an address. In addition, an IP address shows one of the points on a route an email takes while enroute from one computer to another.

**F. COUNT SIX – Falsifying Evidence**

All text messages sent by the supposed child are actually manufactured and typed in by the adult officer. Sometimes another officer is brought in to be the voice actor on a recorded phone call. These manufactured text messages and phone calls are then captured both on the officer's devices and the defendant's devices. These texts and replies sent by the defendant are the core evidence presented, violating 18 U.S. Code § 1519 Falsifying evidence and the defendant right to due process guaranteed by the Fifth and Fourteenth Amendment. It also violates 18 U.S. Code § 242 Deprivation of rights under color of law.

**G. COUNT SEVEN – Destruction of Evidence**

In several cases, the text messages exchanged were altered or deleted. In *Virginia v. Einuis,* text messages were deleted, but Det. Boffi claimed it was an accident. Since Einuis could not remember what was in the deleted text messages, it was ruled to be harmless error. In *Virginia v. Christopher Hawthorne*, Stafford County Case No. CR16000383, Det. Darryl Wells released Hawthorne's computer from evidence and returned it to Hawthorne's employer without notifying the defense. Hawthorne had hired a digital forensic expert to examine the computer and his attorney wrote several letters demanding the computer. After the device was released from evidence, Assistant Commonwealth's Attorney Ryan C. Frank wrote a letter claiming the computer was "still being analyzed by the Sheriff's Office."

Prosecution seems to intentionally delay providing Discovery to the defense so it is longer than 180 days. The 180-day point is critical because service providers typically only keep text messages for 180 days due to the provision of 18 U.S. Code § 2701. This provision states that unread messages or emails kept longer than 180 days are abandoned, requiring only a written statement certifying that the information is relevant to an investigation. By providing the Discovery after 180 days, the defendant cannot subpoena their own service provider for a true copy of the text messages because they are deleted. The Prosecution uses the weapon of time to destroy evidence beneficial to the defendant.

In addition, the FBI refuses to investigate any crimes committed by officers until the case had been adjudicated. The appeals process takes years. Those illegally arrested sit in prison for years. By that time, the statute of limitations kicks in and the officers are off the hook, while those falsely arrested rot in prison.

**H. COUNT EIGHT – Extortion**

Even if the attorney submits a motion to suppress arguing evidence was illegally obtained, it is only heard by the judge in the motions hearing days before trial. No county judge will stick their neck out and overturn years of erroneous precedence, let alone arrest their own officers and the county prosecutor for criminal ECPA violations. So, the jury is not informed evidence was

illegally obtained using impersonation. This results in about 95-98% of all defendants signing a plea deal. In a typical plea deal, the defendant waives their right to appeal and waives their right to be pardoned. Defendants are threatened with significantly more jail time if they go to trial, such as Stephen Kilpatrick who went to trail and got 35 years in prison, *Virginia v. Kilpatrick,* Bedford County, VA Case No CR19000024-00-07.

Interviewing Mr. Einuis, he said that Det. Boffi threatened him with additional charges if he posted bond so he would be continually re-arrested and lose his savings. These threats were made in the jail corridor outside of camera view. Det. Boffi managed to override the jail psychologist and declare that Mr. Einuis was suicidal. Mr. Einuis was placed in a special cell, naked, for days with nothing but a rough blanket and no contact with his attorney or access to phone calls. Einuis told his attorney that Det. Boffi should not be able to impersonate someone else and use their phone. His attorney replied that officers do it all the time, so it has to be legal.

**I. COUNT NINE – Fraud**

Online sting operations typically feature undercover officers trolling on dating sites, impersonating someone else, and using their phone (tablets or computers) without a warrant. Many sites have user agreements expressly prohibiting this practice. Federal policy requires that software shall be properly acquired and licensed, but violating the user agreement also violates the licensing agreement. Detectives do not produce any written permission or cooperative agreement signed by application's legal counsel for the express purpose of conducting said online internet undercover sting operation. Violating the user agreement also violates Title 18 U.S. Code § 1030 the Federal Computer Fraud and Abuse Act. For example, Snapchat,[13] Instagram,[14] TikTok,[15] iCloud,[16] and Gmail[17] do not allow anyone else using the user's account and do not allow impostors. Dating apps like Skip the Games or Grindr strictly prohibit impersonation, illegal activities like pimping children, and government sting operations. Grindr's User Agreement is typical and it states:

- *You must be a legal adult. You hereby affirm and warrant that you are currently eighteen (18) years of age or over (twenty-one (21) years in places where eighteen (18) years is not the age of majority) and you are capable of lawfully entering into and performing all the obligations set forth in this agreement.*[18]

---

[13] *Snap Inc. Terms of Service - Snap Inc.* (n.d.). Snap.com. https://snap.com/en-US/terms
[14] Instagram. (2023). *Terms of Use | Instagram Help Center*. Instagram.com. https://help.instagram.com/581066165581870
[15] TikTok. (2019, February). *Terms Of Service | TikTok*. Www.tiktok.com. https://www.tiktok.com/legal/page/us/terms-of-service/en
[16] *Legal - iCloud - Apple*. (n.d.). Apple Legal. https://www.apple.com/legal/internet-services/icloud/
[17] *Google Terms of Service – Privacy & Terms – Google*. (2009). Google.com; Privacy & Terms – Google. https://policies.google.com/terms?hl=en-US
[18] Grindr's User Agreement, July 1, 2018, *at 2 sec. 1.2.*

- *You will NOT impersonate any person or entity, falsely*[19]
- *Government End Users. The Grindr Services are intended for the use by individuals, not government entities.... Otherwise, nothing in this Agreement or otherwise will give a government user rights to the Grindr Services broader than those set forth in this Agreement.*[20]

A *user* is defined in federal criminal code as a person "who uses an electronic communication service; and is duly authorized by the provider to engage such use." 18 U.S. Code § 2510 (13). Since the detective violated the user agreement, he was not duly authorized to use the dating app and is an illegal user under criminal code.

Phones are not considered interception devices, if, and only if, they are used in the ordinary course of business, 18 U.S. Code § 2510(a). Conducting an undercover operation while impersonating someone else online is not in the ordinary course of business. Because the detective had no warrant and did not use the site in the "ordinary course of business," the phone / electronic device became an interception device to obtain communication content, 18 U.S. Code § 2510(5)(a).

When an officer violates the user agreement of a commercially available product like a dating app, this also violates Federal Acquisition Regulations, FAR. The officer did not comply with government regulations including FAR 12.212(a) (1995), FAR 52.227-19, or FAR 52.227-14 (ALT III). When it is not disclosed in discovery provided to the Defense that the officer violated federal regulations, this can be considered a Giglio violation which is an extension of the Brady violation, *Giglio v. United States*, 405 U.S. 150 (1972).

**J. COUNT TEN – RICO**

These illegal sting operations are financially beneficial the officers and the law enforcement department running the operations. These operations and the grants to fund them have had the blessings of those at the highest level of government. In 1998, the newly elected Sheriff Michael Brown founded ICAC in Bedford, VA with DOJ grants from Janet Reno. He had not lived in Virginia for 30 years but was a DOJ contractor in the Caribbean. He registered to vote in Virginia the day after he submitted his name to run for sheriff. He soon reported "780 cases have been perfected". ICAC's first action was to lobby Virginia's General Assembly in 1998 to define new crimes for soliciting a minor online and to increase the severity of possession of child porn from a low-level misdemeanor to a felony. It passed in 1999.[21] In 2000, Republican Sheriff Brown received a federal appointment from the Clinton administration to train ICAC officers across the

---

[19] Grindr's User Agreement, July 1, 2018, *at 5 sec. 8.3.7.*
[20] Grindr's User Agreement, July 1, 2018, *at 12 sec. 15.8.*
[21] Burkhardt, B. (2024). *Manufacturing Criminal, 2nd Edition - Wiretapping and Planting Evidence.* Chapter 12.

country, after 3 years of local law enforcement.[22] ECPA was passed twelve years earlier in 1986, so there is no excuse for ICAC ignoring ECPA law when developing tactics and procedures.

When manufacturing criminals online, only the suspect's IP address or account name is available and their true identity is not known. The suspect's name and address must be obtained to arrest them. Hank Asher was a former Caribbean drug runner who founded The Last One, TLO. TLO is a huge data mining company to allow officers to unmask the identity of suspects.[23] The Pen Register / Trap and Trace law requires a warrant to unmask the identity of a suspect, 18 U.S. Code § 3121. Officers submit administrative subpoenas with an IP address or account name to service providers, claiming authority under 18 U.S. Code § 2703(c). However, this depends on reversing the wording of the law and intentionally misinterpreting it. Administrative subpoenas are only allowed when the officer provides the identity of the subscriber, then the service provider will return their IP address or account name. National Center for Missing and Exploited Children, NCMEC, added the Cyber Tipline program in 1998. Its primary focus appears to be correlating hash codes to content so emails or file transfers could be wiretapped and flagged automatically for law enforcement. This is done without a warrant.

I have tracked money coming from multiple sources:

1. DOJ Federal ICAC grants totaling about $1,000,000,000 since 1998.[24] [25] [26] However, DataRepublican.com lists $64,271,406 of new funding.[27]
2. DOJ SMART grants, Sex Offender Sentencing, Monitoring, Apprehending, Registering and Tracking. These grants are spent to maintain the Sex Offender Registry and monitor those on it. By manufacturing criminals, they are illegally placing men on this registry after their release to get SMART grant money. Between 2021 and 2025, "SMART" grants totaled $64,257,428.[28]
3. State ICAC grants. This probably matches the federal grant amount. Cases like *Virginia v. Pick* are touted in ICAC's annual report to the state legislature to justify getting more state grants.
4. State funds to house prisoners in local jails. For example, Virginia pays the local jails about $130 per day per inmate to house them. County judges deny bond to hold the

---

[22] Burkhardt, B. (2024). *Manufacturing Criminal, 2nd Edition - Wiretapping and Planting Evidence*. Chapter 1, 33-34.
[23] Burkhardt, B. (2024). *Manufacturing Criminal, 2nd Edition - Wiretapping and Planting Evidence*. Chapter 14.
[24] DOJ, OJJDP (Office of Juvenile Justice and Delinquency Prevention). *Internet Crimes Against Children Task Force*. https://ojjdp.ojp.gov/programs/internet-crimes-against-children-task-force-program Accessed August 31, 2020.
[25] 34 U.S. Code § 21117
[26] Awards: List of Funded Projects | Office of Juvenile Justice and Delinquency Prevention (ojp.gov)
[27] *Government grant award search*. (2024). DataRepublican. https://datarepublican.com/award_search/?keywords=icac
[28] *Tableau*. (2025). Usdoj.gov. https://charts.ojp.usdoj.gov/t/public/views/OJPAwardsDashboardallFiscalYears/AwardsByStateAndCity?%3Aembed=y&%3Aiid=2&%3AisGuestRedirectFromVizportal=y

suspect until they sign a plea deal or have a trial. Then the convicted person is shipped to prison. So, each suspect is held in the county jail about 2 years to rake in $100,000.

5. Local grants
6. Donations[29] [30] [31]

Stafford County Sherriff's Department in Virginia hired a contractor, Det. Daryl Wells, to run these sting operations and pack the jail. Det. Wells used his imaginary person "Heather Boon" in 2001 with *Hix v. Commonwealth,* 042717 (Va. 2005) through 2014 with *Virginia v. Hawthorne.* Interviewing Hawthorne, he said Det. Wells packed the 80-bed wing of the Stafford County Jail with about 120 inmates, so about 40 inmates had to sleep on the floor of the jail cells. It is estimated that Stafford County received:

$130 per day * 365 days per year * 120 men = $5,644,000 paid to the jail per year.

For the 20-year period when Det. Wells worked for Stafford, that amounts to over $100,000,000 sent to Stafford by the Commonwealth of Virginia. Even when you take out the cost of running the jails, this more than covers the $36 million needed to build the new public safety center in 2006[32] which houses the new sheriff's office. Jon-Paul Snyder was one of the men arrested in these illegal sting operations, and since committed suicide. So, this Stafford County building appears to have been paid for with blood money.

Any organization engaged in criminal activity to get money is called racketeering, 18 U.S. Code § 1962. Racketeering activity means *"(A) any act or threat involving ... extortion ... which is chargeable under State law and punishable by imprisonment for more than one year;"* 18 U.S. Code § 1961(1). "Interstate commerce" includes communications and intrastate use of a telephone, 15 U.S. Code § 78c(a)(17). The critical evidence is text messages exchanged using a telephone. ICAC is a nationwide organization with 61 branches and thousands of officers who have worked for ICAC. Does this violate RICO, 18 U.S. Code §§ 1961-1968?

Officers filed papers with the court or filled out electronic forms to obtain grant money without disclosing that the funds would be used to illegally impersonate other people and illegally intercept communications intended for them. These activities may also violate 18 U.S. Code §§

---

[29] *Exploring Cloud Forensics in Child Exploitation Cases*. (2025, February 4). Zero Abuse Project. https://zeroabuseproject.org/for-professionals/icac-training-technology/

[30] *ContentKeeper Content Filtering*. (2025). Greenvillesheriffsfoundation.org. https://greenvillesheriffsfoundation.org/greenville-county-sheriffs-office-i-c-a-c-unit-receives-90000-donation/

[31] *Washington Internet Crimes Against Children (ICAC) Task Force | Seattle Police Foundation*. (2022). Seattle Police Foundation. https://seattlepolicefoundation.org/internet-crimes-against-children/

[32] *Stafford County Awards Northrop Grumman Public Safety Building Contract*. (n.d.). Northrop Grumman Newsroom. https://news.northropgrumman.com/news/releases/stafford-county-awards-northrop-grumman-public-safety-building-contract

287 (false claims), 371 (conspiracy), 1001 (false statements), 1341 (mail fraud) and 1343 (wire fraud).

**K. COUNT ELEVEN – Involuntary Manslaughter**

Numerous defendants have committed suicide because their lives were ruined by these manufactured crimes, illegal arrests and prosecution. It is estimated by member of Concerned Citizens Against Government Entrapment, CAGE, in Washington state that about 5% of all young men arrested there commit suicide. Applying that same percentage to the estimated 180,000 people illegally prosecuted by ICAC, that totals about 9,000 suicides.[33] Causing someone to commit suicide can be considered involuntary manslaughter, 18 U.S. Code § 1112(a). This includes Jon Paul Snyder from Virginia and 8 names from Washington state from NetNanny stings. Jon Paul was still alive when I listed him in one of my reports to Virginia AG Herring's office, yet the AG's office did nothing.

**L. COUNT TWELVE – Electronic Warfare**

Signals received by a cell phone are electronic magnetic (EM) spectrum signals (EMS). Signals transmitted over an internet wire connected to a computer are EMS signals as well. Military and intelligence personnel may transmit a signal or send communications to better surveil the target. This is only allowable if the target treats it as background ambient noise (e.g. shining a flashlight, radar, sonar, or spam email). When a deceptive transmission leads the target to react in a manner detrimental to itself, however, the transmission has crossed the ambient noise threshold and is now considered an act of electronic warfare (EW). *See* Joint Publication 3-13.1 *Electronic Warfare (2012), Appendix 7.* This was explained in detail in my amicus brief filed *pro se* with permission of the Appellate Court of Virgina in Achin's appeal, pp. 23-25 (CAV Record No. 1950-19-4), and in Pick's appeal, pp. 29-31 (CAV record No. 1945-19-2).

In *Virginia v. Achin*, Bauer sent communications to Achin, masked to look like it came from a trusted source, "Alex VA." Bauer transmitted a deceptive message with a picture of someone else (using an EMS signal) to Achin's electronic device (launching an electronic warfare attack). Achin answered this communication in a manner ultimately detrimental to himself. He was arrested. Bauer's electronic warfare attack was successfully carried out.

Using electronic communications in this manner crosses the line of legitimate police investigative work. The first line crossed was from legal police work to criminal electronic surveillance without a warrant. This involves intercepting Achin's communications that he sent. However, officers went beyond listening to actively participated in the conversation while impersonating someone else which caused Achin to respond. When officers impersonate and

---

[33] Burkhardt, B. (2024). *Manufacturing Criminal, 2nd Edition - Wiretapping and Planting Evidence*. Chapter 34.

use EMS communications signals to evoke a response, it crosses the second line: from criminal electronic surveillance into the realm of electronic warfare against a United States citizen.

**M. COUNT THIRTEEN – Misprision**

Misprision is the crime of not reporting a serious crime, 18 U.S. Code § 4. This reporting can be made "to some judge or other person in civil or military authority under the United States". Those receiving the report are then obligated to do something about it. I have filed dozens of reports, but no one has done anything to investigate or prosecute these crimes. After being notified, officials intentionally refused to investigate. This prevents their colleagues from being arrested and prosecuted, which violates 18 U.S. Code § 3 Accessory after the fact. Here is a summary of the complaints I have filed:

Federal:

1. Letter to Hon. Judge Karen Schreier prior to sentencing Mr. Paulson, U.S. District Court, SD. 2023-08-03. Clayton John Paulson, Case No. 21-50134
2. whistleblower@judiciary-rep.senate.gov - 2018-05-25
3. whistleblower@finance.senate.gov – 2020-05-14
4. whistleblower@judiciary-rep.senate.gov – 2020-05-14
5. info@osg.gov – 2020-05-16
6. Cigie.information@cigie.gov - 2020-05-16
7. GAO FraudNet – 2020-05-11 (COMP-20-000925)
8. Sen. Lindsey Graham – 2020-05-14
9. FBI complaints – 2017-09-26, 2017-10-24, 2017-10-26, 2018-06-08, 2018-09-21, 2018-10-07, 2018-11-26, 2019-02-07 (received a receipt), 2019-07-31, 2019-08-16, 2021-03-20
10. FBI interview with SA Amanda Fung – 2019-10-17
11. Letters to SA Amanda Fung – 2019-11-20, 2019-03-24, 2020-04-09, 2021-11-1
12. Emails to federal Prosecutor Brianna Edgar USDOJ.gov – 2019-04-07

Virginia:

13. I filed an amicus brief *pro se* with the Appellate Court of Virginia for *Virginia v. Achin*, CAV Record No. 1950-19-4.
14. I filed an amicus brief *pro se* with the Appellate Court of Virginia for *Virginia v. Pick*, CAV record No. 1945-19-2.
15. Virginia Delegate Dave Albo, Chair of Judicial Committee 2017-07-10
16. Virginia AG Mark Herring, 2017-07-21, 2017-09-26, 2017-09-26, 2018-08-06, 2018-09-30, 2018-11-22, 2018-11-28, 2019-02-07, 2019-09-08, 2020-09-20,
17. Virginia AG Jason Miyares - phone call in January, 2021, 2022-05-30
18. Virginia OSIG 2022-05-31
19. Loudoun County, Virginia – 2020-07-20
20. Speech to the Fairfax County Supervisors 2020-07-22

21. Stafford County meeting on 2018-04-18 with Maj. Lenhart including an inch-thick binder of documentation regarding *Virginia v. Christopher Hawthorne,* Stafford County No CR16000383. Audio recording is available.
22. Virginia State Police meeting on 2019-02-04. Audio recording is available.
23. Numerous fliers, emails, and speeches to Virginia Delegates and Senators.

Other states:

24. Other state AGs across the country - 2022-06-17
25. Jefferson County Circuit Court of New York requesting permission to submit an amicus curiae analysis of the case, *New York v. St. Pierre*, Jefferson County Case No. D311-11076123. The analysis would explain why I believed "[t]here were about 51 federal crimes, 7 New York felonies, and 6 misdemeanors committed by officers and government officials."

Publications:

26. Book: Manufacturing Criminals, Fourth Amendment Decay in the Electronic Age, December, 2020.
27. Book: Manufacturing Criminals, 2nd Edition – Wiretapping and Planting Evidence, March, 2024.

**N. COUNT THIRTEEN – Denying Access to the Grand Jury**

Since no one was acting on my complaints, I tried to appear before the Fairfax County, VA grand jury to present evidence of this criminal activity. I tried to file a petition to the Grand Jury to present evidence of ECPA crimes committed by Fairfax County governmental employees, 2021-02-25. My petition and briefs gave great detail on the Common Law right of a citizen to present evidence of the grand jury. This dates back to Colonial Virginia and was recently affirmed in 2011 in Winchester City, VA. The Clerk consulted with the Chief Judge and denied my request without taking any action to investigate the crimes I wanted to report. This turned into two civil suits against the Chief Judges. Even the Virginia Supreme Court would not allow me access to the grand jury, *Burkhardt v. Penney Azcarate, Chief Judge*, Virginia Supreme Court Record No. 230875 (2024). The ruling was that I could not sue a judge and there was no statute stating I could appear before a grand jury, even though it was allowed in another Virginia Circuit. None of the judges hearing my plea took any action to investigate the crimes or to stop the ongoing criminal activity by government officials.

The Constitution and Bill of Rights have two provision to prevent our government from degrading into a tyranny. The Second Amendment gives citizens the right to keep and bear arms. The other is the grand jury. The responsibilities of the grand jury vary slightly by state, but in general the grand jury is considered the Fourth Branch of government to be a watchdog over the other three branches. The grand jury is responsible to check all indictments to prevent frivolous arrests and prosecutions. Its other responsibility is (using Virginia as an example):

*(2) To investigate and report on any condition that involves or tends to promote criminal activity, either in the community or by any governmental authority, agency, or official therefrom."* Va. Code § 19.2-191(2).

Around 1940, the power of the grand jury began to be whittled away. Federal court rules now require a citizen to notify a federal prosecutor of their complaint, then the federal prosecutor will advise the grand jury about the citizen's complaint. I have sent a letter to a federal prosecutor advising them of this criminal activity, and heard nothing in return. Judges and federal prosecutors have now positioned themselves to be gatekeepers for the grand jury and prevent citizen access. The grand jury is now just a rubber stamp for the prosecutor.

## V. UNINTENDED CONSEQUENCES

If Courts continue to rule that these tactics are legal without a warrant, then anyone can grab someone else's picture off the internet, post the picture on a dating website, pimp them, and animate them by exchanging texts as if they were the person picture. The person shown in the image may be real, partially real, an animated character, or even a judge's family member. Anyone can then combine multiple images, voice, and texting to animate life-like images that speak and text. The animated character's likeness and voice could be mimicked to intercept communications. These characters would now be lawful parties to any communication. The animated character could intercept private communications intended for the person pictured, a legal impossibility under current law.

Technology exists to manufacture the illusion of a human online – consider computer games. Computers combine visual images, voice, and dialogue to project a life-like person talking and moving in whatever manner is typed into the keyboard. No matter the technology involved, animated characters are not "human beings capable of having rights." They cannot legally be a "person" who is party to the conversation. Illusions have no birth certificates.

What about Robo callers? A computer manipulates a Robo caller voice using either a computer-generated voice or by playing a person's recorded voice. Although Robo callers "participate" in conversations, federal ECPA law prohibits Robo callers from recording unless a warning is first given: "This call may be monitored or recorded." Since computers have no birth certificates, they cannot be a 'person party to conversations.' The law protects privacy of text messages just like it protects phone calls, 18 U.S. Code § 2511.

Vigilante groups are already duplicating these police tactics including the television series "To Catch a Predator" and Ghost CC Unit (Creep Catcher).[34] [35] Ghost flew from California to Virginia to hunt down Norman Achin after his initial arrest, *Virginia v. Achin*. Ghost CC Unit posted a video, I believe it was on Bit Chute,[36] showing Achin hiking alone in broad daylight on an open park trail holding a water bottle, unaware that Ghost was approaching from behind with a camera. The added narration claimed that Achin was there to rape a boy. Ghost gave the video and supposed texts to police who then re-arrested Achin for violating probation. Apparently, Ghost CC Unit has an LLC in California and "Donate" buttons posted with his videos. Bit Chute has since blocked their channel due to harassment. I complained to Instagram and their account was shut down.

## VI. CONCLUSION

Statutes only allow disclosing content of intercepted communications in court or a grand jury proceeding if they were obtained by a means authorized by U.S. Code. Interception by impostors or by impersonators is a crime under federal and state ECPA law. In all these cases, prosecutors and others disclose illegally intercepted communications to a grand jury and use them to indict the defendant. Conversation content was also disclosed to the press and used to discredit the defendant. Since using and disclosing illegally intercepted communications are also federal crimes under 18 U.S. Code § 2511(1)(c,d), this qualifies as misconduct. If a judge determines there was misconduct before the grand jury, a judge has authority to dismiss the indictment, *United States v. Williams*, 504 U.S. 36, 112 S. Ct. 1735 (1992).

I pray that you will take appropriate action regarding the violations of ECPA laws identified and hold those accountable who have criminally violated these laws. In 2013, ICAC stated that they arrested over 89,400 individuals.[37] However, this number is now estimated to be about 180,000,[38] and the majority are for these manufactured crimes. For everyone who has had illegally intercepted evidence used against them, their indictments should be dismissed, the convictions overturned, and signed plea deals rejected. Those prosecuted have had their lives ruined. They have lost their homes, property, income, profession, and reputation. They also lost

---

[34] Freeman, D. (2019, November 16). *San Diego "Creep Catching Unit" Takes Up Fight Against Online Predators*. NBC 7 San Diego; NBC San Diego. https://www.nbcsandiego.com/news/local/san-diego-creep-catcher-unit-takes-up-fight-against-online-predators/2161596/

[35] *15 reactions · 3 comments | Have You Heard of the Creep Catching Unit? | Ghost is the anonymous founder of CC UNIT, a San Diego-based social media movement that exposes internet perverts preying on children. Tune in to... | By Mike Morse Law Firm | Facebook*. (2022). Facebook.com. https://www.facebook.com/watch/?v=434031147872799

[36] Bitchute. (2025). *Bitchute*. Bitchute. https://www.bitchute.com/channel/wNybYk5qmqjB/?fbclid=IwAR2kzzvIG7NRiu9xTJPoxjeZW5-YEhgz0FToZEQflQEm08hKcP-1TvElnQE

[37] *Home*. (2013). Icactaskforce.org. https://www.icactaskforce.org/

[38] Burkhardt, B. (2024). *Manufacturing Criminal, 2nd Edition - Wiretapping and Planting Evidence*. Chapter 34.

custody of their children and missed watching them grow up. Most marriages ended with divorce. Friends and family members disown them.

After release from prison, the men are enslaved by the sex offender registry. The registry was originally for violent sexual offenses. Now sending a text message to an imaginary person is a violent sexual offense. There is no equivalent registry for murderers, thieves, drug dealers, or terrorists. Professional licenses are revoked. Offenders are forced to take re-education classes on how not to re-offend, which they have to pay for. The men are publicly humiliated by apps that automatically send alerts to their neighbors notifying them that Mr. XYZ at a particular address is a sex offender. If the men are privileged to have internet access so they can apply for a job or fill out a timecard, they are required to have monitoring software installed on their phones and computers so every keystroke is reported to the police. As Moses said to Pharoah in Exodus 5:1:

Let my people go.

DATED: June 23, 2025
*Respectfully submitted,*

Bonnie Burkhardt
8402 Gambrill Lane
Springfield, VA 22153
Phone: (703)505-2793

Email: Bonnie.burkhardt@blueridge-sw.com

# Exhibit "D"

LIMITED OFFICIAL USE ONLY

LAW ENFORCEMENT SENSITIVE

DEPARTMENT OF JUSTICE
OFFICE OF JUSTICE PROGRAMS
QUI PRO DOMINA JUSTITIA SEQUITUR

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

*ICAC Program Operational and Investigative Standards*

**FOR ICAC PURPOSES ONLY**

**Codified Under: Title 34 U.S.C. 21101-21131**

**Revised Update: October 16, 2014**

## Definitions of Terms

### Applicability of Terms

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

**"Affiliate" or "Affiliate Agency"** is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

**"Authorized Personnel"** are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

**"Commander"** is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

**"CEOS"** is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

**"Crime"** is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

**"CVIP"** is the Child Victim Identification Project operated by NCMEC.

**"CyberTipline"** is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

**"Deconflict"** is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

**"DOJ"** is the United States Department of Justice.

**"Employee"** is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool - including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** – any identity established or created by an Employee to aid an Investigation. Excluding and Not Including Online Profiles Age of 18 Years Old and Older. Including and Not Excluding Online Profiles Age of 17 Years Old and Younger as provided for by sections 13.3 and 13.4 of these Standards.

.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead"** or **"Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

## 4. Selection and Retention of Task Force Members

4.1 When practicable during the selection process of Members, Commanders and Supervisors shall evaluate prospective candidates for work histories that indicate prior investigative experience, courtroom testimony skills, technical knowledge and ability, an ability to prudently handle sensitive information, a genuine interest in the protection of children, and an understanding of the effects that Members may experience when exposed to Images.

4.2 Commanders and Supervisors shall acknowledge the potential effects of Investigations and exposure to Images. When practicable, they shall attempt to mitigate the potential effects of the work using, for example, the following techniques:

- *Work environment considerations* – Commanders and Supervisors are encouraged to provide a physical location for the work environment that allows the Investigator to conduct discreet Investigations.

- *Work* flexibility – Commanders and Supervisors are encouraged to allow flexibility for Investigators and others who are exposed to Images (e.g., frequent breaks, having an open-door policy, etc.).

- *Educating colleagues* – Commanders and Supervisors are encouraged to teach their colleagues that the viewing of Images is serious and restricted.

- *Work with Mental Health Providers (MHP)* – In compliance with their agency guidelines, Commanders and Supervisors are encouraged to work with MHP to make recommendations for care of Members and to provide education and training designed to minimize the impact of Images.

- *Training* -- Commanders and Supervisors are encouraged to share or seek out best practices for minimization of the impact of Images and to promote attendance at trainings regarding methods used to minimize said impact.

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 Commanders and Supervisors are responsible for determining Investigative priorities and selecting cases for Investigation in their respective agencies. Those determinations shall include an assessment of victim risk, jurisdiction, known offender behavioral characteristics, and the likelihood of securing the information necessary to pursue each Investigation.

6.2 Conventional boundaries often are meaningless in today's digital world where the usual constraints of time, place, and distance lose their relevance. These factors increase the possibility of Lead and/or Affiliate Agencies targeting other law enforcement personnel, Investigating the same target, or inadvertently disrupting an ongoing Investigation. To foster effective case coordination, collaboration, and communication, each Member shall make every effort to Deconflict all active Investigations.

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the Monthly Performance Measures Report.

7.3 Commanders shall compile and submit information on all cases referred for local, state, or federal prosecution. Information is required for all cases referred by the Lead Agency, as well as all Affiliates that received more than $20,000 a year in OJJDP ICAC funding, and any Affiliate the Commander selects to include. The case reporting requirement is ongoing and begins with the prosecutorial agency the case is referred to and continues through the final disposition of the case.

7.3.1 This ongoing quarterly report shall be submitted within 30 days of the end of the quarter.

7.4 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

7.4.1 The name of each Affiliate Agency.

7.4.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.

7.4.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 Investigations shall be conducted in a manner consistent with applicable laws and constitutional requirements.

8.2 Only Sworn Personnel shall conduct Investigations.

8.2.1 Authorized Personnel acting under the direction and supervision of Sworn Personnel may participate in Investigations.

8.2.2 Members shall not approve, condone, encourage, or promote cyber-vigilanteism by private citizens. As such, Members shall not use unauthorized private citizens to proactively seek out Investigative targets.

8.2.3 The above section (8.2.2) shall not preclude the use of information related to a Crime provided by victims or public citizens who discover evidence (e.g., CyberTip reports, mandated reports from professionals, computer repair shop complaints, parental complaints, et cetera). Nor does it preclude the use of authorized over-hears or other similar investigative methods designed to further an Investigation.

8.3 Investigations shall be documented. Any departures from this provision due to unusual or exigent circumstances shall be documented in the relevant case file and reviewed by the Supervisor.

8.3.1 The retention, storage, security, and disposal of Investigative or case information shall be consistent with the subject agency's policies and federal and state law regarding same.

8.3.2 Access to Investigative case files shall be restricted to Authorized Personnel.

8.4 Members shall not electronically upload, transmit, or forward any Images.

8.4.1 Section 8.4 shall not prohibit the transfer of evidence between Investigators as provided for by sections 8.9 and 8.10 of these Standards nor shall it prohibit the submission of Images to CVIP as provided by section 10.1 of these Standards.

8.5 Visual depictions of any identifiable person used to represent an investigative persona or any identifiable minor, shall be only those of an Employee who has given his or her written consent and only if that Employee was at least 18 years old at the time of consent. Further, the depictions themselves may be of that Employee under the age of 18. Excluding and Not Including Online Profiles 18 years of age and older. Including and Not Excluding Online Profiles 17 years of age and younger as provided for by sections 13.3 and 13.4 of these Standards.

•

8.6 Absent prosecutorial input to the contrary, during online dialogue, officers shall allow the Investigative target to set the tone, pace, and subject matter of the online conversation. Excluding and Not Including Dating Applications and Websites for Consenting Adults. Excluding and Not Including Escorting Applications and Websites for Consenting Adults. Excluding and Not Including Prostitution Applications and Websites for Consenting Adults as provided for by sections 13.1 and 13.2 of these Standards.

8.6.1 The above section (8.6) shall not be construed to prohibit Investigators from performing any of the following activities when initiating or conducting an Investigation: (a) posting information including visual depictions (image or video/printed or digital) to establish an online presence, (b) placing advertisements or posts, or (c) sending messages. Again Excluding and Not Including Dating Applications and Websites for Consenting Adults. Excluding and Not Including Escorting Applications and Websites for Consenting Adults. Excluding and Not Including Prostitution Applications and Websites for Consenting Adults again as provided for by sections 13.1 and 13.2 of these Standards.

8.6.2 Members shall familiarize themselves with relevant state and federal law, including but not limited to those regarding the defense of entrapment, and should confer with relevant prosecutors for legal consultation, as needed as provided for by section 13.7 of these Standards.

8.6.3 Members planning large-scale (multi-target) operations shall advise the Commander and shall consult relevant prosecutors regarding the operation.

8.7 The examination of digital storage devices shall be performed consistent with the subject agency's protocol.

8.8 Images shall be maintained pursuant to the subject agency's policy.

8.8.1 Absent a court order specifically ordering otherwise, evidence containing Images shall not be released to any defendant or representative thereof.

8.9 Absent exigent circumstances, all Members' case referrals between jurisdictions shall include:

- Notification to and acceptance by the Commander(s) of both jurisdictions that are involved in the referral;
- A secure (i.e., digitally-protected) copy of the case file;
- An official Investigative report or affidavit containing case details; and,
- Documentation, preferably the original, of all legal process conducted and all compliance with same, especially those documents related to the issue of jurisdiction and identification of suspect(s).

8.10 The transfer of evidence containing Images among law enforcement shall be done in a secure manner.

## 9. Work Environment

9.1 ICAC Equipment shall be reserved for the exclusive use of its Members, and shall be used in accordance with their respective agency's policies.

9.2 When practicable, Equipment which might be used in undercover aspects of an Investigation shall be purchased covertly.

9.3 No personally-owned Equipment shall be used in Investigations.

9.4 Software shall be properly acquired and licensed.

9.5 Investigations shall be conducted in an approved work environment as designated by a Commander or Supervisor.

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

## 13. Mandated Proper Tactics and Rules of Engagement

13.1 Law Enforcement Officers Shall not use and are Prohibited from using Online Dating Applications/Websites for Consenting Adults nor Escorting Applications/Websites for Consenting Adults nor Prostitution Applications/Websites for Consenting Adults.

13.2 Law Enforcement Officers Shall not use and are Prohibited from using Online Instant Messaging Chatrooms for Consenting Adults.

13.3 Law Enforcement Officers Shall not use and are Prohibited from using Adult Profiles of the Age of 18 Years Old and Older on Online Social Media/Social Networking Applications/Websites.

13.4 Law Enforcement Officers are Allowed to use and Shall only use Profiles of the Age of 17 Years Old and Younger on Online Social Media/Social Networking Applications/Websites.

13.5 Law Enforcement Officers when Setting Up an Online Internet Undercover Sting Operation are Mandated to ask for Permission in Writing via a Cooperative Agreement to said Social Media/ Social Networking Application's/Website's Legal Counsel/Legal Team for the Express Purpose of Conducting said Online Internet Undercover Sting Operation. Law Enforcement Officers Shall not Violate and are Prohibited from Violating the Terms and Conditions of the Online User Service Agreement of any and all Adults Only Oriented Applications/Websites because then they would be in Violation of Title 18 U.S.C. §1030 the Federal Computer Fraud and Abuse Act.

13.6 If Law Enforcement Officers Violate and Do not Honor the Liability Clause of the Internet Crimes Against Children Task Force Memorandum of Understanding and Violate and Do not Honor the Oversight Clause of the Internet Crimes Against Children Task Force Operational and Investigative Standards then they would be in Violation of Title 18 U.S C. § 1961-1968 the Racketeer Influenced and Corrupt Organizations Act.

13.7 Law Enforcement Officers are Prohibited from Committing and Shall Not Commit Egregious-Outrageous Conduct, Entrapment by Cajoling, Compelling, Convincing, Enticing, Inducing, Luring, Persuading, Seducing, Tempting a person who Is Not Predisposed to Commit the Crime Nor Premeditating to Commit the Crime and if not complied with would be in Violation of Title 18 U.S.C. § 373 the Solicitation to Commit a Crime of Violence Act and in Violation of Title 18 U.S.C. § 2422 the Coercion and Enticement Act and in Violation of the Federal Elements of Entrapment from the United States Department of Justice Archives Manual Criminal Resource Manual Section 645.

**End of ICAC Standards**

# Exhibit "E"

LIMITED OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

## Definitions of Terms

### Applicability of Terms

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

**"Affiliate" or "Affiliate Agency"** is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

**"Authorized Personnel"** are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

**"Commander"** is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

**"CEOS"** is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

**"Crime"** is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

**"CVIP"** is the Child Victim Identification Project operated by NCMEC.

**"CyberTipline"** is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

**"Deconflict"** is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

**"DOJ"** is the United States Department of Justice.

**"Employee"** is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool – including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** - any identity established or created by an Employee to aid an Investigation. Excluding and Not Including Online Profiles Age of 18 Years Old and Older. Including and Not Excluding Online Profiles Age of 17 Years Old and Younger as provided for by sections 13.3 and 13.4 of these Standards.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead"** or **"Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

## 4. Selection and Retention of Task Force Members

4.1 When practicable during the selection process of Members, Commanders and Supervisors shall evaluate prospective candidates for work histories that indicate prior investigative experience, courtroom testimony skills, technical knowledge and ability, an ability to prudently handle sensitive information, a genuine interest in the protection of children, and an understanding of the effects that Members may experience when exposed to Images.

4.2 Commanders and Supervisors shall acknowledge the potential effects of Investigations and exposure to Images. When practicable, they shall attempt to mitigate the potential effects of the work using, for example, the following techniques:

- *Work environment considerations* – Commanders and Supervisors are encouraged to provide a physical location for the work environment that allows the Investigator to conduct discreet Investigations.

- *Work* flexibility – Commanders and Supervisors are encouraged to allow flexibility for Investigators and others who are exposed to Images (e.g., frequent breaks, having an open-door policy, etc.).

- *Educating colleagues* – Commanders and Supervisors are encouraged to teach their colleagues that the viewing of Images is serious and restricted.

- *Work with Mental Health Providers (MHP)* – In compliance with their agency guidelines, Commanders and Supervisors are encouraged to work with MHP to make recommendations for care of Members and to provide education and training designed to minimize the impact of Images.

- *Training* -- Commanders and Supervisors are encouraged to share or seek out best practices for minimization of the impact of Images and to promote attendance at trainings regarding methods used to minimize said impact.

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 Commanders and Supervisors are responsible for determining Investigative priorities and selecting cases for Investigation in their respective agencies. Those determinations shall include an assessment of victim risk, jurisdiction, known offender behavioral characteristics, and the likelihood of securing the information necessary to pursue each Investigation.

6.2 Conventional boundaries often are meaningless in today's digital world where the usual constraints of time, place, and distance lose their relevance. These factors increase the possibility of Lead and/or Affiliate Agencies targeting other law enforcement personnel, Investigating the same target, or inadvertently disrupting an ongoing Investigation. To foster effective case coordination, collaboration, and communication, each Member shall make every effort to Deconflict all active Investigations.

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

7.3 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

7.3.1 The name of each Affiliate Agency.

7.3.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.

7.3.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 Investigations shall be conducted in a manner consistent with applicable laws and constitutional requirements.

8.2 Only Sworn Personnel shall conduct Investigations.

8.2.1 Authorized Personnel acting under the direction and supervision of Sworn Personnel may participate in Investigations.

8.2.2 Members shall not approve, condone, encourage, or promote cyber-vigilanteism by private citizens. As such, Members shall not use unauthorized private citizens to proactively seek out Investigative targets.

8.2.3 The above section (8.2.2) shall not preclude the use of information related to a Crime provided by victims or public citizens who discover evidence (e.g., CyberTip reports, mandated reports from professionals, computer repair shop complaints, parental complaints, et cetera). Nor does it preclude the use of authorized over-hears or other similar investigative methods designed to further an Investigation.

8.3 Investigations shall be documented. Any departures from this provision due to unusual or exigent circumstances shall be documented in the relevant case file and reviewed by the Supervisor.

8.3.1 The retention, storage, security, and disposal of Investigative or case information shall be consistent with the subject agency's policies and federal and state law regarding same.

8.3.2 Access to Investigative case files shall be restricted to Authorized Personnel.

8.4 Members shall not electronically upload, transmit, or forward any Images.

8.4.1 Section 8.4 shall not prohibit the transfer of evidence between Investigators as provided for by sections 8.9 and 8.10 of these Standards nor shall it prohibit the submission of Images to CVIP as provided for by section 10.1 of these Standards.

8.5 Visual depictions of any identifiable person used to represent an investigative or any identifiable minor, shall be only those of an Employee who has given his or her written consent and only if that Employee was at least 18 years old at the time of consent. Further, the depictions themselves may be of that Employee under the age of 18. Excluding and Not Including Online Profiles 18 years of age and older. Including and Not Excluding Online Profiles 17 years of age and younger as provided for by sections 13.3 and 13.4 of these Standards.

8.6 Absent prosecutorial input to the contrary, during online dialogue, officers shall allow the Investigative target to set the tone, pace, and subject matter of the online conversation. Excluding and Not Including Dating Applications and Websites for Consenting Adults. Excluding and Not Including Escorting Applications and Websites for Consenting Adults. Excluding and Not Including Prostitution Applications and Websites for Consenting Adults as provided for by sections 13.1 and 13.2 of these Standards.

8.6.1 The above section (8.6) shall not be construed to prohibit Investigators from performing any of the following activities when initiating or conducting an Investigation: (a) posting information including visual depictions (image or video/printed or digital) to establish an online presence, (b) placing advertisements or posts, or (c) sending messages. Again Excluding and Not Including Dating Applications and Websites for Consenting Adults. Excluding and Not Including Escorting Applications and Websites for Consenting Adults. Excluding and Not Including Prostitution Applications and Websites for Consenting Adults again as provided for by sections 13.1 and 13.2 of these Standards.

8.6.2 Members shall familiarize themselves with relevant state and federal law, including but not limited to those regarding the defense of entrapment, and should confer with relevant prosecutors for legal consultation, as needed as provided for by section 13.7 of these Standards.

8.6.3 Members planning large-scale (multi-target) operations shall advise the Commander and shall consult relevant prosecutors regarding the operation.

8.7 The examination of digital storage devices shall be performed consistent with the subject agency's protocol.

8.8 Images shall be maintained pursuant to the subject agency's policy.

8.8.1 Absent a court order specifically ordering otherwise, evidence containing Images shall not be released to any defendant or representative thereof.

8.9 Absent exigent circumstances, all Members' case referrals between jurisdictions shall include:

- Notification to and acceptance by the Commander(s) of both jurisdictions that are involved in the referral;
- A secure (i.e., digitally-protected) copy of the case file;
- An official Investigative report or affidavit containing case details; and,
- Documentation, preferably the original, of all legal process conducted and all compliance with same, especially those documents related to the issue of jurisdiction and identification of suspect(s).

8.10 The transfer of evidence containing Images among law enforcement shall be done in a secure manner.

## 9. Work Environment

9.1 ICAC Equipment shall be reserved for the exclusive use of its Members, and shall be used in accordance with their respective agency's policies.

9.2 When practicable, Equipment which might be used in undercover aspects of an Investigation shall be purchased covertly.

9.3 No personally-owned Equipment shall be used in Investigations.

9.4 Software shall be properly acquired and licensed.

9.5 Investigations shall be conducted in an approved work environment as designated by a Commander or Supervisor.

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

## 13. Mandated Proper Tactics and Rules of Engagement

13.1 Law Enforcement Officers Shall not use and are Prohibited from using Online Dating Applications/Websites for Consenting Adults nor Escorting Applications/Websites for Consenting Adults nor Prostitution Applications/Websites for Consenting Adults.

13.2 Law Enforcement Officers Shall not use and are Prohibited from using Online Instant Messaging Chatrooms for Consenting Adults.

13.3 Law Enforcement Officers Shall not use and are Prohibited from using Adult Profiles of the Age of 18 Years Old and Older on Online Social Media/Social Networking Applications/Websites.

13.4 Law Enforcement Officers are Allowed to use and Shall only use Profiles of the Age of 17 Years Old and Younger on Online Social Media/Social Networking Applications/Websites.

13.5 Law Enforcement Officers when Setting Up an Online Internet Undercover Sting Operation are Mandated to ask for Permission in Writing via a Cooperative Agreement to said Social Media/ Social Networking Application's/Website's Legal Counsel/Legal Team for the Express Purpose of Conducting said Online Internet Undercover Sting Operation. Law Enforcement Officers Shall not Violate and are Prohibited from Violating the Terms and Conditions of the Online User Service Agreement of any and all Adults Only Oriented Applications/Websites because then they would be in Violation of Title 18 U.S.C. §1030 the Federal Computer Fraud and Abuse Act.

13.6 If Law Enforcement Officers Violate and Do not Honor the Liability Clause of the Internet Crimes Against Children Task Force Memorandum of Understanding and Violate and Do not Honor the Oversight Clause of the Internet Crimes Against Children Task Force Operational and Investigative Standards then they would be in Violation of Title 18 U.S C. § 1961-1968 the Racketeer Influenced and Corrupt Organizations Act.

13.7 Law Enforcement Officers are Prohibited from Committing and Shall Not Commit Egregious-Outrageous Conduct, Entrapment by Cajoling, Compelling, Convincing, Enticing, Inducing, Luring, Persuading, Seducing, Tempting a person who Is Not Predisposed to Commit the Crime Nor Premeditating to Commit the Crime and if not complied with would be in Violation of Title 18 U.S.C. § 373 the Solicitation to Commit a Crime of Violence Act and in Violation of Title 18 U.S.C. § 2422 the Coercion and Enticement Act and in Violation of the Federal Elements of Entrapment from the United States Department of Justice Archives Manual Criminal Resource Manual Section 645.

**End of ICAC Standards**

# Exhibit "F"

LIMITED OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

## Definitions

As used herein, the following definitions shall apply:

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"CEOS"** is the Child Exploitation and Obscenity Section of the Criminal Division of the Department of Justice.

**"Commander"** is the individual designated as the leader of the state or regional ICAC Task Force.

**"Supervisor"** is any manager responsible for supervising personnel involved in ICAC related cases.

**"ICAC"** is the Internet Crimes Against Children program composed of Task Forces and Affiliates.

**"TASK FORCE"** is defined as an ICAC law enforcement agency designated by OJJDP to act as the State and/or Regional Task Force.

**"AFFILIATE"** is defined as a law enforcement agency that is working in partnership with a Task Force and has agreed in writing to adhere to ICAC Operational and Investigative Standards.

**"PARTNER"** is defined as an agency assisting a Task Force absent a written agreement.

**"NATIONAL INITIATIVE"** is defined as any investigative proposal that relies on the cooperation and resources of all Task Forces or mandates action by OJJDP.

**"Unlawful images, contraband images, images depicting the sexual exploitation of minors"** Any visual depiction of child sexual exploitation as defined by federal and/or state statute.

**"CVIP"** is the Child Victim Identification Program operated by the National Center for Missing & Exploited Children.

**"CYBERTIPLINE"** is a reporting mechanism for cases of online child sexual exploitation and enticement operated by the National Center for Missing & Exploited Children.

For the purposes of this program, *crime* is defined as any offense that involves the exploitation of children facilitated by technology.

*Investigative interest* is established when there is reasonable suspicion that a screen name or other potentially identifiable entity has committed a crime or that entity is engaged in a sequence of activities that is likely to result in the commission of a crime.

A *proactive investigation* is designed to identify, investigate and prosecute offenders that may or may not involve a specific target, and requires online interaction and a significant degree of pre-operative planning.

A *reactive investigation* involves the investigation of a complaint of a crime.

*Reasonable suspicion* is established when sufficient facts exist to lead a law enforcement officer to believe that an individual or organization is involved in a definable criminal activity.

## 1. Oversight

1.1 Each ICAC agency shall have supervisory systems and procedures that shall provide for observation, documentation, and periodic review of ICAC activity. Such system should comply with the principles of quality case management and ensure that ICAC activities comply with both agency and ICAC Operational and Investigative Standards (hereto forth, "the Standards").

1.2 Task Forces shall submit all proposed national initiatives to OJJDP prior to project initiation.

1.3 OJJDP may suggest amendments to the original proposal following consultation with the presenting Task Force and other federal, state, and local entities.

## 2. Selection and Retention of ICAC Task Force Personnel

2.1 Supervisors should evaluate prospective ICAC candidates for work history that indicates prior investigative experience, court testimony skills, ability to handle sensitive information prudently, and a genuine interest in the protection of children, and an understanding of the harmful effects of unlawful images.

2.2 Given the graphic nature of evidence routinely encountered in ICAC related investigations, the mental health of all personnel involved in such cases is a concern. ICAC supervisors are encouraged to make reasonable efforts to inform assigned personnel about departmental employee assistance program policies, procedures, and services available to them.

2.3 ICAC supervisors and/or his/her designee should work to ensure the long term well-being of any individuals involved with ICAC related child sexual exploitation investigations. The following recommendations are encouraged:

- *Workspace considerations* - The physical location in an office should be conducive to feeling comfortable while at work.
- *Preparation for new employees* – Develop an interview process in that the potential candidate is educated about the true nature of the crime.
- *Work flexibility* - Allowing investigators and others who are exposed to unlawful images, contraband images, images depicting the sexual exploitation of minors to have flexibility (e.g. frequent breaks, having an open-door policy, etc.)
- *Educating colleagues* - Colleagues should be aware that viewing of child sexual abuse images should be treated as serious, restricted and stressful.
- *Work with Mental Health Providers (MHP)* - In compliance with local agency guidelines work with MHP to make recommendations for care of unit staff and provide education/training regarding self-care and stress management, etc.
- *Best Practices* - ICAC Commanders and supervisors are encouraged to share or seek out any daily office practices used by them or other ICAC Task Forces that can promote mental health and wellbeing.
- *Training* - Encourage attendance at trainings that discuss the specific stressors associated with exposure to images or videos depicting child sexual abuse.

## 3. Training

3.1 All professional and administrative personnel assigned responsibilities associated with ICAC operations shall be required to read and comply with the Standards. Additionally, all training program curriculum supported by ICAC resources shall be consistent with the Standards, and approved by OJJDP or, in instances of local training, the Commander.

3.2 Commanders are responsible for ensuring that the individuals nominated for ICAC sponsored training are employed by agencies that have agreed in writing to adhere to the Standards and that any prerequisite requirements for the training session have been met.

3.3 ICAC task forces may develop and deliver regional training. The training shall comply with the Standards. Any subsequent support required as a result of the regional training shall be the responsibility of the task force providing the training.

## 4. Case Management

### 4.1 Case Predication and Prioritization Factors

4.1.1 Cases may be initiated by referrals from the CyberTipline, Internet service providers, or other law enforcement agencies, and by information gathered through subject interviews, documented public sources, direct observations of suspicious behavior, public complaints, or by any other source acceptable under agency policies.

4.1.2 Supervisors are responsible for determining investigative priorities and selecting cases for investigation. Assuming the information is deemed credible, that determination should begin with an assessment of victim risk and should also consider other factors such as jurisdiction and known offender behavioral characteristics. The following factors should be considered:

- A child is believed to be at immediate risk of victimization.
- A child is vulnerable to victimization by a known offender.
- A known suspect is aggressively soliciting a child(ren).
- Manufacturers, distributors or possessors of images that appear to be home photography with domiciled children.
- Aggressive, high-volume unlawful images, contraband images, images depicting the sexual exploitation of minors, manufacturers or distributors who either are commercial distributors, repeat offenders, or specialize in sadistic images.
- Manufacturers, distributors and solicitors involved in high-volume trafficking or belong to an organized group sharing unlawful images, contraband images, images depicting the sexual exploitation of minors ring that operates as a criminal conspiracy.
- Distributors, solicitors and possessors of unlawful images, contraband images, images depicting the sexual exploitation of minors.
- Any other form of technology facilitated child sexual victimization.

### 4.2 Record Keeping

4.2.1 ICAC agencies shall be subject to existing agency incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each ICAC case.

4.2.2 All affiliated agencies will report their activity to the respective Task Force Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

4.2.3 Task Forces will compile and submit their monthly performance measures report to the OJJDP designated location before the end of the following calendar month. This monthly report does not replace the semi-annual progress report required by the Office of Justice Program's Financial Guide.

4.2.4 ICAC Case Tracker - Task Forces will compile and submit information on all cases referred for local, state, or federal prosecution. Information is required for all cases referred by the grant receiving agency, as well as all affiliates that received more than $20,000 a year, or any affiliate the Commander selects to include. The report is on-going and begins with the prosecutorial agency the case is referred to and continues through the final disposition of the case. This on-going quarterly report will be due within 30 days of the end of the quarter and does not replace either the semi-annual progress report required by the Office of Justice Program's Financial Guide, nor does it replace the Monthly Performance Measures Report (see 4.2.3 above).

### 4.3 Undercover Investigations

4.3.1 Carefully managed undercover operations conducted by well-trained officers are among the most effective techniques available to law enforcement for addressing ICAC offenses.

4.3.2 Supervisors are responsible for ensuring that ICAC investigators receive a copy of the Standards.

4.3.3 ICAC investigations shall be conducted in a manner consistent with the principles of law and due process.

4.3.4 The following minimum standards apply to ICAC investigations:

a. Only sworn, personnel shall conduct ICAC investigations in an undercover capacity. Private citizens shall not be asked to seek out investigative targets, nor shall they be authorized to act as police agents in an online undercover capacity.

b. ICAC personnel shall not electronically upload, transmit, or forward any contraband. This does not prohibit the transfer of evidence between law enforcement officials as provided by section 4.4.4 of these Standards.

c. Other than images or videos of individuals, age 18 or over, which have provided their informed written consent, and at the time consent was given were employed by a criminal justice agency, no actual human images or videos shall be utilized in an investigation. Employee is defined as a sworn, or compensated individual, or any individual working under the direction and control of a law enforcement agency.

d. Absent prosecutorial input to the contrary, during online dialogue, undercover officers should allow the investigative target to set the tone, pace, and subject matter of the online conversation. Image transfer shall be initiated by the target. Excluding and Not Including Dating Websites for Consenting Adults as provided by sections 9.1 and 9.2 of these Standards.

e. Undercover online activity shall be recorded and documented. Any departures from this policy due to unusual circumstances shall be documented in the relevant case file and reviewed by an ICAC supervisor.

## 4.4 Evidence Procedures

4.4.1 The storage, security, and destruction of investigative information shall be consistent with agency policy. Access to files should be restricted to authorized personnel.

4.4.2 The examination of computers and digital media shall be consistent with agency policy and procedure.

4.4.3 Unlawful images or images depicting the sexual exploitation of minors are considered contraband, and should be maintained pursuant to each agency's policies regarding such. It is recommended that absent a court order specifically ordering otherwise, evidence containing unlawful images, contraband images, images depicting the sexual exploitation of minors shall not be released to any defendant or representative thereof.

4.4.4 The transfer of evidence containing unlawful images, contraband images, and images depicting the sexual exploitation of minors among law enforcement shall be done in a secure manner. Methods of transfer may include hand-delivery, electronic transmission of digitally protected files, delivery via a service that tracks the shipment, or other methods consistent with agency policy and practices.

## 4.5 Workspace and Equipment

4.5.1 ICAC equipment will be reserved for the exclusive use of agency and/or designated ICAC personnel. When possible, undercover equipment and online accounts shall be

purchased covertly. No personally owned equipment shall be used in ICAC investigations and all software shall be properly acquired and licensed.

4.5.2 ICAC personnel shall not use ICAC computers, software, or online accounts for personal use.

4.5.3 Absent exigent or unforeseen circumstances, all ICAC investigations should be conducted in a professional and ethical manner in an approved workspace as designated by a Supervisor. Alternative workspace policies may be developed and approved by the Commander (in consultation with OJJDP when appropriate) to allow for investigations to continue during event driven instances where the physical location of the investigator may vary.

## 5. Information Sharing

5.1 Conventional boundaries are virtually meaningless in the electronic world of the Internet and the usual constraints of time, place, and distance lose their relevance. These factors increase the possibility of ICAC agencies targeting one another, investigating the same subject, or inadvertently disrupting an ongoing investigation. To foster coordination, collaboration, and communication, each ICAC agency shall make every effort to deconflict all active investigations.

5.2 When a common target is identified, the agency should consider contacting other local, state, and federal agencies that may be involved in an investigation of the same target.

5.3 When transferring an ICAC investigation to another agency, the appropriate ICAC Commanders shall be notified that a referral has occurred.

## 6. Victim Identification

6.1 Identifying child victims is a critical element of the ICAC Program. DOJ and OJJDP require all Task Forces and affiliates to submit child victim images to the Child Victim Identification Program (CVIP) as a means to improve child victim identification. Absent exigent circumstances, child victim images will be sent to the CVIP consistent with NCMEC guidelines. In addition, ICAC agencies are encouraged to collaborate with NCMEC to identify children depicted in unlawful images, contraband images, images depicting the sexual exploitation of minors.

6.2 A focus of the ICAC Program is to protect children. In circumstances where reporting of child abuse is not required under existing laws, ICAC agencies are strongly encouraged to report instances where a child may be at risk for abuse or exploitation.

6.3 Absent exigent circumstances, victim-identifying information should be protected from public disclosure.

6.4 Adhere to state and federal victimization notification and assistance laws.

## 7. Community Education and Crime Prevention

7.1 Prevention education activities are a critical component of the OJJDP ICAC Program. ICAC agencies should foster awareness and provide practical, relevant guidance to children, parents, educators, librarians, and other individuals concerned about child safety issues.

7.2 Presentations to school staff, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims, not otherwise in the public domain, nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential investigative techniques.

7.3 No member of an ICAC Task Force may endorse any product or service without the express consent of an OJJDP Program Manager. While appearing at public presentations, ICAC members may indicate a preference for a product or service, but to avoid an implicit endorsement, such ICAC members should indicate adequate alternatives.

7.4 The materials and presentation should be consistent with the national ICAC goals as outlined below:

### *Purpose of the ICAC Program*

*The mission of the Internet Crimes Against Children (ICAC) Task Force program is to assist state and local law enforcement agencies in developing an effective response to cyber enticement and the production, possession, and distribution of unlawful images, contraband images, and images depicting the sexual exploitation of minors. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.*

### *Background on the ICAC Program*

*The Internet Crimes Against Children (ICAC) program is a national network of 61 coordinated local task forces and nearly 3,000 local and regional affiliated agencies engaged in both proactive and reactive investigations, forensic examinations, effective prosecutions and community education. The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet, the proliferation of unlawful images, contraband images, images depicting the sexual exploitation of minors, and the heightened online activity by predators searching for unsupervised contact with underage victims. By helping state and local law enforcement agencies develop effective and sustainable responses to online child victimization and unlawful images, contraband images, images depicting the sexual exploitation of minors, the ICAC program delivers national resources at the local level.*

*The ICAC program actively protects children who use the Internet by proactively investigating the online sexual exploitation of children by predators. Because ICAC practitioners understand that arrests alone cannot resolve the problem of on-line victimization, the ICAC program is dedicated to training law enforcement and educating parents and youth about the potential dangers online and offering safety tools.*

## 8. Media Relations and Releases

8.1 Media releases relating to prosecutions, crime alerts or other matters concerning ICAC operations shall not include information regarding confidential investigative techniques and should be coordinated (when applicable) with other Task Force participants, Federal law enforcement agencies, and State and local agencies involved in the investigation consistent with sound information management and media relations practices.

8.2 Commanders and supervisors (or their designees) may speak to members of the media about their own departments' ICAC-related activities according to their own agency's guidelines. No individual affiliated with the ICAC program may speak on behalf of the ICAC Program as a whole.

8.3 Commanders should inform an OJJDP Program Manager if approached by national media outlets about the ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJP.

8.4 Information provided by ICACs to the media shall be consistent with the information provided in Section 7.4

## 9. Mandated Proper Tactics and Rules of Engagement

9.1 Law Enforcement Officers Shall not use and are Prohibited from using Online Dating Websites for Consenting Adults.

9.2 Law Enforcement Officers Shall not use and are Prohibited from using Online Instant Messaging Chatrooms for Consenting Adults.

9.3 Law Enforcement Officers Shall not use and are Prohibited from using Adult Profiles of the Age of 18 Years Old and Older on Online Social Media/Social Networking Websites.

9.4 Law Enforcement Officers are Allowed to use and Shall only use Profiles of the Age of 17 Years Old and Younger on Online Social Media/Social Networking Websites.

9.5 Law Enforcement Officers when Setting Up an Online Internet Undercover Sting Operation are Mandated to ask for Permission in Writing via a Cooperative Agreement to said Social Media/ Social Networking Website's Legal Counsel/Legal Team for the Express Purpose of Conducting said Online Internet Undercover Sting Operation. Law Enforcement Officers Shall not Violate and are Prohibited from Violating the Terms and Conditions of the Online User Service Agreement of any and all Adults Only Oriented Websites because then they would be in Violation of Title 18 U.S.C. §1030 the Federal Computer Fraud and Abuse Act.

9.6 If Law Enforcement Officers Violate and Do not Honor the Liability Clause of the Internet Crimes Against Children Task Force Memorandum of Understanding and Violate and Do not Honor the Oversight Clause of the Internet Crimes Against Children Task Force Operational and Investigative Standards then they would be in Violation of Title 18 U.S C. § 1961-1968 the Racketeer Influenced and Corrupt Organizations Act.

# Exhibit "G"

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

## Table of Contents

Definitions of Terms ........ 3
1. Purpose of the ICAC Standards ........ 5
2. ICAC National Program ........ 6
3. Oversight of the ICAC Program ........ 7
4. Selection and Retention of Task Force Members ........ 8
5. Training ........ 9
6. Case Management ........ 10
7. Task Force Reporting Requirements to OJJDP ........ 11
8. Investigations ........ 12
9. Work Environment ........ 14
10. Victim Identification ........ 15
11. Public Awareness and Community Outreach ........ 16
12. Media Relations and Media Releases ........ 17

# Definitions of Terms

**Applicability of Terms**

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

**"Affiliate"** or **Affiliate Agency"** is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

**"Authorized Personnel"** are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

**"Commander"** is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

**"CEOS"** is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

**"Crime"** is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

**"CVIP"** is the Child Victim Identification Project operated by NCMEC.

**"CyberTipline"** is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

**"Deconflict"** is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

**"DOJ"** is the United States Department of Justice.

**"Employee"** is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool – including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** – any identity established or created by an Employee to aid an Investigation.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead" or "Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

## 4. Selection and Retention of Task Force Members

4.1 When practicable during the selection process of Members, Commanders and Supervisors shall evaluate prospective candidates for work histories that indicate prior investigative experience, courtroom testimony skills, technical knowledge and ability, an ability to prudently handle sensitive information, a genuine interest in the protection of children, and an understanding of the effects that Members may experience when exposed to Images.

4.2 Commanders and Supervisors shall acknowledge the potential effects of Investigations and exposure to Images. When practicable, they shall attempt to mitigate the potential effects of the work using, for example, the following techniques:

- *Work environment considerations* – Commanders and Supervisors are encouraged to provide a physical location for the work environment that allows the Investigator to conduct discreet Investigations.

- *Work flexibility* – Commanders and Supervisors are encouraged to allow flexibility for Investigators and others who are exposed to Images (e.g., frequent breaks, having an open-door policy, etc.).

- *Educating colleagues* – Commanders and Supervisors are encouraged to teach their colleagues that the viewing of Images is serious and restricted.

- *Work with Mental Health Providers (MHP)* – In compliance with their agency guidelines, Commanders and Supervisors are encouraged to work with MHP to make recommendations for care of Members and to provide education and training designed to minimize the impact of Images.

- *Training* -- Commanders and Supervisors are encouraged to share or seek out best practices for minimization of the impact of Images and to promote attendance at trainings regarding methods used to minimize said impact.

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 Commanders and Supervisors are responsible for determining Investigative priorities and selecting cases for Investigation in their respective agencies. Those determinations shall include an assessment of victim risk, jurisdiction, known offender behavioral characteristics, and the likelihood of securing the information necessary to pursue each Investigation.

6.2 Conventional boundaries often are meaningless in today's digital world where the usual constraints of time, place, and distance lose their relevance. These factors increase the possibility of Lead and/or Affiliate Agencies targeting other law enforcement personnel, Investigating the same target, or inadvertently disrupting an ongoing Investigation. To foster effective case coordination, collaboration, and communication, each Member shall make every effort to Deconflict all active Investigations.

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

> 7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

7.3 Commanders shall compile and submit information on all cases referred for local, state, or federal prosecution. Information is required for all cases referred by the Lead Agency, as well as all Affiliates that received more than $20,000 a year in OJJDP ICAC funding, and any Affiliate the Commander selects to include. The case reporting requirement is ongoing and begins with the prosecutorial agency the case is referred to and continues through the final disposition of the case.

> 7.3.1 This ongoing quarterly report shall be submitted within 30 days of the end of the quarter.

7.4 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

> 7.4.1 The name of each Affiliate Agency.
>
> 7.4.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.
>
> 7.4.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 Investigations shall be conducted in a manner consistent with applicable laws and constitutional requirements.

8.2 Only Sworn Personnel shall conduct Investigations.

8.2.1 Authorized Personnel acting under the direction and supervision of Sworn Personnel may participate in Investigations.

8.2.2 Members shall not approve, condone, encourage, or promote cyber-vigilanteism by private citizens. As such, Members shall not use unauthorized private citizens to proactively seek out Investigative targets.

8.2.3 The above section (8.2.2) shall not preclude the use of information related to a Crime provided by victims or public citizens who discover evidence (e.g., CyberTip reports, mandated reports from professionals, computer repair shop complaints, parental complaints, et cetera). Nor does it preclude the use of authorized over-hears or other similar investigative methods designed to further an Investigation.

8.3 Investigations shall be documented. Any departures from this provision due to unusual or exigent circumstances shall be documented in the relevant case file and reviewed by the Supervisor.

8.3.1 The retention, storage, security, and disposal of Investigative or case information shall be consistent with the subject agency's policies and federal and state law regarding same.

8.3.2 Access to Investigative case files shall be restricted to Authorized Personnel.

8.4 Members shall not electronically upload, transmit, or forward any Images.

8.4.1 Section 8.4 shall not prohibit the transfer of evidence between Investigators as provided for by sections 8.9 and 8.10 of these Standards nor shall it prohibit the submission of Images to CVIP as provided for by section 10.1 of these Standards.

8.5 Visual depictions of any identifiable person used to represent an investigative persona or any identifiable minor, shall be only those of an Employee who has given his or her written consent and only if that Employee was at least 18 years old at the time of consent. Further, the depictions themselves may be of that Employee under the age of 18.

8.6 Absent prosecutorial input to the contrary, during online dialogue, officers shall allow the Investigative target to set the tone, pace, and subject matter of the online conversation

8.6.1 The above section (8.6) shall not be construed to prohibit Investigators from performing any of the following activities when initiating or conducting an Investigation: (a) posting information including visual depictions (image or video/printed or digital) to establish an online presence, (b) placing advertisements or posts, or (c) sending messages.

8.6.2 Members shall familiarize themselves with relevant state and federal law, including but not limited to those regarding the defense of entrapment, and should confer with relevant prosecutors for legal consultation, as needed.

8.6.3 Members planning large-scale (multi-target) operations shall advise the Commander and shall consult relevant prosecutors regarding the operation.

8.7 The examination of digital storage devices shall be performed consistent with the subject agency's protocol.

8.8 Images shall be maintained pursuant to the subject agency's policy.

8.8.1 Absent a court order specifically ordering otherwise, evidence containing Images shall not be released to any defendant or representative thereof.

8.9 Absent exigent circumstances, all Members' case referrals between jurisdictions shall include:

- Notification to and acceptance by the Commander(s) of both jurisdictions that are involved in the referral;
- A secure (i.e., digitally-protected) copy of the case file;
- An official Investigative report or affidavit containing case details; and,
- Documentation, preferably the original, of all legal process conducted and all compliance with same, especially those documents related to the issue of jurisdiction and identification of suspect(s).

8.10 The transfer of evidence containing Images among law enforcement shall be done in a secure manner.

## 9. Work Environment

9.1 ICAC Equipment shall be reserved for the exclusive use of its Members, and shall be used in accordance with their respective agency's policies.

9.2 When practicable, Equipment which might be used in undercover aspects of an Investigation shall be purchased covertly.

9.3 No personally-owned Equipment shall be used in Investigations.

9.4 Software shall be properly acquired and licensed.

9.5 Investigations shall be conducted in an approved work environment as designated by a Commander or Supervisor.

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

**End of ICAC Standards**

# Exhibit "H"

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

## Table of Contents


Definitions of Terms ..... 3

1. Purpose of the ICAC Standards ..... 5
2. ICAC National Program ..... 6
3. Oversight of the ICAC Program ..... 7
4. Selection and Retention of Task Force Members ..... 8
5. Training ..... 9
6. Case Management ..... 10
7. Task Force Reporting Requirements to OJJDP ..... 11
8. Investigations ..... 12
9. Work Environment ..... 14
10. Victim Identification ..... 15
11. Public Awareness and Community Outreach ..... 16
12. Media Relations and Media Releases ..... 17

# Definitions of Terms

**Applicability of Terms**

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

"**Affiliate**" or **Affiliate Agency**" is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

"**Authorized Personnel**" are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

"**Commander**" is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

"**CEOS**" is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

"**Crime**" is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

"**CVIP**" is the Child Victim Identification Project operated by NCMEC.

"**CyberTipline**" is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

"**Deconflict**" is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

"**DOJ**" is the United States Department of Justice.

"**Employee**" is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool – including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** – any identity established or created by an Employee to aid an Investigation.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead" or "Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

## 4. Selection and Retention of Task Force Members

4.1 When practicable during the selection process of Members, Commanders and Supervisors shall evaluate prospective candidates for work histories that indicate prior investigative experience, courtroom testimony skills, technical knowledge and ability, an ability to prudently handle sensitive information, a genuine interest in the protection of children, and an understanding of the effects that Members may experience when exposed to Images.

4.2 Commanders and Supervisors shall acknowledge the potential effects of Investigations and exposure to Images. When practicable, they shall attempt to mitigate the potential effects of the work using, for example, the following techniques:

- *Work environment considerations* – Commanders and Supervisors are encouraged to provide a physical location for the work environment that allows the Investigator to conduct discreet Investigations.

- *Work flexibility* – Commanders and Supervisors are encouraged to allow flexibility for Investigators and others who are exposed to Images (e.g., frequent breaks, having an open-door policy, etc.).

- *Educating colleagues* – Commanders and Supervisors are encouraged to teach their colleagues that the viewing of Images is serious and restricted.

- *Work with Mental Health Providers (MHP)* – In compliance with their agency guidelines, Commanders and Supervisors are encouraged to work with MHP to make recommendations for care of Members and to provide education and training designed to minimize the impact of Images.

- *Training* -- Commanders and Supervisors are encouraged to share or seek out best practices for minimization of the impact of Images and to promote attendance at trainings regarding methods used to minimize said impact.

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 Commanders and Supervisors are responsible for determining Investigative priorities and selecting cases for Investigation in their respective agencies. Those determinations shall include an assessment of victim risk, jurisdiction, known offender behavioral characteristics, and the likelihood of securing the information necessary to pursue each Investigation.

6.2 Conventional boundaries often are meaningless in today's digital world where the usual constraints of time, place, and distance lose their relevance. These factors increase the possibility of Lead and/or Affiliate Agencies targeting other law enforcement personnel, Investigating the same target, or inadvertently disrupting an ongoing Investigation. To foster effective case coordination, collaboration, and communication, each Member shall make every effort to Deconflict all active Investigations.

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

7.3 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

7.3.1 The name of each Affiliate Agency.

7.3.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.

7.3.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 Investigations shall be conducted in a manner consistent with applicable laws and constitutional requirements.

8.2 Only Sworn Personnel shall conduct Investigations.

8.2.1 Authorized Personnel acting under the direction and supervision of Sworn Personnel may participate in Investigations.

8.2.2 Members shall not approve, condone, encourage, or promote cyber-vigilanteism by private citizens. As such, Members shall not use unauthorized private citizens to proactively seek out Investigative targets.

8.2.3 The above section (8.2.2) shall not preclude the use of information related to a Crime provided by victims or public citizens who discover evidence (e.g., CyberTip reports, mandated reports from professionals, computer repair shop complaints, parental complaints, et cetera). Nor does it preclude the use of authorized over-hears or other similar investigative methods designed to further an Investigation.

8.3 Investigations shall be documented. Any departures from this provision due to unusual or exigent circumstances shall be documented in the relevant case file and reviewed by the Supervisor.

8.3.1 The retention, storage, security, and disposal of Investigative or case information shall be consistent with the subject agency's policies and federal and state law regarding same.

8.3.2 Access to Investigative case files shall be restricted to Authorized Personnel.

8.4 Members shall not electronically upload, transmit, or forward any Images.

8.4.1 Section 8.4 shall not prohibit the transfer of evidence between Investigators as provided for by sections 8.9 and 8.10 of these Standards nor shall it prohibit the submission of Images to CVIP as provided for by section 10.1 of these Standards.

8.5 Visual depictions of any identifiable person used to represent an investigative persona or any identifiable minor, shall be only those of an Employee who has given his or her written consent and only if that Employee was at least 18 years old at the time of consent. Further, the depictions themselves may be of that Employee under the age of 18.

8.6 Absent prosecutorial input to the contrary, during online dialogue, officers shall allow the Investigative target to set the tone, pace, and subject matter of the online conversation

8.6.1 The above section (8.6) shall not be construed to prohibit Investigators from performing any of the following activities when initiating or conducting an Investigation: (a) posting information including visual depictions (image or video/printed or digital) to establish an online presence, (b) placing advertisements or posts, or (c) sending messages.

8.6.2 Members shall familiarize themselves with relevant state and federal law, including but not limited to those regarding the defense of entrapment, and should confer with relevant prosecutors for legal consultation, as needed.

8.6.3 Members planning large-scale (multi-target) operations shall advise the Commander and shall consult relevant prosecutors regarding the operation.

8.7 The examination of digital storage devices shall be performed consistent with the subject agency's protocol.

8.8 Images shall be maintained pursuant to the subject agency's policy.

8.8.1 Absent a court order specifically ordering otherwise, evidence containing Images shall not be released to any defendant or representative thereof.

8.9 Absent exigent circumstances, all Members' case referrals between jurisdictions shall include:

- Notification to and acceptance by the Commander(s) of both jurisdictions that are involved in the referral;
- A secure (i.e., digitally-protected) copy of the case file;
- An official Investigative report or affidavit containing case details; and,
- Documentation, preferably the original, of all legal process conducted and all compliance with same, especially those documents related to the issue of jurisdiction and identification of suspect(s).

8.10 The transfer of evidence containing Images among law enforcement shall be done in a secure manner.

## 9. Work Environment

9.1 ICAC Equipment shall be reserved for the exclusive use of its Members, and shall be used in accordance with their respective agency's policies.

9.2 When practicable, Equipment which might be used in undercover aspects of an Investigation shall be purchased covertly.

9.3 No personally-owned Equipment shall be used in Investigations.

9.4 Software shall be properly acquired and licensed.

9.5 Investigations shall be conducted in an approved work environment as designated by a Commander or Supervisor.

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

**End of ICAC Standards**

# Exhibit "I"

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

## Table of Contents


Definitions of Terms ........ 3

1. Purpose of the ICAC Standards ........ 5
2. ICAC National Program ........ 6
3. Oversight of the ICAC Program ........ 7
4. Selection and Retention of Task Force Members ........ 8
5. Training ........ 9
6. Case Management ........ 10
7. Task Force Reporting Requirements to OJJDP ........ 11
8. Investigations ........ 12
9. Work Environment ........ 14
10. Victim Identification ........ 15
11. Public Awareness and Community Outreach ........ 16
12. Media Relations and Media Releases ........ 17

# Definitions of Terms

**Applicability of Terms**

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

**"Affiliate"** or **Affiliate Agency"** is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

**"Authorized Personnel"** are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

**"Commander"** is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

**"CEOS"** is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

**"Crime"** is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

**"CVIP"** is the Child Victim Identification Project operated by NCMEC.

**"CyberTipline"** is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

**"Deconflict"** is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

**"DOJ"** is the United States Department of Justice.

**"Employee"** is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool – including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** – any identity established or created by an Employee to aid an Investigation.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead" or "Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

## 4. Selection and Retention of Task Force Members

4.1 (b)(7)(E) [redacted]

(b)(7)(E) [redacted]

4.2 (b)(7)(E) [redacted]

(b)(7)(E) [redacted]

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 (b)(7)(E)

(b)(7)(E)

6.2 (b)(7)(E)

(b)(7)(E)

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

> 7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

7.3 Commanders shall compile and submit information on all cases referred for local, state, or federal prosecution. Information is required for all cases referred by the Lead Agency, as well as all Affiliates that received more than $20,000 a year in OJJDP ICAC funding, and any Affiliate the Commander selects to include. The case reporting requirement is ongoing and begins with the prosecutorial agency the case is referred to and continues through the final disposition of the case.

> 7.3.1 This ongoing quarterly report shall be submitted within 30 days of the end of the quarter.

7.4 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

> 7.4.1 The name of each Affiliate Agency.
>
> 7.4.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.
>
> 7.4.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 (b)(7)(E) [redacted]
(b)(7)(E) [redacted]

8.2 (b)(7)(E) [redacted]

8.2.1 (b)(7)(E) [redacted]

8.2.2

8.2.3

8.3 (b)(7)(E) [redacted]
(b)(7)(E) [redacted]

8.3.1 (b)(7)(E) [redacted]

8.3.2

8.4 (b)(7)(E) [redacted]

8.4.1 (b)(7)(E) [redacted]

8.5 (b)(7)(E) [redacted]
(b)(7)(E) [redacted]

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

8.6 (b)(7)(E) [redacted]

(b)(7)(E) [redacted]

8.6.1 (b)(7)(E) [redacted]

8.6.2

8.6.3

8.7 (b)(7)(E) [redacted]

(b)(7)(E) [redacted]

8.8 (b)(7)(E) [redacted]

8.8.1 (b)(7)(E) [redacted]

8.9 (b)(7)(E) [redacted]

(b)(7)(E) [redacted]

(b)(7)(E) [redacted]

8.10 (b)(7)(E) [redacted]

(b)(7)(E) [redacted]

## 9. Work Environment

9.1 (b)(7)(E)
(b)(7)(E)

9.2 (b)(7)(E)
(b)(7)(E)

9.3 (b)(7)(E)

9.4

9.5
(b)(7)(E)

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

**End of ICAC Standards**

# Exhibit "J"

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

## Table of Contents


Definitions of Terms ........ 3

1. Purpose of the ICAC Standards ........ 5
2. ICAC National Program ........ 6
3. Oversight of the ICAC Program ........ 7
4. Selection and Retention of Task Force Members ........ 8
5. Training ........ 9
6. Case Management ........ 10
7. Task Force Reporting Requirements to OJJDP ........ 11
8. Investigations ........ 12
9. Work Environment ........ 14
10. Victim Identification ........ 15
11. Public Awareness and Community Outreach ........ 16
12. Media Relations and Media Releases ........ 17

## Definitions of Terms

**Applicability of Terms**

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

"**Affiliate**" or **Affiliate Agency**" is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

"**Authorized Personnel**" are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

"**Commander**" is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

"**CEOS**" is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

"**Crime**" is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

"**CVIP**" is the Child Victim Identification Project operated by NCMEC.

"**CyberTipline**" is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

"**Deconflict**" is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

"**DOJ**" is the United States Department of Justice.

"**Employee**" is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool – including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** – any identity established or created by an Employee to aid an Investigation.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead" or "Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

## 4. Selection and Retention of Task Force Members

4.1 (b)(7)(E)

(b)(7)(E)

4.2 (b)(7)(E)

(b)(7)(E)

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 (b)(7)(E)

(b)(7)(E)

6.2 (b)(7)(E)

(b)(7)(E)

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

7.3 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

7.3.1 The name of each Affiliate Agency.

7.3.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.

7.3.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 (b)(7)(E) [redacted]
(b)(7)(E) [redacted]

8.2 (b)(7)(E) [redacted]

(b)(7)(E) [redacted]

8.3 (b)(7)(E) [redacted]
(b)(7)(E) [redacted]

(b)(7)(E) [redacted]

8.4 (b)(7)(E) [redacted]

(b)(7)(E) [redacted]

8.5 (b)(7)(E) [redacted]
(b)(7)(E) [redacted]

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

8.6 (b)(7)(E)

(b)(7)(E)

8.6.1 (b)(7)(E)

8.6.2

8.6.3

8.7 (b)(7)(E)

(b)(7)(E)

8.8 (b)(7)(E)

8.8.1 (b)(7)(E)

8.9 (b)(7)(E)

(b)(7)(E)

(b)(7)(E)

8.10 (b)(7)(E)

(b)(7)(E)

## 9. Work Environment

9.1 (b)(7)(E)
(b)(7)(E)

9.2 (b)(7)(E)
(b)(7)(E)

9.3 (b)(7)(E)

9.4

9.5
(b)(7)(E)

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

**End of ICAC Standards**

# Exhibit "K"

**U.S. Department of Justice**

Office of Justice Programs

Office of the General Counsel

*Washington, D.C. 20531*

April 21, 2023

**VIA Electronic Mail**
bonnie.burkhardt@blueridge-sw.com

Bonnie Burkhardt
Blue Ridge Software Consulting
8402 Gambrill Lane
Springfield, VA 22153

Re: OJP FOIA No. 22-FOIA-00183

Dear Ms. Burkhardt:

This letter responds to your May 8, 2022, Freedom of Information Act/Privacy Act (FOIA/PA) request, which was received in the Office of Justice Programs (OJP), Office of the General Counsel (OGC), on May 9, 2022. A copy of your request is attached for your convenience.

Please be advised that a search has been conducted in the OJP, and three documents, consisting of 49 pages were located which are responsive to your request. After carefully reviewing the attached documents, OGC has determined that these documents are appropriate for release with some excisions made pursuant to Exemption (b)(7)(E) of the FOIA, 5 U.S.C. § 552. Exemption (b)(7)(E) provides protection to all law enforcement information that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." Please be advised that we have considered the foreseeable harm standard when reviewing records and applying FOIA exemptions. This completes the processing of your request by OJP.

You may contact a member of our FOIA staff at (202) 307-6235, via e-mail at FOIAOJP@usdoj.gov, as well as our FOIA Public Liaison for any further assistance and to discuss any aspect of your request at:

US DOJ, Office of Justice Programs
Office of the General Counsel
810 7th Street, NW, Room 5400
Washington, D.C. 20531
Attn: FOIA

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information

Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

If you are not satisfied with OJP's determination in response to this request, you may administratively appeal by writing to the Director, Office of Information Policy (OIP), United States Department of Justice, 441 G Street, NW, 6th Floor, Washington, D.C. 20530, or you may submit an appeal through OIP's FOIA STAR portal by creating an account following the instructions on OIP's website: https://www.justice.gov/oip/submit-and-track-request-or-appeal. Your appeal must be postmarked or electronically transmitted within 90 calendar days of the date of my response to your request. If you submit your appeal by mail, both the letter and the envelope should be clearly marked "Freedom of Information Act Appeal."

Sincerely,

Chandria Slaughter

Chandria L. Slaughter
Assistant General Counsel

Attachments

# Exhibit "L"

Former Policy

**WELCOME.** We hope you find it useful. By accessing or otherwise interacting with our servers, services, websites, or any associated content/postings (together, "CL"), you agree to these Terms of Use ("TOU") (last updated December 29, 2017). You acknowledge and agree CL is a private site owned and operated by craigslist, Inc. If you are accessing or using CL on behalf of a business, that business agrees to the TOU. If you do not agree to the TOU, you are not authorized to use CL. We may modify the TOU at any time in our sole discretion. You are responsible for periodically checking for changes and are bound by them if you continue to use CL. Our privacy policy (cl.com/about/privacy.policy), prohibited list (cl.com/about/prohibited), and all other policies, site rules, and agreements referenced below or on CL, are fully incorporated into this TOU, and you agree to them as well.

**LICENSE.** If you agree to the TOU and (1) are of sufficient age and capacity to use CL and be bound by the TOU, or (2) use CL on behalf of a business, thereby binding that business to the TOU, we grant you a limited, revocable, non-exclusive, non-assignable license to use CL in compliance with the TOU; unlicensed use is unauthorized. You agree not to display, "frame," make derivative works, distribute, license, or sell, content from CL, excluding postings you create. You grant us a perpetual, irrevocable, unlimited, worldwide, fully paid/sublicensable license to use, copy, display, distribute, and make derivative works from content you post.

**USE.** Unless licensed by us in a written agreement, you agree not to use or provide software (except general purpose web browsers and email clients) or services that interact or interoperate with CL, e.g. for downloading, uploading, creating/accessing/using an account, posting, flagging, emailing, searching, or mobile use. You agree not to copy/collect CL content via robots, spiders, scripts, scrapers, crawlers, or any automated or manual equivalent (e.g., by hand). Misleading, unsolicited, and/or unlawful postings/communications/accounts are prohibited, as is buying or selling accounts. You agree not to post content that is prohibited by any of CL's policies or rules referenced above ("Prohibited Content"). You agree not to abuse CL's flagging or reporting processes. You agree not to collect CL user information or interfere with CL. You agree we may moderate CL access/use in our sole discretion, e.g., by blocking, filtering, re-categorizing, re-ranking, deleting, delaying, holding, omitting, verifying, or terminating your access/license/account. You agree (1) not to bypass said moderation, (2) we are not liable for moderating or not moderating, and (3) nothing we say or do waives our right to moderate, or not.

**LIQUIDATED DAMAGES.** You further agree that if you violate the USE section, or you encourage, support, benefit from, or induce others to do so, you will be jointly and severally liable to us for liquidated damages as follows for: (A) collecting/harvesting CL users' information, including personal or identifying information - $1 per violation; (B) publishing/misusing personal or identifying information of a third party in connection with your use of CL without that party's express written consent - $1,000 per violation; (C) misrepresenting your identity or affiliation to anyone in connection with your use of CL - $1,000 per violation; (D) posting or attempting to post Prohibited Content - $4 per violation; (E) posting or attempting to post Prohibited Content in any paid section of CL - the price per post applicable to that section of CL; (F) sending an unauthorized/unsolicited email to an email address obtained from CL - $25 per violation; (G) using CL user information to make/send an unauthorized/unsolicited text message, call, or communication to a CL user - $500 per text/call/communication; (H) creating a misleading or unlawful CL account or buying/selling a CL account - $4 per violation; (I) abusing or attempting to abuse CL's flagging or reporting processes - $1 per violation; (J) distributing any software to facilitate violations of the USE Section - $1,000 per violation; (K) aggregating, displaying, copying, duplicating, reproducing, distributing, or exploiting CL content for any purpose without our express written consent - $3,000 for each day you engage in such violations; (L) requesting, viewing, or accessing more than 1,000 pages of CL in any 24-hour period - $0.25 per page during the 24 hour period after the first 1,000 pages; (M) bypassing or attempting to bypass our moderation efforts - $4 per violation. You agree that these amounts are (1) a reasonable estimate of our damages (as actual damages are often difficult to calculate), (2) not a penalty, and (3) not otherwise limiting on our ability to recover under any legal theory or claim, including statutory damages and other equitable relief (e.g., for spam, we can elect between the above liquidated damages or statutory damages under the anti-spam statute). You further agree that repeated violations of the USE section will irreparably harm and entitle us to injunctive or equitable relief, in addition to monetary damages.

**FEES.** You authorize us to charge your account for CL fees in paid areas (cl.com/about/help/posting_fees). Any tax is additional. Fees are non-refundable, even for posts we remove, delay, omit, re-categorize, re-rank, or otherwise moderate. We may refuse any posting.

**DISCLAIMER & LIABILITY.** To the full extent permitted by law, craigslist, Inc., and its officers, directors, employees, agents, licensors, affiliates, and successors in interest ("CL Entities") (1) make no promises, warranties, or representations as to CL, including its completeness, accuracy, availability, timeliness, propriety, security or reliability; (2) provide CL on an "AS IS" and "AS AVAILABLE" basis and any risk of using CL is assumed by you; (3) disclaim all warranties, express or implied, including as to accuracy, merchantability, fitness for a particular purpose, and non-infringement; and (4) disclaim any liability or responsibility for acts, omissions, or conduct of you or any party in connection with CL. CL Entities are NOT liable for any direct, indirect, consequential, incidental, special, punitive, or other losses, including lost profits, revenues, data, goodwill, etc., arising from or related to CL, and in no event shall such liability exceed $100 or the amount you paid us in the year preceding such loss. Some jurisdictions restrict or alter these disclaimers and limits, so some may not apply to you.

**CLAIMS & INDEMNITY.** Any claim, cause of action, demand, or dispute arising from or related to CL ("Claims") will be governed by the internal laws of California, without regard to conflict of law provisions, except to the extent governed by US federal law. Any Claims will be exclusively resolved by courts in San Francisco, CA (except we may seek preliminary or injunctive relief anywhere). You agree to (1) submit to the personal jurisdiction of courts in San Francisco, CA; (2) indemnify and hold CL Entities harmless from any Claims, losses, liability, or expenses (including attorneys' fees) that arise from a third party and relate to your use of CL; and (3) be liable and responsible for any Claims we may have against your officers, directors, employees, agents, affiliates, or any other party, directly or indirectly, paid, directed or controlled by you, or acting for your benefit.

**TRADEMARKS.** CRAIGSLIST, "CL" and the peace symbol logo are registered trademarks with the U.S. Patent and Trademark Office and with multiple trademark offices around the world.

**MISC.** Users complying with prior written licenses may access CL thereby until authorization is terminated. Otherwise this is the exclusive and entire agreement between us and you, and our actions or silence toward you or anyone else does not waive, modify, or limit the TOU or our ability to enforce it. The USE, LIQUIDATED DAMAGES, and CLAIMS & INDEMNITY sections survive termination of the TOU, and you will remain bound by those sections. If a TOU term is unenforceable, it shall be limited to the least extent possible and supplemented with a valid provision that best embodies the intent of the parties. The English version of the TOU controls over any translations. If you reasonably believe content infringes your IP rights, see cl.com/about/dmca. Questions? Email legal@craigslist.org.

**Prohibited**

Users must comply with all applicable laws, the CL terms of use, and all posted site rules.
Here is a partial list of goods, services, and content prohibited on craigslist:

- weapons; firearms/guns and components; BB/pellet, stun, and spear guns; etc
- ammunition, clips, cartridges, reloading materials, gunpowder, fireworks, explosives

- offers, solicitation, or facilitation of illegal prostitution and/or sex trafficking
- exploitation or endangerment of minors; child pornography
- recalled items; hazardous materials; body parts/fluids; unsanitized bedding/clothing
- prescription drugs, medical devices; controlled substances and related items
- alcohol or tobacco; unpackaged or adulterated food or cosmetics
- pet sales (re-homing with small adoption fee ok), animal parts, stud service
- endangered, imperiled and/or protected species and any parts thereof, e.g. ivory
- false, misleading, deceptive, or fraudulent content; bait and switch; keyword spam
- offensive, obscene, defamatory, threatening, or malicious postings or email
- anyone's personal, identifying, confidential or proprietary information
- food stamps, WIC vouchers, SNAP or WIC goods, governmental assistance
- stolen property, property with serial number removed/altered, burglary tools, etc
- ID cards, licenses, police insignia, government documents, birth certificates, etc
- US military items not demilitarized in accord with Defense Department policy
- counterfeit, replica, or pirated items; tickets or gift cards that restrict transfer
- lottery or raffle tickets, sweepstakes entries, slot machines, gambling items
- spam; miscategorized, overposted, cross-posted, or nonlocal content
- postings or email the primary purpose of which is to drive traffic to a website
- postings or email offering, promoting, or linking to unsolicited products or services
- affiliate marketing; network, or multi-level marketing; pyramid schemes
- any good, service, or content that violates the law or legal rights of others

Please don't use CL for these purposes, and flag anyone else you see doing so.
Thanks for helping keep craigslist safe and useful for everyone

New Law

The U.S. Senate on Wednesday overwhelmingly approved **legislation amending Section 230** of the Communications Decency Act to allow civil and criminal sex trafficking-related claims against internet companies, sending the bill to the White House.

The Allow States and Victims to Fight Online Sex Trafficking Act, or FOSTA (H.R. 1865), was approved in a vote of 97-2. The only lawmakers voting against the bill were Oregon Democrat Ron Wyden, who co-authored Section 230, and Kentucky Republican Rand Paul. Sen. John McCain, R-Arizona, did not vote, although he supported the bill.

A proposed amendment by Wyden to help fund sex-trafficking enforcement was defeated. Wyden withdrew a **separate proposed amendment** that aimed to expressly shield internet companies from legal liability, if they actively moderated their forums.

President Donald Trump is expected to sign the bill into law. After the House approved H.R. 1865 at the end of February, White House Press Secretary Sarah Sanders called the legislation "an important step forward" in the fight against sex trafficking.

Critics of the bill, however, have said the legislation is vaguely worded and will not only be counterproductive—by forcing sex-trafficking operations further underground—but also hinder internet freedom by exposing companies to litigation over user content.

The Electronic Frontier Foundation **said in a statement** that, in the wake of the bill's passage, "online platforms will have little choice but to become much more restrictive in what sorts of discussion—and what sorts of users—they allow, censoring innocent people in the process."

The bill **expands existing criminal sex-trafficking law** to rope in facilitation of trafficking by web sites. It also makes those provisions retroactive, which the Justice Department **has said** is probably unconstitutional.

Earlier drafts of the legislation were strongly opposed by the Internet Association, which represents companies including Google, Facebook, Twitter and Reddit. But the organization changed its position after tweaks were made.

In a tweet, **Wyden took a shot at internet companies** for not taking a stand against the bill. "We are in a fight for the Internet every day. Big Internet companies are NOT engaged in this fight – Their only interest is currying favor with the nations where they wish to do business," he wrote.

The impetus for the legislation was Backpage.com, the online classified ad site that a **Senate investigation found** had "knowingly concealed" evidence of criminal sex trafficking through its site and facilitated child sex trafficking.

That investigation was led by Sens. Rob Portman, R-Ohio, and Claire McCaskill, D-Missouri, who championed the FOSTA bill and its earlier Senate version, called SESTA.

"Today's vote is a victory for trafficking survivors and a victory for our efforts to help stop the selling of women and children online," Portman said in a statement, adding that the legislation "will ensure justice for trafficking victims and help us combat this evil crime."

# Exhibit "M"

198

ICAC Internet Crimes Against Children
Training & Technical Assistance Program

# Undercover Concepts and Techniques



## Bellevue, WA
## June 15-19, 2015

Fox Valley Technical College

OJJDP Office of Juvenile Justice and Delinquency Program

*This training is designed to provide you with information, tools, and skills that you can apply in your work. Not all of the material presented in this class may be applicable in your particular jurisdiction. Laws vary from one jurisdiction to another and both technology and laws are dynamic and ever-changing. Before implementing any aspect of this training, consult with your supervisor and local prosecutor. Always follow your agency's policy and guidance.*

*Printed and electronic material provided to you is intended to help you learn and apply the information presented. These materials are not intended to be all-inclusive or exhaustive. The use of specific investigative methodologies, hardware devices and software tools demonstrated in the training is not an endorsement by Fox Valley Technical College, OJJDP, OJP, or the USDOJ, nor a guarantee that their use is appropriate in all circumstances. Before using these tools, check with your supervisors and prosecutor's office, if applicable, to be sure they are valid and appropriate in your jurisdiction. Software and other material may be subject to copyright protection and may require licensing or permission before use.*

*The opinions expressed by presenters in their oral or written material are theirs alone, and do not necessarily represent those of Fox Valley Technical College, OJJDP, OJP, or the USDOJ.*

OJJDP Office of Juvenile Justice and Delinquency Prevention

*This project is supported by Grant #2013-MC-FX-K104 awarded by the OJJDP, OJP, US DOJ.*

Fox Valley Technical College

Internet Crimes Against Children Training & Technical Assistance Program

# ICAC Undercover Concepts and Techniques Training Program
## Bellevue, WA
## June 15-19, 2015

Table of Contents ........ 1
Class Agenda ........ 3
Instructor Biographies ........ 11
**Notes**
Lined paper ........ 15
**Handouts**
Backpage LE Guide ........ 21
Case Example ........ 23
Consent for Named LEO to Use Picture ........ 35
Consent to Search ........ 37
Helpful Communication Excerpts ........ 39
Hobbyist Boards ........ 41
Motherless MIRC Server – How to Connect ........ 43
MIRC 7.22 Setup and Tips ........ 45
Online Consent Adult ........ 49
Sample Subpoenas – Craigslist ........ 51
Sample Interrogation Questions ........ 55
Social Networking Searches – Quick Reference ........ 65
UC Operation Start Up Guide ........ 67
Undercover Evidence Documentation Checklist ........ 69
Undercover Persona – Sizing Chart ........ 71
Undercover Identity Worksheet ........ 73
Web Evidence Gathering – Quick Reference Sheet ........ 75
**General Handouts**
ICAC Operational and Investigative Standards ........ 79
Helpful Commands & Websites ........ 97
Free & Helpful Resources ........ 99

Internet Crimes Against Children Training & Technical Assistance Program

# ICAC Online Undercover Concepts and Techniques Training Program

## Bellevue, WA

## June 15-19, 2015

**Day 1**

8:00 am – 8:30 am

**Welcome & Overview** – *Mike Sullivan*

- Housekeeping items
- Websites (ICAC Task Force, ICACCOPS and NCJTC) Additionally, students will create an ICACCOPS account. Upon creation of the ICACCOPS user account students will be shown how to use ICACCOPS to deconflict IP addresses, screen names, email and the different type of investigative information available on ICACCOPS.
- Introductions

8:30 am – 9:30 am

**ICAC Investigative Standards** – *Mike Sullivan*

During this module students will review the Internet Crimes Against Children (ICAC) Task Force Undercover Standards and Guidelines relevant to undercover investigations and digital evidence. Included in the review are issues surrounding entrapment statutes and transfer of evidence between law enforcement officials.

9:30 am – 11:00 pm

**Online Tools in Online Ads Investigations** – *Tony Leonard*

Successful investigation and prosecution of ICAC investigations requires proper documentation of online investigative activities. In this module the student will learn principles, tools and techniques to document their online investigations and to organize the evidence they collect. In a hands-on environment, students will learn to use several tools and capture on-line information. These tools will be used throughout the course to build student proficiency in their use.

11:00 am – 12:00 pm

**Callyo** – *Mike Sullivan*

During this block students will familiarize themselves with the use of the Callyo undercover recorded telephone calls. Students will utilize a training account to place, receive, monitor and record telephone conversations.

12:00 pm- 1:00 pm

**Lunch (on own)**

| | |
|---|---|
| 1:00 pm – 2:00 pm | **Establishing an Undercover Identity - Child Personas** – *Robert Leazenby*<br><br>During this module, the focus will be establishing a child's undercover persona for proactive investigations. Select chat clients will be used to practice basic functions common to most chat programs. The discussion will include the issues involved with what evidence can be captured and produced as a result of their online activities and how to properly collect and store that evidence. |
| 2:00 pm – 5:00 pm | **Establishing an Undercover Identity - Adult Personas** – *Robert Leazenby*<br><br>During this module, the focus will be establishing an adult undercover persona for proactive investigations. Select chat clients will be used to practice basic functions common to most chat programs. The discussion will include the issues involved with what evidence can be captured and produced as a result of their online activities and how to properly collect and store that evidence. |

1:00 pm – 2:00 pm

**Establishing an Undercover Identity - Child Personas** – *Robert Leazenby*

During this module, the focus will be establishing a child's undercover persona for proactive investigations. Select chat clients will be used to practice basic functions common to most chat programs. The discussion will include the issues involved with what evidence can be captured and produced as a result of their online activities and how to properly collect and store that evidence.

2:00 pm – 5:00 pm

**Establishing an Undercover Identity - Adult Personas** – *Robert Leazenby*

During this module, the focus will be establishing an adult undercover persona for proactive investigations. Select chat clients will be used to practice basic functions common to most chat programs. The discussion will include the issues involved with what evidence can be captured and produced as a result of their online activities and how to properly collect and store that evidence.

| | Day 2 |
|---|---|
| 8:00 am – 8:30 am | **Review –** *Robert Leazenby, Chris Meehan Tony Leonard and Mike Sullivan* |
| 8:30 am – 9:30 am | **Reading Email Headers and IP Look-up –** *Tony Leonard*<br><br>The investigation of on-line ads requires an understanding of email and how to trace email. This module will explain how email operates and how to read email headers so they can be traced to their source. |
| 9:30 am – 10:30 pm | **Online Resources for ICAC Investigations –** *Chris Meehan*<br>In this module, students will learn about and use various sites where "free" digital intelligence can be gathered on the web. Students will be provided with a listing of websites to utilize in their quest to uncover and identify their suspect. |
| 10:30 pm – 12:00 pm | **Investigating Online Ads** *– Robert Leazenby*<br><br>During this module students will learn about online ads using Craigslist to illustrate the principle. They will learn how Craigslist works and about different types of proactive investigations that can be initiated. The instruction will include methods of responding to suspicious ads and proactively placing ads. They will receive information about the utilities and forms needed to begin an investigation. students will see examples of actual Craigslist ads that have resulted in successful operations. The instruction will focus on what is a "good, bad, or ambiguous ad." More importantly, students will see the importance not to miss out on initiating an investigation from an ambiguous ad. Students will also see a case study that shows how information from previous postings can strengthen their case. The module will also showcase advanced methods for identifying a suspect. Proactively placed ads by the investigator will also be discussed, along with ideas to evolve the undercover method of initiating exploitation investigations on Craigslist. |
| 12:00 pm – 1:00 pm | **Lunch (on own)** |
| 1:00 pm – 3:00 pm | **Investigating Online Ads (*continued*)** |
| 3:00 pm – 4:00 pm | **Undercover Investigations Lab** – *Mike Sullivan*<br><br>This module will allow the students to use the techniques learned in the class to locate a suspect and within a very short period of time elicit the suspect's personally identifying information. The students will participate in an exercise to get an online suspect to give them the suspect's true name, address, employment and phone number through online interaction. |

4:00 pm – 5:00 pm

**Overcoming Undercover Requests** – *Tony Leonard*

During the module investigative challenges and strategies will be discussed including:

- UC Voice Conversation – Parent, Child, Adult Persona
- UC Social Media - Issues & Comments
- UC Photographs - Issues & Comments

| | Day 3 |
|---|---|
| 8:00 am – 8:30 am | **Review** – *Robert Leazenby, Tony Leonard, Chris Meehan and Mike Sullivan* |
| 8:30 am – 10:30 am | **Overcoming Undercover Requests *(continued)*** |
| 10:30 am – 12:00 pm | **Interview Strategies in Undercover Investigations** – *Robert Leazenby*<br><br>This module is designed to show students what evidence to look for and what questions to ask during an interview and/or interrogation following the analysis of evidence gathered during and after an investigation. We will discuss interview techniques and considerations, technology based interview questions, and questions based on information gathered during an investigation. Technology facilitated crime scene issues will also be discussed, such as "where" the crime scene is, whether a warrant is needed or whether it is incidental to the arrest, and what items to take from the crime scene. |
| 12:00 pm – 1:00 pm | ***Lunch (on own)*** |
| 1:00 pm –2:00 pm | **Considerations for Scaleable UC Operations** – *Mike Sullivan*<br><br>During this module, students will learn how to coordinate, set-up, organize and successfully conduct an undercover operation. Considerations for large scale online undercover sting operations will also be discussed. These operations have many moving parts, but are scalable to fit each agency's size and needs. Discussions will also include selecting the undercover location, personnel, cost and partner agencies. |
| 2:00 pm – 4:00 pm | **Practical Exercise** – *Robert Leazenby, Tony Leonard, Chris Meehan* |
| 4:00 pm – 5:00 pm | **Video Audio Screen Capture Software** – *Chris Meehan*<br><br>During this block students will learn to use the software suite of Camtasia to conduct video captures of online sessions. |

| | Day 4 |
|---|---|
| 8:00 am – 8:30 am | **Review** – *Tony Leonard, Chris Meehan and Mike Sullivan* |
| 8:30 am – 9:00 am | **ICACCOPS Gridcop/CPS** – *Mike Sullivan*<br><br>Participants will use the websites of ICACCOPS and Gridcop/CPS to deconflict investigations on a national level. The students will also learn how to use these databases to localize their investigations to their home jurisdiction by city, county or state. |
| 9:00 am – 10:00 am | **Takeover Account Issues** – *Chris Meehan*<br><br>During this module, students will be exposed to common issues encountered when taking over accounts. |
| 10:00 am – 11:00 am | **Android Emulator** – *Chris Meehan*<br><br>During this module students will install the Android emulator, Blue Stacks on their computer and then install the app KIK. Students will then chat and exchange files via the KIK app to learn how the app communicates and stores data. |
| 11:00 am – 12:00 pm | **Tor Browser and Tor Chat Client** – *Mike Sullivan*<br><br>Students will install the TOR browser to gain an understanding of how TOR browsing obfuscates the IP Address in use. The students will then install TOR Chat and use the program to chat and exchange files to understand where items of evidentiary value can be found. |
| 12:00 pm – 1:00 pm | Lunch (on own) |
| 1:00 pm – 2:00 pm | **EXIF Data** – *Tony Leonard*<br><br>During this module, students will learn how to check the exchange information (EXIF) data embedded in digital images. They will use the software program Irfanview to locate and display the EXIF associated to images they brought with them to the class. This block will also use Windows Explorer to exam and change the EXIF data. |
| 2:00 pm – 3:00 pm | **Encryption** – *Mike Sullivan*<br><br>Students will gain an understanding of the public-private key and symmetric key methods of encryption. They will use the software program BC Archive to create encrypted files and folders. Then decrypt the files to view the content. This module will also discuss the sending of contraband/evidence between law enforcement officials. |

3:00 pm – 3:30 pm **TCP/IP Identification** – *Tony Leonard*

During this module students will learn how to locate the IP Address in use by subjects in chat clients or during chat sessions. This module will also use the command prompt to view internal and external IP Addresses.

3:30 pm – 4:00 pm **Basic Evidence Recovery** – *Mike Sullivan*

This module will demonstrate how data written to a drive can be deleted and then recovered. The students will use the RECUVA software to recover deleted data from an external drive.

4:00 pm – 5:00 pm **Motherless.com** – *Chris Meehan*

This module will look at the website Motherless.com as a source of information concerning online conduct and subject matter. Students will learn how to use the deconfliction sites to locate regionalized targets and then access Motherless.com to confirm geographical location.

| | Day 5 |
|---|---|
| 8:00 am – 8:30 am | **Review** – *Tony Leonard, Chris Meehan and Michael Sullivan* |
| 8:30 am – 11:30 am | **Paltalk.com Instructor Demo** – *Tony Leonard*<br><br>This block will examine how students can identify subjects seeking to sexually exploit children using Paltalk Chat to interact with children and adults. During this block, students will use undercover personas to engage these subjects in a conversation designed to document the subject's illegal activities. Students will also learn how to add a server to the list of IRC servers and move from one net of suspect to switch between chat rooms or create new chat rooms. |
| 11:30 am – 12:00 pm | **Mental Health** – *Chris Meehan*<br><br>During this module students will learn some of the best practices in use by ICAC's around the country to maintain a healthy work environment. They will also learn to recognize symptoms that may signal a need for a break from contact with child sexual exploitation materials. |
| 12:00 am – 1:00 pm | **Lunch (on own)** |
| 1:00 pm – 4:00 pm | **IRC Chat** – Tony *Leonard*<br><br>This block will examine how students can identify subjects seeking to sexually exploit children using Internet Relay Chat to interact with those children. During this block, students will use undercover personas to engage these subjects in a conversation designed to document the subject's illegal activities. Students will also learn how to add a server to the list of IRC servers and move from one net of suspect to another. |
| 4:00 pm – 4:30 pm | **Save Chat and Online Ads Evidence to Folder Structure** – *Tony Leonard and Chris Meehan*<br><br>In this module we will show the students methods for saving to files in a structure for effective use as evidence. |
| 4:30 pm – 5:00 pm | **Closing, Certifications and Evaluations** – *Tony Leonard, Chris Meehan, and Mike Sullivan* |

# Bios

**ROBERT LEAZENBY**
**SPECIAL AGENT**
**WYOMING DIVISION OF CRIMINAL INVESTIGATION**
**316 W. 22ND STREET**
**CHEYENNE, WY 82002**
**(307) 777-6700**
**(307) 777-7252 FAX**
**rleazenby@mac.com**

Robert Leazenby is assigned to the Computer Crime team within the Wyoming Division of Criminal Investigation, which is a member of the Internet Crimes Against Children (ICAC) task force. His duties primarily involve the investigation of child exploitation crimes on state and federal levels. Robert conducts proactive undercover operations and is trained in the current methods of forensic procedures.

Robert is versed in the computer programming languages of C++, Visual Basic 6, Visual Basic.net, and Real Basic. He has assisted in the development of programs to enhance software packages used throughout the ICAC community. He provides instruction as well as technical assistance in support of these packages. In addition, he lectures and provides instruction to numerous law enforcement and prosecutorial groups on the methods and mission of the Wyoming ICAC.

Prior to his current assignment, Robert investigated state and federal drug crimes and has worked in uniformed patrol on a local and state level. Robert was initially trained in electronics and its technical application, courtesy of the United States Marine Corps.

**ANTHONY LEONARD**
**CAPTAIN**
**SMYRNA POLICE DEPARTMENT**
**2646 ATLANTA ROAD**
**SMYRNA, GA 30080**
**(678) 631-5184**
**(770) 431-2870 FAX**
**tleonard@ci.smyrna.ga.us**

Anthony Leonard has served with the Smyrna Police Department since 1995, where he currently commands the Criminal Investigations Division. Capt. Leonard formed the Smyrna Police Department's Computer Crimes Unit, which he also supervises. He is responsible for overseeing the investigation of all the agency's ICAC cases, computer forensic examinations, and investigations into computer-related crimes. He began working ICAC cases in 2006, and has investigated numerous cases consisting primarily of peer-to-peer investigations and undercover chat investigations.

Since 1998, Tony has served as a part-time instructor at the North Central Georgia Law Enforcement Academy, conducting over 1,500 hours of classroom and hands-on training. He is a Georgia POST-certified Senior Instructor. Tony has also served as a guest lecturer at Kennesaw State University.

**CHRISTOPHER MEEHAN**
**SERGEANT**
**COLLIN COUNTY SHERIFF'S OFFICE**
**2205 LOS RIOS BLVD**
**PLANO, TX 75074**
**(972) 633-6753**

Sergeant Chris Meehan has 24 years of experience in law enforcement in Texas. He is currently in the Investigations Unit at the Collin County Sheriff's Office, where he is assigned to the Internet Crimes Against Children (ICAC) Task Force. His primary duties now include working undercover online as a minor and investigating online solicitation of minor cases. Sgt. Meehan has received extensive training in the field of child physical and sexual abuse as well as the use of the Internet by sexual predators to seduce, entice and gain access to children for the purposes of sexual exploitation.

Sgt. Meehan is deputized as a Federal Agent with the United States Secret Service Electronic Crimes Task Force, and is certified as a Computer Forensics Examiner. Sgt. Meehan is certified as an expert in State and Federal Courts in regards to computer forensics and on investigating Internet Crimes Against Children. He also trains across the Country on Internet safety and investigating online crimes targeting children.

Sgt. Meehan has won several awards, including: Directors Award for Law Enforcement 2009 from Oklahoma State Bureau of Investigations; Law Enforcement Commendation Medal 2010 from National Society Sons of the American Revolution.

Sgt. Meehan holds a Master Peace Officer license with the State of Texas.

**MICHAEL SULLIVAN**
**DEPUTY BUREAU CHIEF**
**ILLINOIS ATTORNEY GENERAL'S OFFICE**
**100 W. RANDOLPH**
**CHICAGO, IL 60601**
**(312) 814-3505**
**(312) 814-8283**
**misullivan@atg.state.il.us**

Deputy Chief Sullivan is a thirty-year veteran of law enforcement and holds a Bachelor's Degree in Law Enforcement Administration from Western Illinois University. He currently is assigned as the Deputy Chief of the Investigations Division for the Illinois Attorney General's Office and the Internet Crimes Aagainst Children Task Force Commander.

Deputy Chief Sullivan served as a member of State and Federal Narcotic Task Forces, working in an undercover capacity. Deputy Chief Sullivan was a member of the DuPage County Illinois Major Crimes Task Force and was responsible for the data entry and leads collection for major cases involving the Task Force. He is a member of the ICAC Advisory Board, and the Co-Chair of the ICAC Emerging Technology Group.

Deputy Chief Sullivan has been a member of the teaching faculty at North East Multi-Regional Training, The College of DuPage, The Suburban Law Enforcement Academy, and for the Fox Valley Technical College/OJJDP. Deputy Chief Sullivan has also been a guest lecturer for Assistant United States Attorneys at the Department Of Justice, Office of Legal Education Training Center in Columbia South Carolina, Governors State University, Prairie State College and the Federal Law Enforcement Training Center in Glyco Georgia. Deputy Chief Sullivan is the author of two books, *Safety Monitor* and *Online Predators*, which focus on the use of computers to victimize children.

Deputy Chief Sullivan's investigative techniques have resulted in the arrest and prosecution of numerous predators of children. As the task force commander of the Internet Crimes against Children task force he has created training classes for the investigation of child exploitation and delivered that training to local, state and federal law enforcement officers and prosecutors. He is the co-creator of the SAFEKIDS program in conjunction with the Microsoft Corporation, which is a course of instruction for children from the 4th to 5th grade on the dangers of the Internet. The program uses a workbook, lecture and a fully narrated slide presentation to give children the skills to deal with predators on the Internet. In the creation of the slide presentation, nationally known news reporters from ABC and NBC News loaned their voices to the characters in the presentation. Deputy Chief Sullivan has received numerous awards for his work including the Medal of Valor, the Meritorious Service Medal, and The Illinois Bar Association's Law Enforcement Official of the Year.

Notes

Course Handouts

iCAC Internet Crimes Against Children Training & Technical Assistance Program

# ICAC UC Concepts and Techniques Training Program

***Course Handouts***

- Backpage LE Guide
- Case Example
- Consent for Named LEO to Use Picture
- Consent to Search
- Helpful Communication Excerpts
- Hobbyist Boards
- Motherless MIRC Server – How to Connect
- MIRC 7.22 Setup and Tips
- Online Consent Adult
- Sample Subpoenas – Craigslist
- Sample Interrogation Questions
- Social Networking Searches – Quick Reference
- UC Operation Start Up Guide
- Undercover Evidence Documentation Checklist
- Undercover Persona - Sizing Chart
- Undercover Identity Worksheet
- Web Evidence Gathering - Quick Reference Sheet

CONFIDENTIAL: FOR LAW ENFORCEMENT USE ONLY

# LAW ENFORCEMENT GUIDE

*Backpage.com* is committed to making our site safer for our users and our community. We are focused on improving the safety and security of the site and on blocking those users intent on committing illegal activity through the site.

*Backpage.com* will accept electronic service of out-of-state subpoenas and search warrants as it allows us to expedite the return. We respect the terms of the Stored Communications Act, 18 U.S.C. §§ 2701, et seq.

FOR SUBPOENAS, WARRANTS, AND COURT ORDERS:

Backpage.com, LLC
Subpoena Compliance/Law Enforcement Support
2501 Oak Lawn Ave., Suite 700
Dallas, TX 75219

Fax: 214-757-8548
Email: records@backpage.com

FOR QUESTIONS:

Email us 24/7/365 at the email address below:
records@backpage.com

For telephone contact, between 8 am and 5 pm local Central/Standard time:
214-757-8574 or 214-757-8578

backpage.com

CONFIDENTIAL: FOR LAW ENFORCEMENT USE ONLY

# FREQUENTLY ASKED QUESTIONS

1. *What information will be included in the return?*
   We can provide the following information for each post requested:
   - a copy of the ad
   - a 4 color PDF for electronic documents
   - all invoices associated with that ad
   - IP addresses used to post along with the time, date, and time zone
   - user's email address

2. *What information is needed to research an ad?*
   We need at least one of the following to locate a posting:
   - post ID number and city (e.g. 12253807 Dallas)
   - the email address used to post
   - the phone number listed in the ad

   In all cases, please include the city the ad appeared in if possible.
   If the subpoena is the result of a report from NCMEC, please include the Cyber Tip number in the subpoena.

3. *How long do you store ads?*
   Most ads are stored for six (6) months after expiration. Some postings are archived for up to two (2) years.

4. *How quickly can I expect to have my subpoena processed?*
   Subpoenas are generally processed within 5-7 business days. If you have a subpoena involving possible child exploitation, please let us know at records@backpage.com and we will expedite your request.

5. *When is the IP address stored for an ad?*
   We capture the IP address, time, date, and time zone when the ad is first created and on any subsequent renewals. We do not capture the IP address when an ad is edited.

*Please send any suggestions on how we can improve subpoena processing or quality of information furnished to records@backpage.com.*

backpage.com

From October 10th-17th 2011 Special Agent (SA) Mike Duffey was participating in an undercover operation in Tallahassee, FL. The operation named "Tallyop" was a joint operation involving police officers from multiple law enforcement agencies in Florida including the Tallahassee Police Department. During this operation officers posted to various social media sites, which resulted in the posting being answered via email by the individuals who had viewed the posting.

On October 12th 2011 at 5:32pm EDT Tallahassee Police Department Investigator Sonya Bush posted to the Craigslist-Tallahassee-Personals-Casual Encounters section of Craigslist using the following undercover email account sarahp1871@gmail.com.

The posting stated the following in the subject line:
"mom needing help with daughter- w4m-40 (tally)".

Below the posting is in the body of the posting was the following.
"single mom needs help from a discreet man to help teach daughter,,,no games please" Posting ID 2646542078. A screen capture of this posting was captured by Investigator Bush upon making the post along with the unique posting ID number list above.

A copy of this posting will be maintained electronically

On October 12th 2011 at 6:13pm Investigator Bush began to receive emails to her undercover account sarahp1871@gmail.com, regarding the craigslist posting. The emails were from "trusmaniac@gmail.com- Jason Harrell". This individual was later identified as Jason Jarrell.

The following are the emails both send a received between Investigator Bush's undercover email account and the suspect Jason Jarrell using the email trusmaniac@gmail.com.

**From: Jason Harrell trusmaniac@gmail.com**
**Wed, Oct 12, 2011 at 6:13 PM**
To: "pers-mhjxf-2646542078@craigslist.org" <pers-mhjxf-2646542078@craigslist.org>
Hey there I am willing to help you with this and can be very discreet. I would like you to respond with something first just so I know you are real. No games just reply and we can go from there. –

Sent from Sent from my iPhone

**From: Sarah Peterson sarahp1871@gmail.com**
**Wed, Oct 12, 2011 at 6:22 PM**
To: Jason Harrell <trusmaniac@gmail.com>
This is a pic of me...my daughter looks like me,,only alot younger and thinner. I wont put any pics out there of her until I am comfortable they are in safe hands...
**sarah.jpg.** 369K
* The photo send to Jarrell was a undercover photo of Investigator Bush and was of her as an adult. This photo will also be attached as a related item.

**From: Jason Harrell trusmaniac@gmail.com**
**Wed, Oct 12, 2011 at 7:32pm**
To: Sarah Peterson <sarahp1871@gmail.com>
When do you want to meet up?
Sent from my iPhone

**From: Jason Harrell trusmaniac@gmail.com**
**Wed, Oct 12, 2011 at 8:19pm**
To: Sarah Peterson <sarahp1871@gmail.com>
Hey just want to see if you got my email.
Sent from my iPhone

From: **Sarah Peterson sarahp1871@gmail.com**
**Wed, Oct 12, 2011 at 8:36pm**
To: Jason Harrell <trusmaniac@gmail.com>
id like to chat a little more before we meet and make sure you are the right man for her

**From: Jason Harrell trusmaniac@gmail.com**
**Wed, Oct 12, 2011 at 8:40pm**
To: Sarah Peterson <sarahp1871@gmail.com>
That's fine. What would you like to know? I'm about 5 10 175. I'm 31 with brown hair and eyes.
Sent from my iPhone

**From: Sarah Peterson <sarahp1871@gmail.com**
**Wed, Oct 12, 2011 at 8:47pm**
To: Jason Harrell <trusmaniac@gmail.com>
r u cool with teaching young girls

**From: Jason Harrell <trusmaniac@gmail.com**
**Wed, Oct 12, 2011 at 8:51pm**
To: Sarah Peterson <sarahp1871@gmail.com>
As long as she is willing to listen and learn yes. How old?
Sent from my iPhone

**From: Jason Harrell <trusmaniac@gmail.com**
**Wed, Oct, 12 2011 at 9:02pm**
To: Sarah Peterson sarahp1871@gmail.com
I'm not judging or anything I'm just curious.
Sent from my iPhone

**From: Jason Harrell <trusmaniac@gmail.com**
**Wed, Oct 12, 2011 at 9:24pm**
To: Sarah Peterson <sarahp1871@gmail.com
Are you getting my emails?
Sent from my iPhone

The last email between Investigator Bush and suspect Jarrell was at 9:24pm. After this no further emails were sent or received on October 12th 2011.

A copy of the emails will be maintained in related items.

From October 10th-17th 2011 Special Agent (SA) Mike Duffey was participating in an undercover operation in Tallahassee, FL. The operation named "Tallyop" was a joint operation involving police officers from multiple law enforcement agencies in Florida including the Tallahassee Police Department. During this operation officers posted to various social media sites, which resulted in the posting being answered via email by the individuals who had viewed the posting.

On October 13th 2011 Investigator Bush began receiving emails from Jason Jarrell using the email "trusmaniac@gmail.com". The following is the emails that were exchanged between Jarrell and Investigator Bush who was using the undercover email sarahp1871@gmail.com.

The following is the emails exchanged:

From: Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 1:27 PM
To: Sarah Peterson <sarahp1871@gmail.com
What do you think?
Sent from my iPhone

From: Sarah Peterson <sarahp1871@gmail.com
Thu, Oct 13, 2011 at 2:53 PM
To: Jason Harrell <trusmaniac@gmail.com
hi,,,sorry,,crashed last night,,,just stopping by the house to pick up my phone charger,,,i'll be back around 430today if you wanna chat

From: Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 2:53 PM
To: Sarah Peterson <sarahp1871@gmail.com
Yeh that sounds good. I got to work tonight but should be able to chat a little.
Sent from my iPhone

From: Sarah Peterson <sarahp1871@gmail.com
Thu, Oct 13, 2011 at 4:17 PM
To: Jason Harrell <trusmaniac@gmail.com
how late do you work

From: Jason Harrell trusmaniac@gmail.com
Thu, Oct 13, 2011 at 7:15 PM
To: Sarah Peterson <sarahp1871@gmail.com
I get out at like 10 and I have something I gotta do but it won't take long. Did you want to meet?
Sent from my iPhone

From: Sarah Peterson sarahp1871@gmail.com
Thu, Oct 13, 2011 at 8:19 PM
To: Jason Harrell <trusmaniac@gmail.com
Alex will be 13 on Monday,,,are you cool with her age,,,I understand if you are not

From: Jason Harrell trusmaniac@gmail.com
Thu, Oct 13, 2011 at 8:24 PM

To: Sarah Peterson <sarahp1871@gmail.com
What exactly are you trying to teach her?
Sent from my iPhone

From: Sarah Peterson sarahp1871@gmail.com
Thu, Oct 13, 2011 at 8:28 PM
To: Jason Harrell <trusmaniac@gmail.com
relationships between women and men

From: Jason Harrell trusmaniac@gmail.com
Thu, Oct 13, 2011 at 8:31 PM
To: Sarah Peterson <sarahp1871@gmail.com
Can you send me a pic of both of you and I'll come over then we can talk
Sent from my iPhone

From: Jason Harrell trusmaniac@gmail.com
Thu, Oct 13, 2011 at 8:47 PM
To: Sarah Peterson <sarahp1871@gmail.com
Sorry if it seems like I'm being pushy. I'm just curious. I promise I won't share the picture I'll even delete it in front of you when we meet.
Sent from my iPhone

From: Jason Harrell trusmaniac@gmail.com
Thu, Oct 13, 2011 at 8:59 PM
To: Sarah Peterson <sarahp1871@gmail.com
I understand if you have reservations.
Sent from my iPhone

From: Sarah Peterson sarahp1871@gmail.com
Thu, Oct 13, 2011 at 9:15 PM
To: Jason Harrell <trusmaniac@gmail.com
i will send a pic of me,,,not gonna give out Alex's until I know you are right for us,,,,she looks like me only a lot younger and thinner
sarah.jpg 369K
* sent was the same photo that was sent on October 12th 2011 to Jarrell. The photo contained a undercover photo of Investigator Bush as an adult.

From: Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 9:19 PM
To: Sarah Peterson <sarahp1871@gmail.com
That's fine. Do you want to meet tonight?
Sent from my iPhone

From: Sarah Peterson <sarahp1871@gmail.com
Thu, Oct 13, 2011 at 9:20 PM
To: Jason Harrell <trusmaniac@gmail.com
i don't want to meet until i know what your intentions are and that you are safe

From: Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 9:30 PM
To: Sarah Peterson <sarahp1871@gmail.com
Ok. My intentions are just to help you do what you said. Not sure what I can do for other.
Sent from my iPhone

From: Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 9:32 PM
To: Sarah Peterson <sarahp1871@gmail.com>
Are you a police officer or in any way related to law enforcement?
Sent from my iPhone

From: Sarah Peterson sarahp1871@gmail.com
Thu, Oct 13, 2011 at 9:34 PM
To: Jason Harrell <trusmaniac@gmail.com
no i am not law enforcement,,,my uncle was a game warden down in Palatka years ago,,only one i'm related too

From: Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 9:36 PM
To: Sarah Peterson <sarahp1871@gmail.com
I just meant like federal agency or other government officer.
Sent from my iPhone

From: Sarah Peterson <sarahp1871@gmail.com
Thu, Oct 13, 2011 at 9:39 PM
To: Jason Harrell <trusmaniac@gmail.com
ok are we on the same sheet of music??? are you talking about tudoring or are you talking about sex?

From: Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 9:41 PM
To: Sarah Peterson <sarahp1871@gmail.com
I don't really want to say on here. I'm not a tutor though
Sent from my iPhone

From: Sarah Peterson <sarahp1871@gmail.com
Thu, Oct 13, 2011 at 9:48 PM
To: Jason Harrell <trusmaniac@gmail.com
ok,,,well do you want to talk on the phone?

From:Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 9:50 PM
To: Sarah Peterson <sarahp1871@gmail.com>
That'd be fine. 850 819 8300. Just give me like 15 min before you call
Sent from my iPhone

From: Sarah Peterson <sarahp1871@gmail.com
Thu, Oct 13, 2011 at 9:51 PM

To: Jason Harrell <trusmaniac@gmail.com
no prob

From:Sarah Peterson <sarahp1871@gmail.com
Thu, Oct 13, 2011 at 10:19 PM
To: Jason Harrell <trusmaniac@gmail.com
hey,,i had to take my phone out to the car to charge,,,wont charge on my wall charger for some reason,,,wont take long and ill call

From: Jason Harrell <trusmaniac@gmail.com
Thu, Oct 13, 2011 at 10:22 PM
To: Sarah Peterson <sarahp1871@gmail.com
Sounds good
Sent from my iPhone

At 10:22pm on October 13th 2011 the last email was exchanged. No further emails were exchanged or conversations had. A copy of the emails between Jarrell and Inv Bush will be maintained in related items.

From October 10th-17th 2011 Special Agent (SA) Mike Duffey was participating in an undercover operation in Tallahassee, FL. The operation named "Tallyop" was a joint operation involving police officers from multiple law enforcement agencies in Florida including the Tallahassee Police Department. During this operation officers posted to various social media sites, which resulted in the posting being answered via email by the individuals who had viewed the posting.

On October 14th 2011 FDLE Special Agent (SA) Mike Duffey continued talking with Jarrell using Investigator Bush's email (sarahp1871@gmail.com) due to Investigator Bush being out sick. SA Duffey began receiving emails from Jason Jarrell using the email "trusmaniac@gmail.com". The following is the emails that were exchanged between Jarrell and Investigator Bush who was using the undercover email sarahp1871@gmail.com.

The following is the emails exchanged between SA Duffey and Jarrell:

**From:Jason Harrell <trusmaniac@gmail.com**
**Fri, Oct 14, 2011 at 7:04 PM**
To: Sarah Peterson <sarahp1871@gmail.com
Hey
Sent from my iPhone

**From: sarah peterson <sarahp1871@gmail.com**
**Fri, Oct 14, 2011 at 11:34 PM**
To: Jason Harrell <trusmaniac@gmail.com
Yes

**From: Jason Harrell trusmaniac@gmail.com**
**Fri, Oct 14, 2011 at 11:53 PM**
To: sarah peterson <sarahp1871@gmail.com
You were gonna call last night?
Sent from my iPhone

**From: sarah peterson <sarahp1871@gmail.com**
**Fri, Oct 14, 2011 at 11:56 PM**
To: Jason Harrell <trusmaniac@gmail.com>
Sorry I figured you were not real..... I'm not into playing games.

At 11:56pm on October 14th 2011 the last email was exchanged. No further emails were exchanged or conversations had. A copy of the emails between Jarrell and SA Duffey will be maintained in related items.

From October 10th-17th 2011 Special Agent (SA) Mike Duffey was participating in an undercover operation in Tallahassee, FL. The operation named "Tallyop" was a joint operation involving police officers from multiple law enforcement agencies in Florida including the Tallahassee Police Department. During this operation officers posted to various social media sites, which resulted in the posting being answered via email by the individuals who had viewed the posting.

On October 15th 2011 FDLE Special Agent (SA) Mike Duffey continued talking with Jarrell using Investigator Bush's email (sarahp1871@gmail.com) due to Investigator Bush being out sick. SA Duffey began receiving emails from Jason Jarrell using the email "trusmaniac@gmail.com". The following is the emails that were exchanged between Jarrell and Investigator Bush who was using the undercover email sarahp1871@gmail.com.

The following is the emails exchanged between SA Duffey and Jarrell:

**From: Jason Harrell <trusmaniac@gmail.com**
**Sat, Oct 15, 2011 at 12:10 AM**
To: sarah peterson <sarahp1871@gmail.com>
Not sure what you mean. Would just rather talk on phone or in person than on here.
Sent from my iPhone

**From: sarah peterson sarahp1871@gmail.com**
**Sat, Oct 15, 2011 at 12:19 AM**
To: Jason Harrell <trusmaniac@gmail.com>
Ok before we talk a few things - Are you in Tallahassee & DD Free? We not looking for anything with a long term.
We are home tonight and are free to call

**From: Jason Harrell trusmaniac@gmail.com**
**Sat, Oct 15, 2011 at 12:34 AM**
To: sarah peterson <sarahp1871@gmail.com
I am in tally and ddf. It's too late tonight but tomorrow night or the next might work. Short term is also fine.
Sent from my iPhone

**From: sarah peterson sarahp1871@gmail.com**
**Sat, Oct 15, 2011 at 3:39 PM**
To: Jason Harrell <trusmaniac@gmail.com>
Tonight is good for us. Tomorrow might be busy working on a school project. when can we talk about tonight? I need to discuss a few things i can't risk having a pregnant daughter or an STD.
What do you look like ? and how old are you?

**From: Jason Harrell <trusmaniac@gmail.com**
**Sat, Oct 15, 2011 at 4:31 PM**
To: sarah peterson <sarahp1871@gmail.com
I am disease free 31 about 5 10 brown hair average build.
Sent from my iPhone

**From: sarah peterson <sarahp1871@gmail.com**
**Sat, Oct 15, 2011 at 4:35 PM**
To: Jason Harrell <trusmaniac@gmail.com>
Want me to call you? so we can talk? or you not interested

**From: Jason Harrell <trusmaniac@gmail.com**
**Sat, Oct 15, 2011 at 4:39 PM**
To: sarah peterson <sarahp1871@gmail.com
I'm at work right now so I can't talk until I get off.
Sent from my iPhone

**From: Jason Harrell <trusmaniac@gmail.com>**
**Sat, Oct 15, 2011 at 6:32 PM**
To: sarah peterson sarahp1871@gmail.com
If you call now I may be able to talk for a few minutes assuming I don't get something to do.
Sent from my iPhone

**From: sarah peterson sarahp1871@gmail.com**
**Sat, Oct 15, 2011 at 6:57 PM**
To: Jason Harrell <trusmaniac@gmail.com>
Sorry i had the Refrigerator repair man. woke up this morning and it what blowing hot air. !!! Fixed and working ... what kind of work do you do?

**From:Jason Harrell <trusmaniac@gmail.com**
**Sat, Oct 15, 2011 at 6:59 PM**
To: sarah peterson <sarahp1871@gmail.com>
I make sushi
Sent from my iPhone

**From: sarah peterson <sarahp1871@gmail.com**
**Sat, Oct 15, 2011 at 7:03 PM**
To: Jason Harrell <trusmaniac@gmail.com>
Really !!! haaha my daughter lovs sushi :-)
we will be here all night - No plans

**From: Jason Harrell <trusmaniac@gmail.com**
**Sat, Oct 15, 2011 at 7:04 PM**
To: sarah peterson sarahp1871@gmail.com
Well you could come eat if you want
Sent from my iPhone

**From: sarah peterson <sarahp1871@gmail.com**
**Sat, Oct 15, 2011 at 7:08 PM**
To: Jason Harrell <trusmaniac@gmail.com>
Thanks but i made lasagna. Let me know when to give you a shout.

**From: Jason Harrell <trusmaniac@gmail.com**
**Sat, Oct 15, 2011 at 7:13 PM**
To: sarah peterson <sarahp1871@gmail.com
Ok will do
Sent from my iPhone

**From: sarah peterson <sarahp1871@gmail.com**
**Sat, Oct 15, 2011 at 7:20 PM**
To: Jason Harrell <trusmaniac@gmail.com
are you still interested in the non- tutoring tonight ? if not we will move on with someone else.

**From: Jason Harrell <trusmaniac@gmail.com**
**Sat, Oct 15, 2011 at 8:22 PM**
To: sarah peterson <sarahp1871@gmail.com>
Go ahead and call me
Sent from my iPhone

On October 15th 2011 at 8:47pm an undercover phone call was made to Jarrell's cell phone (850) 819-8300 from undercover phone number (850) 637-8731 by SA Duffey and Tallahassee Police Department Investigator Laura Gereg. The entire phone conversation was audio recorded. During the controlled phone call Inv Gereg, using the undercover name of Sarah began a conversation with Jason. Jason said he worked at Circl Suhi on Mahan until about 10pm, Jason asked Sarah if they wanted to still meet up after he got off work. Sarah told Jason there had to be rules if this was going to happen. Sarah told Jason he had to be genital with her, Jason said that wouldn't be a problem.

Jason said he would be able to bring protection. They both agreed that it was easier to talk on the phone verses in email. When asked by Sarah what they were going to do once he came over Jason asked if this was something the daughter wanted to do. He was told that "yes" it was and after talking with the daughter they decided to do it with way. Jason said that was one of his concerns was that the daughter wanted to do it. Jason was told the daughter needed to know what to tell her daughter to expect but Sara would not be in the room but would be close incase something went wrong.

Jason said he was not going to do anything that the daughter was not comfortable with. If the daughter was ok then he would go from there. To prepare her for the experience he would start with talking with her. They both agreed they were talking about sex with the daughter. Jason said would start with touching her legs and then go from there as long as she was comfortable. Jason said most likely he would use his hand first and then rub her boobs and vagina or whatever the daughter was comfortable with at that time. Jason was again told the daughter was only 13. As the conversation was continuing Jason was asked if he planed on doing oral sex on the daughter. Jason said normally he doesn't do oral but he would go ahead and do oral. Mostly Jason just wanted to be sure the daughter was comfortable with whatever Jason ended up doing.

Before ending the conversation Jason said he would text Sara when he was about to leave work. After 15:32 seconds the controlled telephone conversation was ended. A copy of this audio recording will be maintained in the case file.

At approximately 9:46pm on October 15th 2011 SA Duffey began received a text message from suspect Jason Jarrell. The text message was sent from Jarrell's cell phone (850) 819-8300 and received by Investigator Bush's undercover phone number (850) 637-8731. These text messages continued until the point in which Jarrell arrived at the front door of the undercover residence. The following is the text messages in the order in which they occurred.

10/15/11 09:46:42 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN About to leave
10/15/11 09:58:03 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT ok - whats your plan
10/15/11 09:58:32 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN Do you want to meet somewhere then j follow you or you want me to just come there
10/15/11 10:02:40 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT you can come straight here
10/15/11 10:03:28 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN What's address
10/15/11 10:14:34 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT come to circle k on shamrock, txt me from there so i know ur serious....i will get u here
10/15/11 10:14:56 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN Ok
10/15/11 10:17:32 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN Will prob take me 15 min

10/15/11 10:18:54 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT alright, talk 2 u then
10/15/11 10:37:34 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN Ok I'm the gas station
10/15/11 10:38:24 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT alright, we r at 3616 Suffolk Drive....u got GPS?
10/15/11 10:38:51 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT shit, typo 3717 Suffolk dr, lol
10/15/11 10:40:11 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN Yeh I got gps
10/15/11 10:40:37 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT alright, c u in about 5 mins then
10/15/11 10:50:10 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT where r u? r u lost
10/15/11 10:51:02 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN Just a couple wrong turns almost there
10/15/11 10:51:20 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT ok....makn sure, lol
10/15/11 10:54:09 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN Will you step outside
10/15/11 10:54:34 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS OUT u here?
10/15/11 10:54:54 PM EDT Sonya Bush 850-637-8731 850-819-8300 SMS IN Yeh

At approximately

# Florida Department of Law Enforcement
## Consent to Use Picture

*To ensure that you,____________________, understand the consent form, I first must read it to you and answer any questions you might have. Then, you will be given the option to freely and voluntarily sign and date the form.*

*The information that will be collected is confidential. Only agents of the Florida Department of Law Enforcement (FDLE) can view and chart the use of your picture(s). You will be kept apprised of how your picture(s) will be / is used in any and all undercover activity and investigation.*

*Notwithstanding the confidential nature of the use of your picture(s), the defense attorney in each case will learn how your picture was used and will receive copies of it.*

I, ________________________, knowingly and voluntarily consent to the use of the attached picture(s) of myself in an undercover capacity for the investigation of the alleged sexual exploitation of children. I hereby authorize Mike Duffey to use my picture(s) in an undercover operation by:

- ☐ sending it through United States mail
- ☐ scanning it and transmitting it via electronic mail
- ☐ posting it to an undercover online profile, to wit: any pertinent general website.
- ☐ posting it to an undercover Web page, to wit: any pertinent general webpage.

In signing this consent form, I fully understand and appreciate the following considerations:

- My picture(s) (in its/their intact form) will be used for undercover investigations.
- My picture(s) might be downloaded by anyone anywhere at any time, copied by them, and redistributed by them to anyone anywhere at any time.
- Those outside law enforcement who download or receive a copy of my picture(s) might morph and/or distort my picture(s), such changes could be pornographic in nature, and any such changed images also might be downloaded by anyone anywhere at any time, copied by them, and redistributed by them to anyone anywhere at any time.
- No one ever will be capable of retrieving all of the copies made of my picture(s).
- I might be summonsed to court regarding investigations involving the use of my picture(s). I will do all that is practicable to make myself available for these court appearances.
- Pursuant to any lawful court order, my voice might be recorded to assist in an investigation involving the use of my picture(s). I will do all that is practicable to cooperate in obtaining such court orders.
- I will not seek any causes of action, suits, injuries, damages or demands of whatever nature against the Florida Department of Law Enforcement, and the ICAC Task Force, arising from the use of my pictures.

- I hereby waive all claims whatsoever I may have in the future against agents of the Florida Department of Law Enforcement arising from online use of my picture(s) in an investigative capacity.
- When I wish to terminate or withdraw my consent, I must give Chad Hoffman an oral and written notice of said termination/withdrawal.
- If any member of law enforcement other than the FDLE uses my picture(s) for any reason, I can seek any causes of action, suits, injuries, damages or demands of whatever nature against that person and/or his/her employer.

I hereby release and hold harmless Florida Department of Law Enforcement, its agents, attorneys, and other employees, from any and all liability, causes of action, suits, injuries, damages or demands of whatever nature arising out of Mike Duffey's use of my picture in an online investigative capacity. In addition, by executing this consent agreement, I agree to waive all claims whatsoever I may have in the future against the Florida Department of Law Enforcement.

I give my consent freely and voluntarily without fear, threat, or promise of any kind. I understand and acknowledge that I have an absolute right to refuse to give my consent prior to signing, and I hereby voluntarily waive this right.
***Please return the attached and completed form, even if you have chosen not to consent.**

This consent is given by me this ______ day of __________, 2013, at ________AM/PM.

Consenting Person: ------------------------------ Signature: ------------------------------
Address: ____________________________
____________________________

Investigator: ------------------------------------ Signature: ------------------------------
Address: ____________________________

Witness: ------------------------------ Signature: ------------------------------
Address: ____________________________
____________________________

## FDLE

## CONSENT TO SEARCH

## COMPUTER(S), COMPUTER PERIPHERALS, & RELATED MEDIA

I, ______________________________, do hereby authorize and give my permission to ______________________________, who has identified himself/herself to me as a sworn federal or state law enforcement officer, with the necessary assistance of a __________ computer forensic examiner, to make a full and complete search of my computer(s), computer peripherals and related media located at: ______________________________.

I have been advised by the above law enforcement officer that law enforcement officers are engaged in an investigation concerning an alleged violation of federal and/or state laws pertaining to Internet crimes against children, including child pornography. I do further authorize and give permission to take from my ______________, located at ______________________________, any computer(s), computer peripherals and related media which may have or might have connection, value or relevance as evidence in said investigation.

The above law enforcement officer has fully and fairly advised me of my rights as follows:

That I have a right to refuse consent to this search of my property.

That I have a right to consult with an attorney or any other person of my choice prior to giving this consent and permission to search the above described property.

That any computer(s), computer peripherals and related media found by said officers in the course of their search can be used as evidence against me or others in a court of law.

I fully understand and appreciate these rights and wish that it be specifically understood that I am hereby giving consent and permission to conduct the search of the computer(s), related peripherals and related media solely because of my desire to freely and voluntarily cooperate and assist in this investigation. I have not been promised anything or been threatened or coerced in any way; nor has any inducement of any kind been held out to me in return for this consent and permission to search.

**Signed:** ____________________ **Witness:** ____________________

**Date / Time:** ____________________ **Witness:** ____________________

**Location:** ______________________________

## Sample Communication Excerpts
## Typical Introductions

- Wat up,,,just saw ur post. U down 2 kick it wit sum1 a lot younger? :)
- Ohhhh snap,,,wat up boy. Down 2 kick it wit sum1 alot younger?
- Hi. Saw ur post. Interested in sum1 younger?

### Introductions if Subject Included a Photo in Ad

- Diz-am!!! Props 4 keepin it real,,,down to kick it wit sum1 alot younger?
- Is that really u in that pic?? Im prolly way 2 young but wanted to give u props

### Introduction While Feigning No Expectations of Reply from Subject

- Hey saw ur post and wanted to give u props,,,im wayyyy to young but still wanted to say hi :) byeeeee
- Honstly I just wanted to say hi and give u props for a hella legit ad,,,im prolly 2 young but still wanted to at least say props 4 keepin it reals

### Themes to Reinforce You're a Juvenile

- It hella sux bein in 8th grade,,,cant wait til I get 2 high school
- I can prolly sneek out when my mom goes 2 bed
- Ughhhhh I cant wait,,,only 2 years and 3 months b4 it turn 16!! Holllaaaa! hehe
- My aunt would KILL me if she found out i was textin sum1 ur age
- 2 b honest,,,im not tryin 2 be on mtvs 14 n preggers if u feel!
- Would u b able 2 drop me off around the corner from my house so no 1 sees us?

### Dealing with Common Questions / Requests

<u>When asked if you have a Facebook account:</u>

- Fo sho I do but I only get it 2 peeps I really know
- Yea I do but my aunt makes me be friends wit her so she can creep on my page,;sux!!!

<u>Requests to talk on the phone:</u>

- Member I cant make calls from my ipod touch
- Who talks on the phone???? Like 4 real u wanna talk? Haha
- Ummmm thats kinda weird,,,I just like 2 text

Requests for pictures:

- Sorry a lil while ago this creeper tried to bribe me for krazy pics when I sent him a few :(,,,so I don't send pics n e more
- Hmmmmmm,,,if I know u better maybe ill hook u up
- Send me sumthin of u 1st and maybe ill hook u up
- Sorry,,,I had sum school drama b4,,,no more naked pics!

**Random Communication – Entailing You've Sent an Erroneous Message, Meant for Another Person**

Pending parties:

- Hey r u going 2 that ditch party this fri?
- michelle z told me u never hit her back about the party next sat
- r u able to sneek n e thing from ur parents

School gossip:

- Did u hear that felica got caught wit pills in 3rd period?!
- Mrs brock totally just took justines phone,,,dont text her til later :(
- Do u think the creepy kid in 3rd period is related 2 kendra??
- That fight behind the portable yesterday is on youtube

Random communication:

- Julian just text me askin about if I told u,,,haha!!!
- Did u watch vampire diaries???? OMG!!!
- Lenny's lil bro is no doubt hating life rite now!
- Was that u who hit me up last nite at 2???

# Check Hobbyists Boards

- Reverse phone look-up: www.411.com
- Number validation: www.phonevalidator.com
- Cell phone recording: www.spydialer.com
- Check phone number using www.escortphonesearch.com
- Check hobbyist review boards for comments regarding age, a pimp or multiple girls:
- www.naughtyreviews.com
- www.theeroticreview.com
- www.bestgfe.com
- www.eros-guide.com
- www.date-check.com
- www.usasexguide.info

How to Connect to the Motherless MIRC Server

You have to be a registered motherless.com user to use the Motherless MIRC server. In MIRC do the following:

Click on File>Select Server. A list of MIRC servers will pop up.

Click the "Add" button

In the Description Field enter "motherless chat" (without quotes).

In the IRC server field enter "chat.motherless.com"

Add "6667" in the Ports Field if it's not already entered.

In the password field enter your Motherless.com password.

Next click the Add button.

You are now ready to connect to the Motherless IRC server. You will need to use your Motherless.com user name as your IRC nickname. You will not be able to connect to the Motherless IRC server if you don't use your Motherless.com user name and password.

MIRC 7.22 Setup and tips

Remember every version of MIRC has subtle changes to the configuration. Most of the items in here are in each version but may be in a different location.

Setup – Click the +

Connect:

Nickname: When selecting a nickname make sure it is specific enough to distinguish you from thousands of other users. For example becky would not work, but beckypil1234 would. Also make sure the screen name is in all lower case.

Alternative: Just a secondary nickname incase the one you choose is already in use

Name: Anything you want it to be but remember others can see this

Email Address: Not verified so I usually make it Generic and non-gender specific eg. Me@me.com

**Note** Nicknames on IRC are not assigned meaning that people can change their nicknames as much as they want and IRC does not track this.

Servers: Random US Undernet or Dalnet (Both Popular)

Options: Notice the default port 6667 in case you need to port forward. It may be a good idea if you have multiple users of IRC in your office to change the port number to your Police ID Number or something similar. Everything else in this section is optional depending on your preference.

Local Info: This is all completed by default by MIRC

Ident Enable all check marks in IDENT – All other info is completed by default by MIRC

Proxy: Do nothing in this section leave it alone.

IRC – Click the +

Messages: Check box to Timestamp Events

Logging :

Automatically Log: **Both**

Check Boxes in (**Reload Logs – only in newer versions), Timestamp Logs, Date Filenames (By Day)**

Note Default Location for logs

Windows 7 = C:/users/(user Name)/appdata/roaming/MIRC/Logs

Windows XP = C:/Program Files/MIRC/Logs

Change this to C:\UCOps\Logs\MIRC

**This May change with a newer or older versions of MIRC**

DCC – Click the +

Folders – Notice where they are saved (You can change this) (Suggestions)

Ignore – Can change this to Ignore only, Accept only, or disable (Advantages / Disadvantages)

**If you need to change any options go to tools menu and then options also can click on the icon that looks like a hammer**

Two ways to do whois (Determine the IP address)

Through the Command menu at the top of the window

By right clicking on the subjects name in a chat and selecting whois

Notify Option – Located in tools menu and address book and then click on the tab notify. You must check the box to enable in order to work. (This lets you know when someone you are chatting with in the past is online. (Demo adding people) (check perform whois box)

- Someone who is online will show up in status window, to log the status window type the command **/log on**

Once you connect you click on the ICON that looks like a piece of paper with the # sign on it. The GUI will open asking you if you want to GET LIST or APPLY the list. The first time you join a server (one for Dalnet and one for Undernet) you must GET LIST. However after you download the list of rooms the first time, the program will write a text file with all the room names. Any time after, when you sign on you can simply click on APPLY and the text file will populate the list.

- Uncheck hide text channels
- Make the min users 0
- Show how to apply with different terms and how to sort the rooms in the list
- Show how to enter a room and talk about ethics by ops
- Show users in room and the menu when you right click on a user. Talk about different options.

/Who command in status window

The WHO command can help DNS a room for an ISP. Say you have an ISP that only services your area it would be helpful to know the screen name and chat room those users are in. You can use this command to localize an investigation.

Demonstrate - **/who *hsd1.md.comcast***

**/who *hsd1.*.comcast***

**/who *.verizon.net***

**/who *.balt.east.verizon.net***

You can also create your own chat rooms on IRC. The command for that is:

**/join #**(room name you want)

You need the # sign in front of your created room name. (You can also use the /join command to enter any room as long as you know the room name.)

You can change your "nick" at any time by using the command **/nick** (remember do not use this while still in a chat room (demonstrate)

## CONSENT TO ASSUME ONLINE PRESENCE

I, ______________________________, hereby voluntarily authorize ______________________________________________________ to take over control of and use my "online presence." This online presence includes the following screen name(s), nick name(s), and/or e-mail addresses, as well as the passwords associated with these accounts:

| ACCOUNT NAME | PASSWORD |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |

I consent to the use of my online presence for any purpose relating to an official investigation by the above law enforcement authority, including (but not limited to) sending and receiving e-mail or conducting any other electronic communications, accessing stored information, and using and disclosing such communications or information. I understand and acknowledge that by signing the consent form, I relinquish all present and future claims to the use of these accounts. I understand that law enforcement authorities will change the password(s) to this account so that I will no longer have access.

I give this consent freely and voluntarily, without fear, threats, coercion, or promises of any kind. I have been advised of my right to refuse to allow the assumption of my online presence, and I hereby voluntarily waive this right.

Signature: ____________________ Witness: ________________________

Name (printed): ______________ Name (printed): ____________________

Date: _______________________

# YOUR POLICE DEPARTMENT

Your Police Chief, CHIEF

**ADMINISTRATIVE SUBPOENA**

**ISSUED PURSUANT TO YOUR LOCAL LAW**

**THE XXX POLICE DEPARTMENT SENDS GREETINGS TO:**

**Craigslist, Attention: Custodian of Records**
1381 9th Avenue San Francicso, CA 94122
**FAX#: 415-504-6394**
**Email: legal@craigslist.org**

---

**YOU ARE HEREBY REQUESTED,** pursuant to the authority granted to a law enforcement agency, XXX, that all and singular business excuses being set aside, you produce:

**RE: Your Report Number**

1. A true and accurate copy of your customer records for the following customers:

**-Account information (email address, IP address, verified phone number, etc) associated with posting ID: XXX which was posted on XXX. The post was titled "XXX"**
**-Also being requested are all previous postings associated with the aforementioned account (based on email address).**

The records shall be delivered, as soon as possible, to the XXX Police Department via fax #(XXX) 555-1212 to the attention of Detective XXX or via email to XXX.

**This subpoena is made to further a criminal/civil investigation being conducted by the XXX Police Department. If you have any questions about this subpoena, contact Detective XXX at (XXX) 555-1212. Failure to produce these records may subject you to liability for contempt and for costs and fees expended in the enforcement of this subpoena. You are requested not to disclose the existence of this subpoena. Any such disclosure could obstruct and impede the investigation being conducted and thereby interfere with the enforcement of the law.**

Dated this XXX day of XXX, 2015.

**Your Police Chief, POLICE CHIEF**

**By:** ______________________________

# YOUR POLICE DEPARTMENT

Your Police Chief, CHIEF

**ADMINISTRATIVE SUBPOENA**

**ISSUED PURSUANT TO YOUR LOCAL LAW**

**THE XXX POLICE DEPARTMENT SENDS GREETINGS TO:**

**Craigslist, Attention: Custodian of Records**
1381 9th Avenue San Francicso, CA 94122
**FAX#: 415-504-6394**
**Email: legal@craigslist.org**

---

**YOU ARE HEREBY REQUESTED,** pursuant to the authority granted to a law enforcement agency, XXX, that all and singular business excuses being set aside, you produce:
**RE: Your Report Number**

1. A true and accurate copy of your customer records for the following customers:

**-Reference posting ID: XXX which was posted on XXX,. I'm looking for information on those who *responded* to the post (to include their email address, IP address, and date and time stamps associated with the reply).**

The records shall be delivered, **as soon as possible,** to the XXX Police Department via fax #(XXX) 555-1212 to the attention of Detective XXX or via email to XXX.

**This subpoena is made to further a criminal/civil investigation being conducted by the XXX Police Department. If you have any questions about this subpoena, contact Detective XXX at (XXX) 555-1212. Failure to produce these records may subject you to liability for contempt and for costs and fees expended in the enforcement of this subpoena. You are requested not to disclose the existence of this subpoena. Any such disclosure could obstruct and impede the investigation being conducted and thereby interfere with the enforcement of the law.**

Dated this XXX day of XXX, 2015.

**Your Police Chief, POLICE CHIEF**

**By:** ______________________________

# YOUR POLICE DEPARTMENT

Your Police Chief, CHIEF

**ADMINISTRATIVE SUBPOENA**

**ISSUED PURSUANT TO YOUR LOCAL LAW**

**THE XXX POLICE DEPARTMENT SENDS GREETINGS TO:**

**Craigslist, Attention: Custodian of Records**
1381 9th Avenue San Francicso, CA 94122
**FAX#: 415-504-6394**
**Email: legal@craigslist.org**

---

**YOU ARE HEREBY REQUESTED,** pursuant to the authority granted to a law enforcement agency, XXX, that all and singular business excuses being set aside, you produce:
**RE: Your Report Number**

1. A true and accurate copy of your customer records for the following customers:

**-Previous postings and account information (email address, IP addresses, etc) based on the verified phone number XXX-XXX-XXXX.**

The records shall be delivered, **as soon as possible,** to the XXX Police Department via fax #(XXX) 555-1212 to the attention of Detective XXX or via email to XXX.

**This subpoena is made to further a criminal/civil investigation being conducted by the XXX Police Department. If you have any questions about this subpoena, contact Detective XXX at (XXX) 555-1212. Failure to produce these records may subject you to liability for contempt and for costs and fees expended in the enforcement of this subpoena. You are requested not to disclose the existence of this subpoena. Any such disclosure could obstruct and impede the investigation being conducted and thereby interfere with the enforcement of the law.**

Dated this XXX day of XXX, 2015.

**Your Police Chief, POLICE CHIEF**

**By:** ______________________________

# YOUR POLICE DEPARTMENT

Your Police Chief, CHIEF

**ADMINISTRATIVE SUBPOENA**

**ISSUED PURSUANT TO YOUR LOCAL LAW**

**THE XXX POLICE DEPARTMENT SENDS GREETINGS TO:**

**Craigslist, Attention: Custodian of Records**
1381 9th Avenue San Francicso, CA 94122
**FAX#: 415-504-6394**
**Email: legal@craigslist.org**

---

**YOU ARE HEREBY REQUESTED,** pursuant to the authority granted to a law enforcement agency, XXX, that all and singular business excuses being set aside, you produce:
**RE: Your Report Number**

1. A true and accurate copy of your customer records for the following customers:

**-Any previous posting associated with IP address XX.XX.XXX from XXX until XXX. To include poster information (email address, verified phone number, etc).**

The records shall be delivered, **as soon as possible,** to the XXX Police Department via fax #(XXX) 555-1212 to the attention of Detective XXX or via email to XXX.

**This subpoena is made to further a criminal/civil investigation being conducted by the XXX Police Department. If you have any questions about this subpoena, contact Detective XXX at (XXX) 555-1212. Failure to produce these records may subject you to liability for contempt and for costs and fees expended in the enforcement of this subpoena. You are requested not to disclose the existence of this subpoena. Any such disclosure could obstruct and impede the investigation being conducted and thereby interfere with the enforcement of the law.**

Dated this XXX day of XXX, 2015.

**Your Police Chief, POLICE CHIEF**

**By:** ______________________________

# INTERVIEW / INTERROGATION QUESTIONS FOR COMPUTER RELATED CHILD SEXUAL EXPLOITATION SUSPECTS (REVISED 11/21/07)

**BACKGROUND -**

- Name, address, phone number(s), birthplace etc.
- Former addresses
- What other names have you used?
- Any scars, marks, tatoos?
- Education - particularly computer education
- Any prior arrests?
- How would you describe your level of computer expertise: Beginner? Intermediate? Advanced?

**FAMILY SITUATION -**

- Married? (get full information about spouse)
- Divorced? (get full information on all prior marriages)
- Girlfriend/boyfriend (get full info)
- Children (get full information on all children including those from prior marriages and girlfriends children)

**EMPLOYMENT & TRAVEL -**

- Where are you employed?
    - Address, phone number of business
- What is your position and job description?
- How long have you been employed there?
- Do you have Internet access there?
- Where did you work previously?
    - What was your position and job description at the prior job?
    - How long did you work there?
    - Why did you leave that job?
    - Did you have Internet access at your former employment?
- What foreign countries have you visited?
    - Did you engage in any sex acts with minors there?

**HOBBIES, VOLUNTEER WORK, SEXUAL PREFERENCES -**

- Coach? Photographer? Babysitter?
- Youth group leader? Teacher?
- Religious activities? Counselor?
- Where else to you find access to children?
- What are your sexual preferences?
    - Heterosexual, homosexual, bisexual?
    - Are you sexually attracted to minors?
    - Use sexual aides?
    - Do you use Viagra or an equivalent?
    - Do you have any sexually transmitted diseases?

**SUSPECT'S USER NAME/ID -**

- What Internet Service Provider (ISP) do you use?
- What is your online profile?
- How do you pay for the account?

- What time of day or night are you usually online?

**PASSWORD AND ENCRYPTION ISSUES -**

- What are all the passwords you use?
- Who else has knowledge of the passwords?
- Does you utilize encryption?
- What type of encryption?
- What is the password for the encryption, and is there more than one password?

**CONTROL, KNOWLEDGE AND OWNERSHIP OF THE COMPUTER-**

- Who uses the computer?
- During what hours of the day is the computer normally used?
- From what locations do you use a computer? Home, business, public library, public computer café, friend's house?
  - (Obtain addresses of all other locations from which the suspect computes)
- What level of computer expertise do you have? (beginner – intermediate - advanced?)

**EQUIPMENT -**

- How many computers do you have?
- Hard drives?
- Scanners?
- Digital Cameras?
- Zip Drives?
- Thumb Drives?
- Tape Drives?
- Recordable CD's? DVD's?
- Does you own or utilize a laptop computer?
- Does you own or utilize a hand-held personal electronic organizer like a Palm Pilot or Handspring Visor?
- Do you store any of your equipment or storage media in other locations? If yes, where?
- Where in your home do you use the computer?
- Has the computer been serviced or repaired recently?
- Do you use a web camera?
  - Do you expose your genitals to others while using your web cam?
  - Do you expose your genitals to minors while using your web cam?

**SOFTWARE -**

- What operating systems are used? (Windows 98, Windows 2000, Linux, UNIX, OS/2, Apple & MAC)
- What programs do you have for chatting?
- What programs do you have for images or movies?
- What programs do you have for encryption?
- What programs do you use for wiping or shredding data?

**INTERNET -**

- What Internet Service Provider (ISP) is used to access Internet?
- How long have you used this ISP?
- What is your ISP logon name and password?
  - Why did you choose that name, what significance does it have?
- What type of communication system do you use to access the Internet? Analog phone line? Digital Subscriber Line (DSL), Cable?

- Do you have your own web site or home page?
  - What is the web page address?
  - What ISP do you use for this service?
- What time of day do you normally logon to the Internet?
- What nicknames and screen names to you use and why did you choose these?
- Who are the people listed on your buddy lists?
- Do you have e-mail accounts?
- What e-mail services do you use? Hotmail, Yahoo, Juno, AOL?
  - Do you maintain a Yahoo profile with images stored on-line?
- Do you use IRC or MIRC?
- What is your ICQ number and password and who are your buddies?
- What newsgroups do you subscribe to?
- Do you use any on-line storage services to save files?
- Do you use peer-to-peer services such as Phex, Kazaa, Bearshare or Morpheus?
- What search terms do you use? (e.g: PTHC, r@ygold, Lolita)
- At what times of the day do you usually search?
- How many peer to peer files do you share?
- Do you have direct contact with people you share files with (internet chat, e-mail, regular mail, face to face)?

**FILE AND IMAGE STORAGE -**

- What images and information are stored on your computer?
- Where else do you store pornographic images and where are these devices? (floppy disk, CD, tape, Palm, cell phone, off-site storage at a web site or on someone else's server).
- Do you categorize your computer image files by the age of the person in the image?
- Do you categorize your computer image files according to the sex acts being performed?
- How are your images and movie files stored? JPEG, GIF, Bitmap?
- How do you trade images and movies with others?
- Do you have back-up files?
  - Where are the back-up's kept?
- Did you know that even after users believe that they have deleted images from a computer the images will sometimes remain on the computer?
- Do you know what a cache file is?
  - How would you describe a cache file?
- Do you know what unallocated space is?
  - How would you describe unallocated space?

**PUTTING THE SUSPECT BEHIND THE COMPUTER -**

- You are the only user of the computer, is that correct?
  - (If no...) Who are the other users? (name, address, phone...)
  - Where are they now?
- You are the only one who knows your passwords, is that correct?
  - (If no...) Who are the other users? (name, address, phone...)
  - Where are they now?
- You are the only person who uses the screen name __________, correct?
  - (If no...) Who are the other users? (name, address, phone...)
  - Where are they now?

**ADULT PORNOGRAPHY -**

(Asking questions about adult pornography allows you to later make a logical transition to asking about the child pornography.)

Intro-

- There are over a million adult pornography sites on the Internet. Most adult pornography is not unlawful. Millions of people view adult pornography and the right to do that is protected under the First Amendment to the US Constitution.
- Are we going to find any adult pornography on your computer?
- How often do you view adult pornography on the Internet?
- How many pornographic pay sites do you belong to?
    - What are the names of the sites?
- Do you have any adult pornography stored on your computer, floppy diskettes or other media?
- What percentage of your pornographic image collections depict adults only?
- Estimate how many images of adult pornography you think there are on the Internet.
- Do you masturbate to the images?
    - How often do you masturbate?
- Do you think that someone who enjoys adult pornography will automatically begin to start also enjoying illegal child pornography?

**CHILD EROTICA -**

- Do you keep children's toys?
- Do you keep children's clothing?
- Do you keep children's undergarments?
- Do you have images of children nude?
- Do you have paintings of children?
- Do you keep non-sexual photographs of children?
- What television programs do you enjoy most?
- What computer games do you play?
- What kinds of collections do you keep?
- Have you ever written stories about your sexual activities?
    - Where are those stories now? (Note: collect the stories to help prove intent)
- Have you written stories about your sexual fantasies?
    - Where are those stories now? (Note: collect the stories to help prove intent)
- Do you trade stories and information about your sex life and fantasies with others?
    - Who are the other people?

**CHILD PORNOGRAPHY -**

- Tell me your definition of child pornography.
    - If the offender only describes nudisim or erotica as:
        1. As you know, child pornography also includes unlawful images of the sexual exploitation of children and you were aware of that correct?
- Do you have illegal child pornography in the computer now?
    - Describe the images.
- Do you have illegal child pornography on any storage media?
    - Describe the images.
- Do you have printed images of illegal child pornography?
    - Describe the images.
- Have you had images of illegal child pornography in the computer previously?
    - Describe the images.
- Estimate how many of your collected images contain children?
- How do you get the images?
- Where do you store these images (home, office, rented storage locker, off-site computer storage)?

- How many of these images do you currently have saved to your computer hard drive, floppy diskettes, off-site storage or other media?
- What search engines do you use? Google? Dogpile? Alta Vista?
- What search terms do you use to find Images?
- What web sites do you visit?
- Have you searched Pre-teen or Lolita sites for sexual images?
- Did you show any of the child pornography images to anyone else?
- How do you hide the images from others?
- Is your wife/girlfriend aware that you have child pornography?
- Did you delete any of these images from your computer, floppy diskettes or other media?
- How old do you think the children are in these images?
- Do you masturbate to the images?
- How often do you masturbate to the images?
- What kinds of images make you the most sexually aroused?
- Do you have printed out images of minors involved in sex acts anywhere?
  - Where are the images now?
- Who else to you trade images with?
- Do you sell or trade images and movie files? (trafficking)
  - What form(s) of payment to you use to collect from those you sell images or movies to?
  - What do you do with the money you collect from those you sell images or movies to?
- Who do you sell images to?
- What do you think should happen to someone who possesses illegal child pornography?
- What do you think should happen to someone who creates child pornography while sexually victimizing a minor?
- What message would you like us to give to the actual victims of child pornography?

**PUBLISHER -**

- Are you a published author or writer?
  - What have you published?
  - What subjects do you write about?
  - How do you research the subjects you write about?
  - Where were your works published?
  - Were you paid for the publication?
  - How much were you paid?
  - Did your report your earnings to the Internal Revenue Service?
  - Who was the editor and publisher for your publication(s)?
  - Were you a free-lance submitter or are you under contract with the publisher?
    - Who are you under contract with and what are the terms of the contract?

**CHAT -**

- What chat rooms do you visit?
- What screen names do you use in chat rooms?
- Who do you chat with and what do you chat about?
- What days of the week and what times of the day do you chat?
- Do you visit chat rooms where you know that minors might be discussing sex?
- Do you play games on-line so that you can meet minors there?
  - What games do you play?
  - Have you met any of the players in-person?
    - What sex acts did you participate in after you met?
- ***TIP -***

*In undercover luring cases, the interrogator should not tell the suspect that an undercover officer was playing the role of a minor. Let the suspect believe that he was chatting with an actual child.*

**SOCIAL NETWORKING SITES -**

- What social networking or dating sites do you use?
  - Partial list: Craigslist.org, Dittytalk.com, Facebook.com, Friendsfusion.com Friendster.com, Intellectconnect.com, Interracialsingles.net, Livejournal.com Myspace.com, Myyearbook.com, Prisonpenpals.com, Studybreakers.com Tagged.com, Xanga.com, Zogo.com
- What screen names do you use at the sites?
- Who are your closest friends on the sites?
  - Have you met any of them in person?
  - When we contact the friends listed on your social networking site(s), what will they tell us about you?
- What email addresses do you use to register at the sites?
- Do you use credit card services to purchase membership?
- What credit card do you use?
- Have you met in person with people you first encountered at a social networking site?
- Would you like to write an apology letter to any of the minor's?

**ENTRAPMENT DEFENSES – DEFUSING -**

- Can you remember back to the first time you imagined having sex with a minor?
  - Tell me about that.
- As an adult, you continued to have thoughts about sex with minors?
- As an adult, how many minors have you contacted on the Internet and chatted with?
  - Did you chat about sex with them?
- In this case, when you first introduced the idea of sexual contact with the child you contacted on the Internet, what was his/her reaction?
  - How old did he/she say he/she was?
- In this case, approximately how long ago was it that you first introduced the idea of sex to the child?
- Did the child resist your offer of sex?
- Did anyone force you to meet with the minor?
- As an adult, how many other times have you met with a minor and engaged in sex?
  - What are the details of those meetings?

**LURING / ENTICEMENT -**

- What screen name(s) do you use?
- When did you first have Internet contact with __(victim or UC)__?
- How long did you chat with __(victim or UC)__?
- How many Internet conversations would you estimate that you had with __(victim or UC)__?
- What chat room were you in?
- Is there a lot of discussion about sex in that chat room?
- How old is __(victim or UC)__?
- What gender is __(victim or UC)__?
- Where does __(victim or UC)__ live?
- If you had not been stopped, you would have had sex with the minor is that correct?
- What sex acts did you plan to have?
  - Where did you plan to have sex?
  - Were you going to use birth control?

- What form of birth control?
- Were you using any protection from sexually transmitted diseases?
  - What form of protection?
- How far did you travel to meet with the minor?
- Did you have any other business in the vicinity of the meeting place?
- Did you bring gifts, money, toys to the meeting?
  - What gifts, how much money, what toys?
- Did you ever send gifts, money or toys to a minor whom you met on the Internet?
- (If the suspect is remorseful) Would you like to write an apology to the minors involved to give everyone closure?
- What message would you like us to give to the victim?
- What do you think should happen to someone who lures or entices a minor for sex?

**IDENTIFYING THE EXPLOITED MINORS IN CHILD PORNOGRAPHY IMAGES -**

- Who are the minors in the images?
- Where are they now?
- Who took the pictures?
- When and where were the pictures taken?
- Have you taken pictures or movies of minors engaged in sex acts?
- (If the suspect is remorseful) Would you like to write an apology to the minors in the pictures to give everyone closure?

**INTERNET PREFERENTIAL SEX OFFENDER CULTURE -**

- What are some of the search terms and phrases you use to find illegal child pornography?
- What does the term "Lolita" mean to you?
- What does PTHC mean? (Pre teen hard core)
- What does the term "pre-teen" mean?
- What do the terms "young" and "younger" mean?
- What does it mean to "cyber"?
- What is NAMBLA? (North American Man-Boy Love Association?

**PRIOR HANDS ON OFFENSES -**

- Tell me about the children you have touched.
- While you were an adult, how many minors have you had sexual contact with?
- What are their names?
- How old were they when it happened?
- How old are they now?
- Where did these incidents happen?
- Where are they now?
- When did these incidents happen?
- How old were the minors when the offenses occurred?
- (If the suspect is remorseful) Would you like to write an apology to the minors in the pictures to give everyone closure?
- Have you ever formed a relationship with an adult who had children so that you could have sex with that persons children?
  - Who was that adult and who were the children?
- Do you fantasize sexually about pre-pubescent children?
  - (If yes) For how long have you had such fantasies?
- Are you a pedophile?
- Have you ever undergone treatment or counseling for your sexual preferences?

**OVERSEAS TRAVEL -**
- Have you been to other countries?
- Which countries have you been to?
- When did you go to those countries?
- Did you have contact with children while you were there?
- Who were the children that you met?
- What are their full names and addresses?
- What travel service(s) did you use?
- How did you learn about these travel services?
- Were these trips made for the purpose of meeting children?
- Did you participate in sex acts with children?
- Were your sex acts recorded, photographed or video taped?
- Where are those images now?
- Were you part of a travel/tour group?
- May I see your passport? (Record the information about travel dates and locations)

**POLYGRAPH -**
- Is everything you told me truthful?
- Would you take a polygraph to verify your truthfulness?
- How do you think the polygraph test would turn out?

**INDICATOR OF DECEPTION -**
- What do you think should happen to a person who commits this offense?
  - If the suspects believe and offender should receive lenient sentencing it may be an indicator of deception. Most people believe criminals should be harshly punished.

**OTHER PERSONAL INFORMATION**
- Are you presently under the care of a psychiatrist or psychologist?
- What is the name of your psychiatrist or psychologist?
- When did you last visit a psychiatrist or psychologist?
- Are you taking any medications prescribed by the psychiatrist or psychologist?
- What medication(s) are you taking?
- Do you ever take your medications and also simultaneously drink alcohol, smoke marijuana or take other drugs?
- What effect do the drugs have on your thoughts about sex?
- Would you call yourself a pedophile?
- When you are released, do you think that you will continue to fantasize about sex with minors?
- When you are released, will you try to contact minors so that you can have sex with them?

**FOLLOW UP INFORMATION & FOR LOCATING THE SUSPECT LATER -**
- Parents names, locations and phone numbers
- Brothers, sisters, cousins names locations and phone numbers
- Former spouses/girlfriends names, locations and phone numbers
- Best friends names, locations and phone numbers?
- Prominent facial, physical or voice characteristics.
- Does the suspect wear glasses? (Take a photo of suspect with and without glasses)
- Medical conditions requiring ongoing treatment?
  - What medications?
- Veteran of the Armed Forces?
- Place of birth; city and, state
- Former places of residence.

- What foreign countries have you visited?
- What job skills to you have?
- What hobbies do you have?
- Do you own any firearms or other weapons?

**CLOSING -**

- Have you been truthful throughout this entire interview?
- What else would you like to tell us?

**LAST RESORT -**

- I speak to people like you every day. Your situation is not unusual nor strange to me. Many of the people I talk to are troubled because they have to live with secrets that they are embarrassed to tell. For some of them, it is a relief to get the information off of their minds and to tell me their stories.
- We have some partial pieces of information about you and we will continue our investigation. Computers and the Internet hold a lot of interesting information about people. Our computer forensics examiners are still busy conducting research on your case. Other investigators may contact friends, relatives, children, neighbors and employers to gather information about your activities. It will just be a matter of time until we have all of the information that we need to find the truth.
- This would be a good time to get this all over with and to get this off of your mind - are you ready to tell me the names? (of unidentified minors victimized)
  - (If not) Here is my name and phone number. When you are ready to tell me the whole story – call.

**END -**

- Were you threatened or intimidated during this interview?
- Were any promises made to you before this interview?
- Thank you for your cooperation.

*I hope that you find the above questions useful.*
*Please send me your ideas for additional questions and I will include them.*
*Thanks -*
*Dr. Frank Kardasz*
*Kardasz@kardasz.org*

(REVISED 112107)

# Quick Reference Sheet for Social Networking Searches:

Social Networking search sites:

- site:facebook.com followed by the name of person, using google
- site:myspace.com followed by the name of person, using google
- www.usernamez.com
- www.yoname.com
- 
- www.kartoo.com - Visual search tool
- www.google.com
- www.spokeo.com - paid service

Statistics Social Networking site info:

- http://en.wikipedia.org/wiki/List_of_social_networking_websites
- www.marketingcharts.com- Then search for social networking sites

Create your own social network site:

- www.ning.com
- www.onesite.com

Social Network mapping:

- www.lococitato.com
- 

Twitter Resources:

- www.twitter.com
- www.twitpic.com
- search.twitter.com
- www.tweetmeme.com

Mobile apps:

- iphone- visit apple.com
- www.loopt.com
- www.seemic.com
- www.iphonehacks.com

# ICAC-UC Operation Startup Guide

(this is only a guide to help you through the process)

1. Start Camtasia (F9), record the entire screen
2. Check www.time.gov to show the time on your local computer matches time.gov
3. Record your I.P. Address, www.ipchicken.com (or similar) or go to the command line and type ipconfig /all
4. Record your UC profile that you are using.
5. Start the client you are going to use and log into your UC persona
6. Check for any offline messages and email, if there is an account associated with the chat client, before you join a room.
7. Check the Preferences and make sure that if you have an option to save messages that it is turned on. (check for each screen name that you sign in with).
8. Ensure that you are prepared to log network traffic with netstat –n from the command prompt or with your netstat logging program. Netstat –n at the command prompt shows results in numerical order, Netstat (without the –n) shows the traffic with the domain name displayed, save these results to a .txt file

**During the chat tasks:**

9. Create the suspect folder by copying the master suspect's folder and renaming it to the screen name of your subject.
10. Copy and save the chats into C:\UCOps\Suspects\{screename}\Chats into a word document named for the date of the chat (i.e. 12-4-2010.docx or.rtf).
11. Check to see if the client displays time stamps in messaging window. If so, set to show
12. Check for target's profile- if there is one document it. Save it as "web page, complete" with your preferred browser (or with a screen capture program). Do the same for other intel you find on the suspect (Facebook or other websites, people searches, etc...)
13. Check social networking sites and search by name or email address.
14. Save any pictures in the C:\UCOps\Suspects\{screename}\Received folder.
15. Save any e-mails in the C:\UCOps\Suspects\{screename}\EMail folder.
16. Capture the suspect IP address during webcam captures (port 5100) or during Photosharing sessions using Netstat or Netstat –n.
17. Check the IP address with Arin.net/whois or the search of your choice.

# ICAC-UC Operation Startup Guide

(this is only a guide to help you through the process)

1. Start Camtasia (F9), record the entire screen
2. Check www.time.gov to show the time on your local computer matches time.gov
3. Record your I.P. Address, www.ipchicken.com (or similar) or go to the command line and type ipconfig /all
4. Record your UC profile that you are using.
5. Start the client you are going to use and log into your UC persona
6. Check for any offline messages and email, if there is an account associated with the chat client, before you join a room.
7. Check the Preferences and make sure that if you have an option to save messages that it is turned on, (check for each screen name that you sign in with).
8. Ensure that you are prepared to log network traffic with netstat –n from the command prompt or with your netstat logging program. Netstat –n at the command prompt shows results in numerical order, Netstat (without the –n) shows the traffic with the domain name displayed, save these results to a .txt file

**During the chat tasks:**

9. Create the suspect folder by copying the master suspect's folder and renaming it to the screen name of your subject.
10. Copy and save the chats into C:\UCOps\Suspects\{screename}\Chats into a word document named for the date of the chat (i.e. 12-4-2010.docx or.rtf).
11. Check to see if the client displays time stamps in messaging window. If so, set to show
12. Check for target's profile- if there is one document it. Save it as "web page, complete" with your preferred browser (or with a screen capture program). Do the same for other intel you find on the suspect (Facebook or other websites, people searches, etc...)
13. Check social networking sites and search by name or email address.
14. Save any pictures in the C:\UCOps\Suspects\{screename}\Received folder.
15. Save any e-mails in the C:\UCOps\Suspects\{screename}\EMail folder.
16. Capture the suspect IP address during webcam captures (port 5100) or during Photosharing sessions using Netstat or Netstat –n.
17. Check the IP address with Arin.net/whois or the search of your choice.

# UC EVIDENCE DOCUMENTATION CHECKLIST

All UC evidence should be stored in the subfolders inside **C:\UCOps>Suspects>*suspect username*.** In order to create these subfolders, The following steps are recommended to properly document undercover chat evidence. Not all steps will apply in all cases.

1. Create the suspect folder by copying the master suspects folder and renaming it to the screen name of your subject .
2. Use your preferred browser or similar tool to capture suspect's profile. Save in Profiles under UCOps.
3. Save any file transfers to Received
4. Save any shared photos to Received. This should be done immediately, while chatting, as they may not be available later. Remember to select "transfer full size photo" if using Yahoo.
5. Perform a Grabstat during file transfer, saving shared photos, or peer-to-peer webcam.
6. Once the chat is complete, copy and paste the chat text into the blank text document in the "Chats" folder under the suspect's username. THIS MUST BE DONE BEFORE YOU LOG OUT OF YOUR CHAT CLIENT. The chat windows will close when you log out of the client.) If you have already closed the chat window, copy and paste the text from the archive.
7. After you stop Camtasia, **copy** the Camtasia file to the suspect's "Captures" folder.
8. **Copy** the netstat log into the suspect's "Captures" folder (Camtasia and netstat files should be copied, leaving the original in UCOps>Logs)
9. Be sure to copy your undercover profile to the profile area of your suspect as well to document what your profile was (takes away any arguments from the defense about what your profile was)

Table 1 Women's sizing

| SIZE RANGE | SIZES | HEIGHT | BODY/GARMENT CHARACTERISTICS |
|---|---|---|---|
| Petites | 2 to 14 or 16<br>P (2-4)<br>S (4-6; 6-8)<br>M (8-10; 10-12)<br>L (12-14; 14-16) | 4'11" or 5'0" to 5'4" | 1) Smaller body and bone structure; narrower shoulders; slimmer or straighter hips; smaller high bust.<br><br>OR 2) Body similar to Misses only on a shorter frame. |
| Women's Petites | 14 to 22 or 24<br>1XP (14-16)<br>2XP (16-18; 18-20)<br>3XP (18-20; 22-24) | 4'11" or 5'0" to 5'4" | Fuller body; more curvature in hips and waist; lower bust; often geared toward older consumer. |
| Half-sizes | 14 1/2 to 24 1/2 | 5'1" to 5'5" | Traditionally represents older consumer with lower bust and hipline, thicker waist; slowly being phased into Women's Petites size range. |
| Misses/ Missy | 2 to 18 or 20 | 5'5" to 5'8" | "Average" size body; consumer has some curvature at the bust, waist, and hips. |
| Juniors | 1 or 3 to 15 | 5'5" to 5'8" | Slimmer body or more linear; less bust, waist, and hip definition; higher bustline. |
| Women's/ Plus Sizes | 14 to 24 or 26 | 5'5" to 5'7 1/2" | Fuller body; more curvature through the bust, waist, and hips. |
| Talls | 8 to 20 or 22 | 5'9" to 6'0" | Larger and longer bone structure or frame, not necessarily larger body mass; similar curvature as Missy unless part of Women's sizes. |

## Girls Averages

## Clothing and Growth

| Age | Hgt | Wgt |
|---|---|---|
| 10 | 54" | 70 |
| 11 | 56" | 80 |
| 12 | 60" | 90 |
| 13 | 63" | 100 |
| 14 | 64" | 115 |
| 15 | 64" | 120 |
| 16 | 65" | 125 |
| 17 | 65" | 130 |

Table 2. Men's sizing.

| SIZE RANGE | SIZES | HEIGHT | BODY/GARMENT CHARACTERISTICS |
|---|---|---|---|
| Regular men's | Chest: 34" - 48/50"<br>Neck: 14" - 18 1/2"<br>Waist: 28" - 46"<br>Arm: 32" - 36"<br>Inseam: 29" - 36" | 5'8" to 5'11 1/2" or 6'0" | REGULAR OR TRADITIONAL CUT: more tailored fit; body conforming.<br>FULL, STOCKY, OR RELAXED CUT: more casual fit; typically larger through the chest, thighs, and seat.<br>TRIM OR SLIM CUT: slimmer, more linear, narrower shoulders.<br>ATHLETIC CUT: wider or broader shoulders, fitted chest, slimmer waist. |
| Tall | Chest: 38" - 50"<br>Neck: 15" - 18 1/2"<br>Arm: 34" - 37 1/2"<br>Inseam: 30" - 37" | 6'0" to 6'4" | Same as Regular men's except proportioned for the taller man. May be combined with Big size range. |
| Short | Chest: 30" - 46"<br>Neck: 13" - 17"<br>Waist: 24" - 40"<br>Arm: 31 1/2" - 35"<br>Inseam: 27" - 32" | 5'3" to 5'7 1/2" | Same as Regular men's except proportioned for the shorter man. |
| Big | Chest: 48" - 64"<br>Waist: 42" - 60"<br>Neck: 17 1/2" - 21"<br>Arm: 35" - 37"<br>Inseam: 29" - 36" | 5'8" to 6'0" | REGULAR CUT OR FULL CUT: Garments are fuller through the chest, waist, and thighs. May be combined with Tall size range. |
| Young men's | Shirts are usually sized S, M, L, XL, not by chest and neck measurements.<br>Waist: 27" - 38"<br>Inseam: 29" - 34" | 5'8" to 5'11 1/2" | REGULAR CUT: contoured to body, slimmer cut, tapered leg.<br>RELAXED CUT: fuller thigh, tapered leg.<br>LOOSE CUT: fuller thigh, fuller seat, non-tapered leg.<br>BAGGY CUT: fuller thigh, pleated front (fuller waist), wider leg. |

## Boys Averages

## Clothing and Growth

| Age | Hgt | Wgt |
|---|---|---|
| 10 | 54" | 75 |
| 11 | 56" | 80 |
| 12 | 58" | 90 |
| 13 | 60" | 105 |
| 14 | 66" | 125 |
| 15 | 69" | 130 |
| 16 | 70" | 140 |
| 17 | 71" | 150 |

# ICAC-UC Undercover Identity Worksheet

| | | | |
|---|---|---|---|
| Subject Photo, used to ID Subject, no nudes | | Cover Photo | |
| Screen Name & Chat Client | | Screen Name & Chat Client | |
| Email | | Email | |
| US Mail Address | | US Mail Address | |
| Last Name | | Last Name | |
| First Name | | First Name | |
| Middle Name | | Middle Name | |
| Address | | Address | |
| City, State Zip | | City, State Zip | |
| Birth date | | Birth date | |
| Age | | Age | |
| Height | | Height | |
| Weight | | Weight | |
| Hair | | Hair | |
| Eyes | | Eyes | |
| Complexion | | Complexion | |
| | | Bra Size | |
| | | Panty/Underwear size | |
| | | Pants Size | |
| | | Shirt Size | |
| | | School | |
| | | Menstrual Cycle | |
| Hobbies | | Hobbies | |
| | | Linked Accounts Email | |
| | | Sent Photo | |
| | | SMS Number or Phone | |
| | | Web Cam | |
| | | Apps or Games | |

# Quick Reference Sheet for Web Evidence Gathering:

Search Engines:

- www.dogpile.com
- www.quintura.com
- www.kartoo.com
- www.google.com - images, extension (search by image), blogs
- www.ask.com
- www.yahoo.com
- www.bing.com

Person Info Finder & SNS Finder

- www.zoominfo.com
- www.zabasearch.com
- www.pipl.com
- www.peekyou.com
- www.knowem.com
- http://snitch.name
- www.socialmention.com
- www.mylife.com
- www.twitter.com
- www.twitpic.com
- www.spokeo.com
- www.google.com- image search, video search
- www.bing.com- image search
- www.twrland.com
- www.shodanhq.com
- www.topsy.com
-

Photo sharing sites

- www.yfrog.com
- www.twitpic.com
- www.lockerz.com
- www.flicker.com
- www.mobypicture.com
- www.smugmug.com

Video Sharing Site

- www.youtube.com
- www.metacafe.com
- www.dailymotion.com
- www.vimeo.com

SNS Mapping Site:
- www.lococitato.com

Website History
- http://archive.org/web/web.php

Information Source
- http://mashable.com
- www.pinerest.com
- www.ifixit.com

Blog searches:
- www.blogdigger.com
- http://blogsearch.google.com

Website Information
- www.sitedossier.com
- www.domaintools.com
- www.centralops.com

System IP Info:
- www.myipinfo.net
- www.geobytes.com
- www.ip-adress.com
- www.ipchicken.com

Property appraisers office:

If you know the city or county where the individual lives you might be able to search the property website for additional info.

National Sex offender database
- http://www.fbi.gov/hq/cid/cac/registry.htm

Map Searches:
- Google earth or maps.google.com
- Microsoft virtual earth- http://www.microsoft.com/maps

General

Internet Crimes Against Children Training & Technical Assistance Program

# ICAC UC Concepts and Techniques Training Program

***General Handouts***

- **ICAC Operational and Investigative Standards**
- **Helpful Commands & Websites**
- **Free & Helpful Resources**

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

## Table of Contents


Definitions of Terms ..... 3
1. Purpose of the ICAC Standards ..... 5
2. ICAC National Program ..... 6
3. Oversight of the ICAC Program ..... 7
4. Selection and Retention of Task Force Members ..... 8
5. Training ..... 9
6. Case Management ..... 10
7. Task Force Reporting Requirements to OJJDP ..... 11
8. Investigations ..... 12
9. Work Environment ..... 14
10. Victim Identification ..... 15
11. Public Awareness and Community Outreach ..... 16
12. Media Relations and Media Releases ..... 17

## Definitions of Terms

**Applicability of Terms**

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

"**Affiliate**" or **Affiliate Agency**" is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

"**Authorized Personnel**" are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

"**Commander**" is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

"**CEOS**" is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

"**Crime**" is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

"**CVIP**" is the Child Victim Identification Project operated by NCMEC.

"**CyberTipline**" is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

"**Deconflict**" is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

"**DOJ**" is the United States Department of Justice.

"**Employee**" is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool – including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** – any identity established or created by an Employee to aid an Investigation.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead" or "Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

## 4. Selection and Retention of Task Force Members

4.1 When practicable during the selection process of Members, Commanders and Supervisors shall evaluate prospective candidates for work histories that indicate prior investigative experience, courtroom testimony skills, technical knowledge and ability, an ability to prudently handle sensitive information, a genuine interest in the protection of children, and an understanding of the effects that Members may experience when exposed to Images.

4.2 Commanders and Supervisors shall acknowledge the potential effects of Investigations and exposure to Images. When practicable, they shall attempt to mitigate the potential effects of the work using, for example, the following techniques:

- *Work environment considerations* – Commanders and Supervisors are encouraged to provide a physical location for the work environment that allows the Investigator to conduct discreet Investigations.

- *Work flexibility* – Commanders and Supervisors are encouraged to allow flexibility for Investigators and others who are exposed to Images (e.g., frequent breaks, having an open-door policy, etc.).

- *Educating colleagues* – Commanders and Supervisors are encouraged to teach their colleagues that the viewing of Images is serious and restricted.

- *Work with Mental Health Providers (MHP)* – In compliance with their agency guidelines, Commanders and Supervisors are encouraged to work with MHP to make recommendations for care of Members and to provide education and training designed to minimize the impact of Images.

- *Training* -- Commanders and Supervisors are encouraged to share or seek out best practices for minimization of the impact of Images and to promote attendance at trainings regarding methods used to minimize said impact.

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 Commanders and Supervisors are responsible for determining Investigative priorities and selecting cases for Investigation in their respective agencies. Those determinations shall include an assessment of victim risk, jurisdiction, known offender behavioral characteristics, and the likelihood of securing the information necessary to pursue each Investigation.

6.2 Conventional boundaries often are meaningless in today's digital world where the usual constraints of time, place, and distance lose their relevance. These factors increase the possibility of Lead and/or Affiliate Agencies targeting other law enforcement personnel, Investigating the same target, or inadvertently disrupting an ongoing Investigation. To foster effective case coordination, collaboration, and communication, each Member shall make every effort to Deconflict all active Investigations.

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

7.3 Commanders shall compile and submit information on all cases referred for local, state, or federal prosecution. Information is required for all cases referred by the Lead Agency, as well as all Affiliates that received more than $20,000 a year in OJJDP ICAC funding, and any Affiliate the Commander selects to include. The case reporting requirement is ongoing and begins with the prosecutorial agency the case is referred to and continues through the final disposition of the case.

7.3.1 This ongoing quarterly report shall be submitted within 30 days of the end of the quarter.

7.4 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

7.4.1 The name of each Affiliate Agency.

7.4.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.

7.4.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 Investigations shall be conducted in a manner consistent with applicable laws and constitutional requirements.

8.2 Only Sworn Personnel shall conduct Investigations.

8.2.1 Authorized Personnel acting under the direction and supervision of Sworn Personnel may participate in Investigations.

8.2.2 Members shall not approve, condone, encourage, or promote cyber-vigilanteism by private citizens. As such, Members shall not use unauthorized private citizens to proactively seek out Investigative targets.

8.2.3 The above section (8.2.2) shall not preclude the use of information related to a Crime provided by victims or public citizens who discover evidence (e.g., CyberTip reports, mandated reports from professionals, computer repair shop complaints, parental complaints, et cetera). Nor does it preclude the use of authorized over-hears or other similar investigative methods designed to further an Investigation.

8.3 Investigations shall be documented. Any departures from this provision due to unusual or exigent circumstances shall be documented in the relevant case file and reviewed by the Supervisor.

8.3.1 The retention, storage, security, and disposal of Investigative or case information shall be consistent with the subject agency's policies and federal and state law regarding same.

8.3.2 Access to Investigative case files shall be restricted to Authorized Personnel.

c.l.

8.4 Members shall not electronically upload, transmit, or forward any Images.

8.4.1 Section 8.4 shall not prohibit the transfer of evidence between Investigators as provided for by sections 8.9 and 8.10 of these Standards nor shall it prohibit the submission of Images to CVIP as provided for by section 10.1 of these Standards.

8.5 Visual depictions of any identifiable person used to represent an investigative persona or any identifiable minor, shall be only those of an Employee who has given his or her written consent and only if that Employee was at least 18 years old at the time of consent. Further, the depictions themselves may be of that Employee under the age of 18.

8.6 Absent prosecutorial input to the contrary, during online dialogue, officers shall allow the Investigative target to set the tone, pace, and subject matter of the online conversation

8.6.1 The above section (8.6) shall not be construed to prohibit Investigators from performing any of the following activities when initiating or conducting an Investigation: (a) posting information including visual depictions (image or video/printed or digital) to establish an online presence, (b) placing advertisements or posts, or (c) sending messages.

8.6.2 Members shall familiarize themselves with relevant state and federal law, including but not limited to those regarding the defense of entrapment, and should confer with relevant prosecutors for legal consultation, as needed.

8.6.3 Members planning large-scale (multi-target) operations shall advise the Commander and shall consult relevant prosecutors regarding the operation.

8.7 The examination of digital storage devices shall be performed consistent with the subject agency's protocol.

8.8 Images shall be maintained pursuant to the subject agency's policy.

8.8.1 Absent a court order specifically ordering otherwise, evidence containing Images shall not be released to any defendant or representative thereof.

8.9 Absent exigent circumstances, all Members' case referrals between jurisdictions shall include:

- Notification to and acceptance by the Commander(s) of both jurisdictions that are involved in the referral;
- A secure (i.e., digitally-protected) copy of the case file;
- An official Investigative report or affidavit containing case details; and,
- Documentation, preferably the original, of all legal process conducted and all compliance with same, especially those documents related to the issue of jurisdiction and identification of suspect(s).

8.10 The transfer of evidence containing Images among law enforcement shall be done in a secure manner.

Ie encryption software.

## 9. Work Environment

9.1 ICAC Equipment shall be reserved for the exclusive use of its Members, and shall be used in accordance with their respective agency's policies.

9.2 When practicable, Equipment which might be used in undercover aspects of an Investigation shall be purchased covertly.

9.3 No personally-owned Equipment shall be used in Investigations.

9.4 Software shall be properly acquired and licensed.

9.5 Investigations shall be conducted in an approved work environment as designated by a Commander or Supervisor.

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness.. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

**End of ICAC Standards**

# Helpful Commands and Websites

To access the command prompt you can:
Click on the START button.
Click on RUN
Type in CMD and click on OK
Another way to access the command prompt is to:
Click on the START button
Click on ALL PROGRAMS
Click on ACCESSORIES
Click on COMMAND PROMPT

Once the command prompt is open any of the following commands can be used to gain information about IP Address and Connectivity. Simply type the command word or word and additional identifier for the command you are using.

1. PING Ping stands for Packet Inter-Network Grouper. This command sends a message from your computer to another computer asking for a response and displaying the time it took to receive the response. If the other computer can not be reached the command will time out.
2. TRACERT is short for trace route. The Command is typed as tracert followed by the IP Address you want to query. It would appear as tracert 111.11.111.11 This command will walk from your machine to the suspects machine and display the "hops" or routers encountered on the way to the suspects machine. Reading the names of the routers can give you some insight into the geographical location of the suspects' computer. This command should be used from a third party site such as centralops.net. This way the suspect will not see your IP Address initiating the trace route, but it will show up as the IP Address listed to Centralops.net.
3. IPCONFIG This command will show the IP Address in use by the computer, the subnet mask and the default gateway. By adding a space /all to the IPCONFIG command you will see additional information such as the MAC Addresses of any Communication card (Network Card, Wireless Card, or Air card in use, or installed. This command will also show the parameters of the lease of the IP Address and the computer name.
4. NETSTAT This command will show all the active connections in use by the computer. Remember the "active" connections time out after about 45 seconds. This does not mean the computer is not still displaying the content, it just means the direct communication with the site has ceased being reported by this command. Adding a space –n will display all the IP Addresses in numeric format and a space –a with display them as alpha characters.
5. NSLOOKUP This command will look up the domain name and IP Address for any site you query. Type nslookup followed by the name of the site. It would look like nslookup www.yahoo.com.
6. Any command followed by a space and /? Will display the different commands that can be associated with the command. For example netstat /? Will return all

the different extensions that accompany that command. For example netstat –n for numeric listing of ip addresses.

7. WWW.MAXMIND.COM will assist with geo-locating a suspect. This site can be used to resolve a geographical location from an IP Address.
8. WWW.IPCHICKEN.COM The site will display the Public IP Address for the computer accessing the website. Some Internet Service Providers will display a step down router associated with the IP Address. This can appear as a city name on the line below the first response.
9. WWW.CENTRALOPS.NET The site is useful to resolve numerical versions of the address of a website from the alpha names of website addresses. This will also display the domain registrant, and a trace route from this site will protect your IP Address from being reported to the suspect during the trace route.
10. WWW.UWHOIS.COM The site can be used to identify the owner of a website.

# Other Useful Resources (not all free)

**UltraEdit** - editor for all kinds of files
http://www.ultraedit.com

**EditPadPro** - editor for all kinds of files
http://www.editpadpro.com/

**Kitty** - Like Putty, but all configuration info lives in files, not the registry
http://kitty.9bis.com/

**WinSCP** - Secure copy over SSH
http://winscp.net/eng/index.php

**Directory Opus** - The best Windows Explorer replacement without exception
http://www.gpsoft.com.au/

**Everything Search** - Lightening fast indexing and searching on your workstation
http://www.voidtools.com/

**DesktopInfo** - Tons of cool info displayed right on your desktop
http://www.glenn.delahoy.com/software/

**ImgBurn** - the only CD/DVD burning software you will ever need
http://www.imgburn.com/

**Desktop Item Position Saver 64-bit edition** - Save and restore icon positions on your desktop
http://amip.tools-for.net/files/dips64/

**Ditto** - Clipboard management at its finest
http://ditto-cp.sourceforge.net/

**GSpot** - Figure out what audio and video codecs a file requires to be played
http://www.headbands.com/gspot/

**nstrings** - Extract a list of all printable strings from a file (useful for binaries)
http://microsoft.net/

**Mozbackup** - Backup any profiles related to anything Mozilla
http://mozbackup.jasnapaka.com/

**ProcessExplorer** - The best replacement for Windows Task Manager
http://technet.microsoft.com/en-us/sysi ... s/bb896653

**HFS** - Stand alone, Windows based web server. Works great in a teaching environment to distribute files to the class
http://www.rejetto.com/hfs/

**PortPeeker** – Listen to on a port, see who answers.
http://www.linklogger.com/portpeeker.htm

**PowerGREP** - Insane search capabilities. Find any patterns in any file with ease!
http://www.powergrep.com/

**TeamViewer** - The best remote access software
http://www.teamviewer.com/en/index.aspx

**Format Factory** - Great free tool for converting audio/video. I have even used it to convert proprietary video software from surveillance systems into something I can work with.
http://www.formatoz.com/
*Note* Be sure to UNCHECK the toolbar during the installation process.

**TeraCopy** - Free Windows utility for copying files. It seems to be faster, has file resume and error recovery. It also has the ability to perform a quick CRC check to verify that all the files copied properly.
http://codesector.com/teracopy

Case 6:22-cv-00065-..GB-LHP Document 42-1 Filed 12/../25 Page 291 of 291 PageID 1506

**CERTIFICATE OF SERVICE**

I, Jason Steuart Hihn, sui juris, proceeding pro se, certify that the foregoing is true and correct, and made with my firsthand knowledge pursuant to the penalty of perjury, pursuant to 28 U.S.C. §1746(1), that on the date affixed below, I did forward to the prison authorities for mailing,[1] my

Motion to Supplement the Record, Affidavit of Mrs Burkhardt and exhibits of December 9, 2025

for forwarding to the Albert V. Bryan U.S. Courthouse 401 Courthouse Square, 2nd Floor, in Alexandria, VA 22314-5704. Said mailing was properly addressed and did contain the proper amount of pre-paid postage affixed thereto.

It appears that the parties to this action are registered with the CM/ECF Electronic Docketing System, therefore as I am proceeding Pro Se, I ask for service by that means also.

Respectfully submitted this 31 day of January, 2026.

By: [signature]

Jason Steuart Hihn, Pro Se
Fed. Reg. No. 52188-509
Federal Correctional Complex - LOW
P.O. Box 1031
Coleman, Florida 33521-1031

Certified Mail Receipt

9590 9402 9435 5069 2402 85
Return Receipt