# Exhibit

# DD

E-FILED
THURSTON COUNTY, WA
SUPERIOR COURT
September 14, 2018
Linda Myhre Enlow
Thurston County Clerk

☐ EXPEDITE
☐ No Hearing Set
☑ Hearing is Set without argument:
Date: 9/21/2018
Time: N/A

The Honorable Chris Lanese

STATE OF WASHINGTON
THURSTON COUNTY SUPERIOR COURT

| | |
|---|---|
| DANIEL MOODY, a Washington resident,<br><br>Plaintiff,<br><br>v.<br><br>WASHINGTON STATE PATROL and WASHINGTON STATE,<br><br>Defendant. | NO. 18-2-02673-34<br><br>SUPPLEMENTAL DECLARATION OF JAMES MJOR |

I, JAMES MJOR, declare under penalty of perjury under the laws of the State of Washington that the following is true and correct:

1. I am over the age of eighteen years, a citizen of the United States, have personal knowledge of the facts stated herein, or knowledge based upon information and belief, and am competent to testify to these stated facts.

2. I am a general authority Washington peace officer employed by the Washington State Patrol (State Patrol). I hold the rank of Lieutenant.

3. I am currently assigned as the Assistant Division Commander for the Investigative Assistance Division. I am a member of the State Patrol's Missing & Exploited Children Task Force (MECTF).



ATTORNEY GENERAL'S OFFICE
Criminal Justice Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-6430

4. On August 20, 2018, I signed a declaration in this matter. The August 20, 2018 declaration did not note the county or city where I signed the declaration. On August 27, 2018, I signed a declaration and noted my location as Olympia, Washington at the time of signing. The statements in both the August 20, 2018 declaration and August 27, 2018 declaration are the same.

5. I understand that the State Patrol submitted to this Court for in camera review a seventeen page document titled "Internet Crimes Against Children Program Operational and Investigative Standards" with a revised update of October 16, 2014.

6. In my August 20, 2018 declaration, I referred to "ICAC Operational and Investigative Standards." However, the document I referred to in the declaration was not limited to the seventeen page "Internet Crimes Against Children Program Operational and Investigative Standards" submitted for in camera review. Rather, the document referred to in my declaration (as it pertains to the ICAC Operational and Investigative Standards) was the "ICAC Internet Crimes Against Children Training & Technical Assistance Program: Undercover Concepts and Techniques" (ICAC Undercover Concepts and Techniques).

7. The ICAC Undercover Concepts and Techniques was presented to me on or about August 2017, by Detective Sergeant Carlos Rodriguez, around the time I took over command of the Missing and Exploited Children Task Force. It is my understanding that this document was provided to Detective Sergeant Rodriguez on or about June 2015. The document was provided to me as a guideline for our undercover chatting operations conducted by MECTF.

8. The ICAC Undercover Concepts and Techniques includes the "ICAC Operational and Investigative Standards" dated October 16, 2014. However, the ICAC Undercover Concepts and Techniques includes approximately 94 pages of additional information. As such, I consider the ICAC Operational and Investigative Standards and the ICAC Undercover Concepts and Techniques as different documents.

9. Based on prior communications with the Internet Crimes Against Children (ICAC) and Seattle Police Department personnel, it was my understanding that the ICAC



ATTORNEY GENERAL'S OFFICE
Criminal Justice Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-6430

Undercover Concepts and Techniques is for law enforcement use only, and should not be disclosed to the public.

10. On or about September 4, 2018, I again reviewed the ICAC Undercover Concepts and Techniques with Captain Roger Wilbur. Captain Wilbur is the division commander for the Investigative Assistance Division. Based on this review, Captain Wilbur and I determined that certain pages of the ICAC Undercover Concepts and Techniques contain sensitive law enforcement techniques and tactics that should not be disclosed to the public. We also determined, however, that the remaining pages of the ICAC Undercover Concepts and Techniques did not contain such sensitive information and may be disclosed to the public.

11. I understand the State Patrol plans to submit a copy of the ICAC Undercover Concepts and Techniques for in camera review. I have reviewed a copy of the ICAC Undercover Concepts and Techniques with bates numbering on the bottom margin, which reads "Moody v. WSP, TCSC 18-2-02673-34" followed by a bates number. This declaration references those bates numbers and not the page numbers on the bottom right corner of the page.

12. The ICAC Undercover Concepts and Techniques bates numbered pages 29-37 and 39-42 should be withheld from public disclosure. These pages outline account, user information, and content law enforcement can obtain from online companies where criminal activity can take place. These pages specifically discuss the use of backpage.com. Although this company is no longer in use by consumers, many companies like backpage.com are in use and offer the same information when a subpoena, court order, or search warrant is presented to the company. Publicly disclosing the content of these pages would undermine and weaken the integrity of the operations conducted by the State Patrol.

13. The ICAC Undercover Concepts and Techniques bates numbered pages 47-48 should be withheld from public disclosure. These pages discuss specific responses law enforcement should consider when communicating with suspects online during investigations.



ATTORNEY GENERAL'S OFFICE
Criminal Justice Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-6430

Publicly disclosing the content of these pages would undermine and weaken the integrity of operations conducted by the State Patrol and agencies nationally.

14. The ICAC Undercover Concepts and Techniques bates numbered page 51 should be withheld from public disclosure. This page points to how law enforcement can set up and use a chat forum and server where law enforcement can communicate with criminals and capture investigative information. The State Patrol has received training on the use of this tool. However, the agency has not and currently does not use the tool.

15. The ICAC Undercover Concepts and Techniques bates numbered pages 53-55 should be withheld from public disclosure. These pages point to how law enforcement can set up and use a chat forum and server where law enforcement can communicate with criminals and capture investigative information. The Washington State Patrol has received training on the use of this tool. However, the agency has not and currently does not use the tool.

16. The ICAC Undercover Concepts and Techniques bates numbered pages 63-71 should be withheld from public disclosure. These pages discuss interview and interrogation questions law enforcement should consider during child sexual exploitation investigations. Publically disclosing these questions could stifle information gathering during the interview of a suspect for child sex crimes.

17. The ICAC Undercover Concepts and Techniques bates numbered pages 79-80 should be withheld from public disclosure. These pages provide human size information for children as a quick reference for officers conducting child sexual exploitation crime investigations. Publically disclosing the recommended responses to child height, weight, and size could jeopardize or stifle an online child sex investigation by ultimately assisting criminals with vetting law enforcement.

18. The ICAC Undercover Concepts and Techniques bates numbered pages 107-108 should be withheld from public disclosure. These pages provide helpful computer commands and websites law enforcement can use to assist them during online child sex crime investigations.



ATTORNEY GENERAL'S OFFICE
Criminal Justice Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-6430

Publically disclosing these tools could stifle an online child sex investigation by encouraging suspects to even more extremes to covertly mislead law enforcement as to the suspect's name, whereabouts, and ultimately the criminal activity they are conducting. The State Patrol does not currently use this tool. However, releasing this information could jeopardize law enforcement nationally who do utilize this tool.

19. On or about September 4, 2018, I again reviewed the seventeen page "Internet Crimes Against Children Program Operational and Investigative Standards" submitted for in camera review. I do not have concerns with the public disclosure of this document.

20. My August 20, 2018 declaration stated, in part, that: "the ICAC Operational and Investigative Standards provides suggestions on items to offer suspects when conducting an undercover operation. If a suspect reviews the ICAC Operational and Investigative Standards and understands what items are offered, then the suspect is able to recognize an undercover operation. The suspect may avoid the undercover operation and seek other opportunities to exploit children." This statement references bates numbered pages 47-48 in the ICAC Undercover Concepts and Techniques. On those pages, the manual discusses responses law enforcement should provide when suspects ask for nude photographs or a phone call. Undercover officers may use these responses in Net Nanny operations to deter the suspect for asking for items we cannot or should not send, such as nude photographs, or a phone call with the suspect.

21. My August 20, 2018 declaration stated, in part, that: "I do not consider the ICAC Operational and Investigative Standards to be a guideline or procedure for conducting the Net Nanny Sting Operations in Pierce County. While the document is a standard of broad application to ICAC programs, it does not control Net Nanny sting operations that are conducted in Pierce County." I believe this statement is true and correct.



ATTORNEY GENERAL'S OFFICE
Criminal Justice Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-6430

22. The State Patrol is an ICAC Affiliate Agency and has entered into an Interagency Agreement with the Seattle Police Department. A true and correct copy of this Interagency Agreement is attached hereto as Exhibit A.

23. The Interagency Agreement states, in part, that: "Affiliate Agencies agree to adhere to the *ICAC Task Force Program Operational and Investigative Standards*[.]" A true and correct copy of the ICAC Operational and Investigative standards dated October 16, 2014 is attached hereto as Exhibit B. A true and correct copy of the ICAC Operational and Investigative Standards dated September 12, 2017 is attached hereto as Exhibit C.

24. While the ICAC Operational and Investigative Standards and the ICAC Undercover Concepts and Techniques are general guidelines, they are not specific to Net Nanny operations in Pierce County, and they do not control Net Nanny operations.

25. The ICAC Operational and Investigative standards dated October 16, 2014 states in pertinent part on page 5:

> ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).
>
> Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

26. A Net Nanny commanding officer's development and execution of a Net Nanny undercover operation is a fluid situation. In developing and executing a Net Nanny undercover operation, the commanding officer may use his or her training and experience, law enforcement best practices and accepted tactics, risk mitigation and management, as well specific intelligence

of information, previous investigations or interactions with subjects or suspects, information specific to arrest location that may change tactics providing for a safer operation, law enforcement tools such as radio communication, available and properly trained personnel, or electronic surveillance tools available at the time of the operation.

27. I understand that on or about March 7, 2018, a Daniel Moody submitted a public records request to the State Patrol for:

> Please provide all general guidelines, regulations, and operating procedures used towards conducting Net-Nanny Sting Operations. Specificly [*sic*] the ones taken from the Washington State Patrol's Regulation manual, the Investigative Assistance Division Standard Operating Procedures, and the ICAC Standard Operating Procedures used as a general guideline for conducting Net-Nanny Sting Operations.

28. I understand that the State Patrol responded to this public records request by providing an exemption log that identified the 17 page ICAC Operational and Investigative Standards. I understand that the State Patrol did not identify the Undercover Concepts and Techniques in that exemption log.

29. I believe that a reason why the exemption log did not identify the Undercover Concepts and Techniques was based on a miscommunication between the relevant commissioned State Patrol officers and the administrative staff who process public records requests for the Investigative Assistance Division. At the time the State Patrol processed Mr. Moody's March 7, 2018 request, I believed that the relevant administrative staff had the Undercover Concepts and Techniques, and understood that record was responsive to the request. I recently realized that the relevant administrative staff (at the time of processing Mr. Moody's request) did not understand that the Undercover Concepts and Techniques was a different document than the ICAC Operational and Investigative Standards.

///

///

///



ATTORNEY GENERAL'S OFFICE
Criminal Justice Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-6430

30. I have recently reviewed my August 20, 2018 declaration. The statements in that declaration are true and correct to the best of my knowledge.

EXECUTED this 13th day of September, 2018 at Olympia, Washington

LIEUTENANT JAMES MJOR



ATTORNEY GENERAL'S OFFICE
Criminal Justice Division
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-6430

# Exhibit A

Print This Item

*NOTE: See attached letters dated July 7, 2016 re: Articles II & XII edits

| | |
|---|---|
| Status | Approved |
| Type of Contract | Other |
| WSP Contract Number | K12194 |
| Other Contract Number | |
| Amendment Number | |
| Task Order Number | |
| Task Order Amendment Number | |
| ECMS Link | http://ecms.ofm.wa.gov/ECMS/ContractMaintenance/Contrac contract_id=186052 |
| Start Date | 7/1/2016 |
| DOE | |
| End Date | 6/30/2018 |
| End Date Options | |
| CFDA No. | |
| QFSR Yes/No | |
| Contract Title | Internet Crimes Against Children Task Force |
| Contractor Name | Seattle PD |
| Contact Name | Capt. Mike Edwards |
| Contact Telephone Number | |
| Contact Email Address | |
| Contact Mailing Address | PO Box 34986, Seattle WA 98124-4986 |
| BFS Contracts Specialist Name | Rebecca Kirby |
| WSP Project Manager | Lt. Mike Eggleston |
| WSP Section/Division/Bureau | IAD |
| Actual Costs | |
| Current Contract Amount | |
| Amendment Amount | |
| Revised Total Amount | |
| Indirect Costs Rate | |
| Budget Coding | |
| Revenue Coding | |
| Billable Code | |
| Regular Time | |
| Overtime | |
| Voluntary OT | |
| Mileage | |
| Allow Leave | |
| Captain Overtime | No |
| Limit by Org Code | |
| Primary Org Code | |

| | |
|---|---|
| External Contract | Yes |
| Comments | for High Tech Crimes Unit<br><br>NOTE: Attached Letters/Addendums dated July 7, 2016 correc for Articles II (Op Standards) and XII (Effective Date). rk |
| BFS Grants & Contracts Manager Approved | Yes |
| BFS Budget Analyst Name | Kathy Longbotham |
| Allotment Needed | |
| Unanticipated Receipt Needed | |
| Type of Receipt | |
| BFS Budget Manager Approved | Yes |
| Encumber Contract | |
| BFS Fiscal Analyst Name | |
| BFS Accounting Manager Approved | Yes |
| BFS FSP Manager Approved | Yes |
| BFS Administrator Approved | Yes |
| Questions | |
| Distribute Executed Copies To: | |
| Attachments | Addendum 1 Article II Edits for Operational Standards.pdf<br>Addendum 2 Article XII Edits for Effective Date.pdf<br>WSP WA ICAC TF IAG K12194 Final (2).docx |

Version: 14.0
Created at 9/7/2016 9:38 AM by Cline, Karen (WSP)
Last modified at 9/14/2016 1:27 PM by Cline, Karen (WSP)

WSP Contract No. K12194

INTERAGENCY AGREEMENT

BETWEEN

THE WASHINGTON STATE INTERNET
CRIMES AGAINST CHILDREN TASK FORCE
ACTING THROUGH THE CITY
OF SEATTLE POLICE DEPARTMENT

AND

WASHINGTON STATE PATROL

This Interagency Agreement is entered into by and between the Washington State Internet Crimes against Children Task Force (WA ICAC TF), acting through the City of Seattle Police Department and Washington State Patrol (Affiliate Agency) acting through its duly authorized representative.

**WHEREAS,** The United States **Department of Justice (DOJ) Office of Juvenile Justice and Delinquency Prevention (OJJDP)** have created the Internet Crimes Against Children (ICAC) Task Force Program, which is a national network of state and local law enforcement cybercrime units. The mission of the national ICAC Task Force Program is to assist state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This assistance encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education. Due in large part to the technological aspects of these cases, the ICAC Task Force Program promotes a multi-jurisdictional, multi-agency, team approach to investigating and prosecuting ICAC cases; and

**WHEREAS,** the ICAC Task Force Program is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies with each task force having an agency designated by the **OJJDP** as the "Lead Agency" which is the law enforcement agency that is awarded federal funding to serve as the "Lead" "Agency" for the corresponding Task Force.

**WHEREAS,** the SPD has been designated by the **OJJDP** as the "Lead Agency" to oversee the multi-jurisdictional **Washington State Internet Crimes Against Children Task Force (WA ICAC TF)** intended to combat crimes related to the sexual exploitation, enticement and victimization of children through the Internet, online communication systems, telecommunications technology and other computer technology; and

**WHEREAS**, the SPD is the recipient of a Federal grant through the **OJJDP** to assist in the investigation and prosecution of Internet crimes against children; and

**WHEREAS**, the SPD will assist law enforcement agencies in Washington State to increase their computer forensic capabilities and receive appropriate training to investigate Internet related cases; and

**WHEREAS**, agencies that agree to work with the SPD as the "Lead Agency" shall be identified in the program as an "Affiliate" or "Affiliate Agency" will execute this signed agreement under the authorization of the proper authority of said agency following all of the terms, conditions and tenets contained herein.

**NOW THEREFORE**, the parties hereto agree as follows:

This Interagency Agreement contains thirteen (13) Articles.

**ARTICLE I TERM OF AGREEMENT**

Affiliate Agencies may withdraw from this Interagency Agreement and new Affiliate Agencies may be added by executing an Interagency Agreement with the SPD in substantially the same form as this Interagency Agreement. The term of this Interagency Agreement shall be in effect until terminated pursuant to the provisions hereof. Either agency may cancel this agreement with (30) thirty days of written notification to the other agency. Said notification must be provided from the appropriate authorized authority within that agency. Upon receipt of the written notification the SPD will permanently remove the agency from Affiliate Agency status with the ICAC Program.

**ARTICLE II OPERATIONAL STANDARDS**

Affiliate Agencies agree to adhere to the *ICAC Task Force Program Operational and Investigative Standards*, attached to and made part of this Agreement, as Attachment A. The undersigned law enforcement agency agrees to investigate ICAC cases within their jurisdiction, and assist other jurisdictions to investigate these cases.

Affiliate Agencies agree to participate on the Washington Internet Crimes Against Children Task Force that is overseen by the SPD.

Affiliate Agencies agree to use only sworn law enforcement investigators to conduct ICAC investigations. Each investigator involved with undercover operations <u>must</u> receive ICAC Program training prior to initiating proactive investigations and shall submit reports of all undercover activity to the **SPD ICAC**.

Affiliate Agencies agree to conduct reactive investigations where subjects are associated within the Affiliate Agencies jurisdiction, including investigations of child pornography, Cybertip (CT) referrals from the National Center for Missing and Exploited Children (NCMEC), Internet Service Provider (ISP) and law enforcement referrals, and other ICAC-related investigations. Additional case initiations may develop from subject interviews,

documented public sources, direct observations of suspicious behavior, public complaints, etc.

Affiliate Agencies agree to record and document all undercover online activity. Any deviations from this policy due to unusual circumstances shall be documented in the relevant case file, reviewed and authorized by the ICAC Unit Commander, or equivalent, for that agency.

Affiliate Agencies agree to provide the SPD with access to all ICAC investigative files including, without limitation, computer records, in order to ensure compliance with all national ICAC standards.

Affiliate Agencies agree to locate its ICAC investigators in secured space, to be provided by the Affiliate Agency, with controlled access to all equipment, software, and investigative files. At a minimum, information should be maintained in locked cabinets and under control of each Affiliate Agencies ICAC personnel, with restricted access to authorized personnel.

Affiliate Agencies agree to conduct education and prevention programs to foster awareness and provide practical, relevant guidance to children, parents, educators, librarians, the business and law enforcement communities, and other individuals concerned about Internet child safety issues. Presenters shall not discuss ongoing investigative techniques and undercover operations utilized by the WA ICAC TF, its Affiliate Agencies or the national ICAC Program.

Affiliate Agencies agree to be responsible for proper maintenance and use of any equipment purchased with OJJDP Grant funds and loaned to an Affiliate Agency by the SPD. Upon termination of this Interagency Agreement, ownership of equipment, hardware, and other non-expendable items will revert to the SPD.

Affiliate Agencies agree to utilize applicable State and Federal laws to prosecute criminal, civil, and forfeiture actions against identified violators, as appropriate.

Affiliate Agencies shall maintain accurate records pertaining to prevention, education and enforcement activities, to be collected and forwarded not less than monthly to the SPD ICAC Commander, Seattle Police Department, PO Box 34986, Seattle, WA 98124-4986, for statistical reporting purposes (form provided.)

**ARTICLE III SUPERVISION**

Each Affiliate Agency will be responsible for the day-to-day operational supervision, administrative control, and personal and professional conduct of its officers and agents assigned to assist the WA ICAC TF. WA ICAC TF investigations are a cooperative effort and investigative decisions will be a joint process guided by the WA ICAC TF standards.

**ARTICLE IV JURISDICTION**

The principal sites of WA ICAC TF activities will be in the respective jurisdictional area of each Affiliate Agency. Nothing in this agreement shall otherwise limit or enhance the jurisdiction and powers normally possessed by an Affiliate Agency's employee(s) as a member of the WA ICAC TF. Affiliate Agencies may on occasion be referred investigations that are outside of the physical boundaries of their respective municipalities due to specific needs, capabilities or expertise as identified by the WA ICAC TF Lead Agency. Affiliate Agencies agree to take these referrals and conduct appropriate investigations in conformance with the ICAC Operational Standards, investigative or operational training, and their agency policing policies.

**ARTICLE V EVIDENCE**

Seized evidence and any other related forfeiture will be handled in a manner consistent with the seizing law enforcement agency's policies.

**ARTICLE VI INSURANCE AND LIABILITY**

Each Affiliate Agency shall maintain sufficient insurance coverage or a fully funded self-insurance program, approved by the State of Washington, for the protection and handling of the liabilities including injuries to persons and damage to property. Each Affiliate Agency agrees to maintain, at its own expense, insurance or self-insurance coverage for all of its liability exposures for this Agreement and agrees to provide the City of Seattle with at least 30 days prior written notice of any material change in the Affiliate Agency's liability coverage.

**ARTICLE VII REPORTING STANDARDS**

Using a process provided by the SPD, each Affiliate Agency shall submit monthly statistics to the SPD on all ICAC investigations or other investigative work pertaining to the sexual exploitation of children via the Internet. These statistics shall be submitted in the appropriate format by the 10th day of each successive month that the statistics were acquired and shall include data on all related investigations opened or closed during the month in all of the categories as designated on the provided form.

In addition, a breakdown or summary of basic case data shall be included for each sexual exploitation of a minor (child pornography) case, and/or criminal solicitation of a minor (enticement/traveler) case investigated by an Affiliate Agency along with references to any local media reporting on the investigation. The SPD will be responsible for all required reporting to the OJJDP.

**ARTICLE VIII TRAINING**

Affiliate Agencies shall make every effort to make investigators designated as Task Force Members available for applicable specialized training provided through the national ICAC Program and other appropriate training programs. The SPD will review training requests and provide funding for ICAC-approved training when appropriate. This funding will include, but is not limited to; WA ICAC TF hosted, or sponsored or facilitated training through the national ICAC Programs authorized vendors.

Affiliate Agencies seeking funding assistance will be required to submit requests at least thirty (30) days in advance in writing and to comply with the procedures set forth in a separate Interagency Agreement for funding requests. A sample of this Interagency Agreement is available upon request but in no way is tacit or expressed authorization of requested funding or financial assistance given in advance. Funding under the Interagency Agreement is limited to the available funds that are received by the SPD under the OJJDP Grant program for the national ICAC program.

**ARTICLE IX CONFIDENTIALITY**

The parties agree that any confidential information pertaining to investigations of WA ICAC TF will be held in the strictest confidence, and will only be shared with other Affiliate Agencies or other law enforcement agencies not participating in the WA ICAC TF where necessary or as otherwise permitted by federal and/or state law.

**ARTICLE X COMPLIANCE WITH EQUAL OPPORTUNITY LAWS**

To the extent required by law, the Affiliate Agency shall comply with all applicable laws, standards, orders and regulations regarding equal employment which are applicable to the Affiliate Agency's performance of this Interagency Agreement, including Rules of Practice for Administrative Proceeding to Enforce Equal Opportunity under Executive Order No. 11246, title 41, subtitle B, Chapter 60, part 60-30, which are incorporated herein by reference.

**ARTICLE XI GOVERNING LAW AND VENUE**

This Interagency Agreement is governed in all respects by applicable local, State, and Federal laws which shall supersede any provisions made in this Interagency Agreement to the contrary. Any provision effected will not negate the rest of the Interagency Agreement. In case any one or more of the provisions contained in this Interagency Agreement shall be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provision thereof and this Interagency Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. Exclusive venue is in Seattle, King County, Washington.

**ARTICLE XII EFFECTIVE DATE**

This Interagency Agreement shall be effective on July 1, 2016 and continue for one (1) years. Upon expiration of the two (2) years this Interagency Agreement shall automatically be renewed for one (1) additional year until such time as federal funding for the ICAC Task Force Program ends or the Interagency Agreement is canceled by either party upon 30 days' written notice delivered to both parties' as delineated in ARTICLE I TERM OF AGREEMENT. This Interagency may be executed in multiple counterparts, each of which shall be deemed to be an original, but all of which, taken together, shall constitute one and the same agreement.

The additional or deletion of Affiliate Agencies to or from this Interagency Agreement shall not affect the Interagency Agreement with the remaining Affiliate Agencies.

This Interagency Agreement can be amended or replaced in the event of new requirements under the national ICAC Task Force Program or as designated by law or other proper lawful authority.

**ARTICLE XIII AMENDMENTS**

No modification or amendment of the provisions hereof shall be effective unless in writing and signed by authorized representatives of the parties hereto. The parties hereto expressly reserve the right to modify this Agreement, by mutual agreement.

# WASHINGTON STATE
# INTERNET CRIMES AGAINST CHILDREN
# TASK FORCE

## INTERAGENCY AGREEMENT

EXECUTED BY

The **SEATTLE POLICE DEPARTMENT** (SPD),
a department of the City of Seattle, hereinafter referred to as "SPD",
Department Authorization Representative:
Captain Michael Edwards
PO Box 34986
Seattle WA 98124-4986

AND

The **WASHINGTON STATE PATROL**,
a department of the State of Washington, hereinafter referred to as "WSP"
Department Authorized Representative:
Chief of Police John R. Batiste
Washington State Patrol
General Administration Building
P.O. Box 42600
Olympia, WA 98504-2600

In Witness Whereof, the parties have executed this Agreement by having their representatives affix their signatures below.

WASHINGTON STATE PATROL

[signature]
John R. Batiste, Chief of Police

Date: 3/22/16

SEATTLE POLICE DEPARTMENT

[signature]
Kathleen O'Toole, Chief of Police

Date: 9/1/16

City of Seattle
Seattle Police Department

July 7, 2016

Greetings,

This is to clarify a clause in the WA ICAC TF Interagency Agreement found in ARTICLE II – OPERATIONAL STANDARDS:

Paragraph one sentence one page 2 of 7 states:

"Affiliate Agencies agree to adhere to the *ICAC Task Force Program Operational and Investigative Standards*, attached to and made part of this Agreement, as Attachment A."

Paragraph 8 sentence one page 3 of 7 states:

"Affiliate Agencies agree to conduct education and prevention programs to foster awareness and provide practical, relevant guidance to children, parents, educators, librarians, the business and law enforcement communities, and other individuals concerned about Internet child safety issues."

The intent of the WA ICAC TF Paragraph 8 sentence one page 3 of 7 clause should be interpreted as "where practical" to remain consistent with the intent of the national program Operational and Investigative Standards.

Please attach this clarification letter to the original agreement as an addendum.

Sincerely,

Mike Edwards, Captain
Seattle Police Department
Internet Crimes Against Children Commander
WA ICAC Task Force Commander
610 Fifth Avenue
Seattle, WA 98104-4986

# City of Seattle

Seattle Police Department

July 7, 2016

Greetings,

This is to clarify a clause in the WA ICAC TF Interagency Agreement found in ARTICLE XII EFFECTIVE DATE:

Paragraph one sentence one page 5 of 7 states:

"This Interagency Agreement shall be effective on July 1, 2016 and continue for one (1) years. Upon expiration of the two (2) years this Interagency Agreement shall automatically be renewed for one (1) additional year until such time as federal funding for the ICAC Task Force Program ends or the Interagency Agreement is canceled by either party upon 30 days' written notice delivered to both parties' as delineated in ARTICLE I TERM OF AGREEMENT."

This was a typographical error that should read the following to be consistent with the intent of the agreement:

"This Interagency Agreement shall be effective on July 1, 2016 and continue for one (1) *year*. Upon expiration of the *first year* this Interagency Agreement shall automatically be renewed for one (1) additional year until such time as federal funding for the ICAC Task Force Program ends or the Interagency Agreement is canceled by either party upon 30 days' written notice delivered to both parties' as delineated in ARTICLE I TERM OF AGREEMENT." *(Amended language is italicized)*

Please attach this clarification letter to the original agreement as an addendum.

Sincerely,

Mike Edwards, Captain
Seattle Police Department
Internet Crimes Against Children Commander
WA ICAC Task Force Commander
610 Fifth Avenue
Seattle, WA 98104-4986

# Exhibit B

LIMITED OFFICIAL USE ONLY
LAW ENFORCEMENT SENSITIVE

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

## Table of Contents

Definitions of Terms ........ 3
1. Purpose of the ICAC Standards ........ 5
2. ICAC National Program ........ 6
3. Oversight of the ICAC Program ........ 7
4. Selection and Retention of Task Force Members ........ 8
5. Training ........ 9
6. Case Management ........ 10
7. Task Force Reporting Requirements to OJJDP ........ 11
8. Investigations ........ 12
9. Work Environment ........ 14
10. Victim Identification ........ 15
11. Public Awareness and Community Outreach ........ 16
12. Media Relations and Media Releases ........ 17

## Definitions of Terms

**Applicability of Terms**

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

**"Affiliate" or Affiliate Agency"** is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

**"Authorized Personnel"** are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

**"Commander"** is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

**"CEOS"** is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

**"Crime"** is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

**"CVIP"** is the Child Victim Identification Project operated by NCMEC.

**"CyberTipline"** is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

**"Deconflict"** is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

**"DOJ"** is the United States Department of Justice.

**"Employee"** is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool – including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** – any identity established or created by an Employee to aid an Investigation.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead" or "Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

> 3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

> 3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

## 4. Selection and Retention of Task Force Members

4.1 When practicable during the selection process of Members, Commanders and Supervisors shall evaluate prospective candidates for work histories that indicate prior investigative experience, courtroom testimony skills, technical knowledge and ability, an ability to prudently handle sensitive information, a genuine interest in the protection of children, and an understanding of the effects that Members may experience when exposed to Images.

4.2 Commanders and Supervisors shall acknowledge the potential effects of Investigations and exposure to Images. When practicable, they shall attempt to mitigate the potential effects of the work using, for example, the following techniques:

- *Work environment considerations* – Commanders and Supervisors are encouraged to provide a physical location for the work environment that allows the Investigator to conduct discreet Investigations.

- *Work flexibility* – Commanders and Supervisors are encouraged to allow flexibility for Investigators and others who are exposed to Images (e.g., frequent breaks, having an open-door policy, etc.).

- *Educating colleagues* – Commanders and Supervisors are encouraged to teach their colleagues that the viewing of Images is serious and restricted.

- *Work with Mental Health Providers (MHP)* – In compliance with their agency guidelines, Commanders and Supervisors are encouraged to work with MHP to make recommendations for care of Members and to provide education and training designed to minimize the impact of Images.

- *Training* -- Commanders and Supervisors are encouraged to share or seek out best practices for minimization of the impact of Images and to promote attendance at trainings regarding methods used to minimize said impact.

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 Commanders and Supervisors are responsible for determining Investigative priorities and selecting cases for Investigation in their respective agencies. Those determinations shall include an assessment of victim risk, jurisdiction, known offender behavioral characteristics, and the likelihood of securing the information necessary to pursue each Investigation.

6.2 Conventional boundaries often are meaningless in today's digital world where the usual constraints of time, place, and distance lose their relevance. These factors increase the possibility of Lead and/or Affiliate Agencies targeting other law enforcement personnel, Investigating the same target, or inadvertently disrupting an ongoing Investigation. To foster effective case coordination, collaboration, and communication, each Member shall make every effort to Deconflict all active Investigations.

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

> 7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

7.3 Commanders shall compile and submit information on all cases referred for local, state, or federal prosecution. Information is required for all cases referred by the Lead Agency, as well as all Affiliates that received more than $20,000 a year in OJJDP ICAC funding, and any Affiliate the Commander selects to include. The case reporting requirement is ongoing and begins with the prosecutorial agency the case is referred to and continues through the final disposition of the case.

> 7.3.1 This ongoing quarterly report shall be submitted within 30 days of the end of the quarter.

7.4 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

> 7.4.1 The name of each Affiliate Agency.
>
> 7.4.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.
>
> 7.4.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 Investigations shall be conducted in a manner consistent with applicable laws and constitutional requirements.

8.2 Only Sworn Personnel shall conduct Investigations.

8.2.1 Authorized Personnel acting under the direction and supervision of Sworn Personnel may participate in Investigations.

8.2.2 Members shall not approve, condone, encourage, or promote cyber-vigilanteism by private citizens. As such, Members shall not use unauthorized private citizens to proactively seek out Investigative targets.

8.2.3 The above section (8.2.2) shall not preclude the use of information related to a Crime provided by victims or public citizens who discover evidence (e.g., CyberTip reports, mandated reports from professionals, computer repair shop complaints, parental complaints, et cetera). Nor does it preclude the use of authorized over-hears or other similar investigative methods designed to further an Investigation.

8.3 Investigations shall be documented. Any departures from this provision due to unusual or exigent circumstances shall be documented in the relevant case file and reviewed by the Supervisor.

8.3.1 The retention, storage, security, and disposal of Investigative or case information shall be consistent with the subject agency's policies and federal and state law regarding same.

8.3.2 Access to Investigative case files shall be restricted to Authorized Personnel.

8.4 Members shall not electronically upload, transmit, or forward any Images.

8.4.1 Section 8.4 shall not prohibit the transfer of evidence between Investigators as provided for by sections 8.9 and 8.10 of these Standards nor shall it prohibit the submission of Images to CVIP as provided for by section 10.1 of these Standards.

8.5 Visual depictions of any identifiable person used to represent an investigative persona or any identifiable minor, shall be only those of an Employee who has given his or her written consent and only if that Employee was at least 18 years old at the time of consent. Further, the depictions themselves may be of that Employee under the age of 18.

8.6 Absent prosecutorial input to the contrary, during online dialogue, officers shall allow the Investigative target to set the tone, pace, and subject matter of the online conversation

8.6.1 The above section (8.6) shall not be construed to prohibit Investigators from performing any of the following activities when initiating or conducting an Investigation: (a) posting information including visual depictions (image or video/printed or digital) to establish an online presence, (b) placing advertisements or posts, or (c) sending messages.

8.6.2 Members shall familiarize themselves with relevant state and federal law, including but not limited to those regarding the defense of entrapment, and should confer with relevant prosecutors for legal consultation, as needed.

8.6.3 Members planning large-scale (multi-target) operations shall advise the Commander and shall consult relevant prosecutors regarding the operation.

8.7 The examination of digital storage devices shall be performed consistent with the subject agency's protocol.

8.8 Images shall be maintained pursuant to the subject agency's policy.

8.8.1 Absent a court order specifically ordering otherwise, evidence containing Images shall not be released to any defendant or representative thereof.

8.9 Absent exigent circumstances, all Members' case referrals between jurisdictions shall include:

- Notification to and acceptance by the Commander(s) of both jurisdictions that are involved in the referral;
- A secure (i.e., digitally-protected) copy of the case file;
- An official Investigative report or affidavit containing case details; and,
- Documentation, preferably the original, of all legal process conducted and all compliance with same, especially those documents related to the issue of jurisdiction and identification of suspect(s).

8.10 The transfer of evidence containing Images among law enforcement shall be done in a secure manner.

## 9. Work Environment

9.1 ICAC Equipment shall be reserved for the exclusive use of its Members, and shall be used in accordance with their respective agency's policies.

9.2 When practicable, Equipment which might be used in undercover aspects of an Investigation shall be purchased covertly.

9.3 No personally-owned Equipment shall be used in Investigations.

9.4 Software shall be properly acquired and licensed.

9.5 Investigations shall be conducted in an approved work environment as designated by a Commander or Supervisor.

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

**End of ICAC Standards**

# Exhibit C

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

# Internet Crimes Against Children Program

# OPERATIONAL AND INVESTIGATIVE STANDARDS

**LIMITED OFFICIAL USE ONLY**
**LAW ENFORCEMENT SENSITIVE**

## Table of Contents

Definitions of Terms .................... 3
1. Purpose of the ICAC Standards .................... 5
2. ICAC National Program .................... 6
3. Oversight of the ICAC Program .................... 7
4. Selection and Retention of Task Force Members .................... 8
5. Training .................... 9
6. Case Management .................... 10
7. Task Force Reporting Requirements to OJJDP .................... 11
8. Investigations .................... 12
9. Work Environment .................... 14
10. Victim Identification .................... 15
11. Public Awareness and Community Outreach .................... 16
12. Media Relations and Media Releases .................... 17

## Definitions of Terms

**Applicability of Terms**

Although some of the definitions below may be generally applicable to law enforcement, they are intended for use in the interpretation of these Standards. As such, where any term defined below is capitalized in these Standards, the Standards are referring to that term as defined below. By contrast, where any term defined below is not capitalized in these Standards, the Standards are referring to that term as it is used generally in the field of law enforcement.

**"Affiliate"** or **Affiliate Agency"** is an agency that is working with a Lead Agency as part of a regional or State ICAC Task Force. An Affiliate has agreed in writing to adhere to these Standards.

**"Authorized Personnel"** are Members who themselves lack powers of arrest but have been authorized by their respective agency to participate in Investigations and are being supervised by Sworn Personnel.

**"Commander"** is the Member of a Lead Agency who has been designated by that Lead Agency and recognized by OJJDP as the leader of the corresponding Task Force.

**"CEOS"** is the Child Exploitation and Obscenity Section of the Criminal Division of the DOJ.

**"Crime"** is any offense (or group thereof) that involves (or involve) the exploitation/victimization of children facilitated by technology.

**"CVIP"** is the Child Victim Identification Project operated by NCMEC.

**"CyberTipline"** is a reporting mechanism operated by NCMEC that allows for the reporting of suspected Crimes.

**"Deconflict"** is a process whereby Members are able to submit Investigative information to each other and/or to ICAC-related databases in order to determine whether other Members or other law enforcement agencies have information concerning the same targets or Crimes.

**"DOJ"** is the United States Department of Justice.

**"Employee"** is a sworn or compensated individual, or any individual working under the direction and control of a law enforcement agency.

**"Equipment"** is any device or tool – including but not limited to computers, phones, and online accounts and services -- purchased or obtained for use in ICAC-related matters.

**"ICAC"** is the Internet Crimes Against Children Program, a national program composed of state and regional Task Forces.

**"Images"** are visual depictions in any form (image or video/printed or digital) of child sexual exploitation as defined by federal and/or state statute.

**"Investigation"** is an investigation into a Crime. Likewise, "Investigate" "Investigating" and "Investigative" are used within the same context.

**"Investigative Persona"** – any identity established or created by an Employee to aid an Investigation.

**"Investigator"** is a Member who is a part of the Sworn Personnel of a Task Force.

**"Lead" or "Lead Agency"** is the law enforcement agency that receives the ICAC grant and is designated by OJJDP to act as the lead agency for the corresponding Task Force.

**"Member"** is a Lead or Affiliate Agency's employee who is either Sworn Personnel or Authorized Personnel and who has been designated to work on ICAC-related matters for his/her respective agency and Task Force.

**"National Initiative"** is any proposal that relies on the cooperation and resources of a significant number of Task Forces and, accordingly, has been approved by OJJDP.

**"NCMEC"** is the National Center for Missing and Exploited Children.

**"OJJDP"** is the Office of Juvenile Justice and Delinquency Prevention within the DOJ.

**"Supervisor"** is a Member who has been designated by his/her respective agency to supervise Investigations and other ICAC-related matters.

**"Standards"** are all of the provisions of these, the ICAC Operational and Investigative Standards.

**"Sworn Personnel"** are Members with powers of arrest.

**"Task Force"** is the Lead Agency and its Affiliate(s) (combined) as designated by OJJDP for a particular state or region.

## 1. Purpose of the ICAC Standards

These Standards are established by OJJDP to guide administration and operation of ICAC and its Members when working on ICAC-related Investigations and matters.

ICAC Members should make every reasonable effort to comply with these Standards. However, since many aspects of Investigations are dynamic and laws vary widely between jurisdictions – their genesis; methods for their evidentiary pursuit; and their application within court – it is difficult to anticipate every circumstance that might present itself. Thus, reasonable deviations from these Standards may occur depending upon various factors (e.g., emergency situations; timing constraints; accessibility constraints; resource constraints; technology constraints; perceived conflicts between the Standards and statutes, decisional law, and court orders; et cetera).

Should questions regarding the interpretation of these Standards arise or conflicts occur between these Standards and agency policies or law, the subject Commander faced with the issue shall seek the guidance of an OJJDP Program Manager. However, nothing in these Standards is meant to interfere with a Commander's or Supervisor's lawful tactical decision-making.

Commanders may supplement, but not contradict, these Standards in the written agreements they establish with their Affiliates to promote the effective operation of their Task Forces.

## 2. ICAC National Program

### 2.1 Mission of the ICAC Program

The Internet Crimes Against Children Task Force Program (ICAC) helps state and local law enforcement agencies develop an effective response to technology-facilitated child sexual exploitation and Internet crimes against children. This support encompasses forensic and investigative components, training and technical assistance, victim services, prevention and community education.

### 2.2 ICAC Background

The Internet Crimes Against Children Program (ICAC) is a national network of 61 coordinated task forces representing more than 3,500 federal, state, and local law enforcement and prosecutorial agencies. These agencies are engaged in both proactive and reactive investigations, forensic examinations, and criminal prosecutions. By helping state and local agencies develop effective, sustainable responses to online child victimization – including responses to child sexual abuse images (Images), The ICAC Program has increased law enforcement's capacity to combat technology facilitated crimes against children at every level.

The ICAC Program was developed in response to the increasing number of children and teenagers using the Internet and other technology, the proliferation of child sexual abuse images available electronically, and the heightened online activity by predators seeking unsupervised contact with potential underage victims.

Because ICAC Members understand that arrests alone cannot resolve the problem of technology-facilitated child sexual exploitation, the ICAC Program is also dedicated to training law enforcement officers and prosecutors, as well as educating parents and youth about the potential dangers of online activity.

## 3. Oversight of the ICAC Program

3.1 The oversight of the ICAC Task Force Program and the administration of ICAC grants is the responsibility of OJJDP. The oversight of each Task Force falls to its Commander. The oversight of each agency, both Lead and Affiliate, falls to its designated Supervisor.

3.2 Commanders shall ensure there are supervisory systems and protocols in place that provide for observation, documentation, and review of ICAC activity. Said systems shall comply with the principles of quality case management and shall ensure that ICAC activities comply with agency policies and these Standards.

3.3 Commanders shall ensure that each Member in his/her Lead Agency and each Supervisor of an Affiliate Agency receives a copy of the Standards.

> 3.3.1 Supervisors shall ensure that each Member in his/her Affiliate Agency receives a copy of the Standards.

3.4 Commanders shall submit all proposed National Initiatives to OJJDP prior to the start of the project.

> 3.4.1 OJJDP may suggest amendments to the original proposal following consultation with the presenting Commander and, as appropriate, other federal, state, and local entities.

3.5 Supervisors shall inform their Members about departmental or Task Force employee assistance programs and services available to them.

## 4. Selection and Retention of Task Force Members

4.1 When practicable during the selection process of Members, Commanders and Supervisors shall evaluate prospective candidates for work histories that indicate prior investigative experience, courtroom testimony skills, technical knowledge and ability, an ability to prudently handle sensitive information, a genuine interest in the protection of children, and an understanding of the effects that Members may experience when exposed to Images.

4.2 Commanders and Supervisors shall acknowledge the potential effects of Investigations and exposure to Images. When practicable, they shall attempt to mitigate the potential effects of the work using, for example, the following techniques:

- *Work environment considerations* – Commanders and Supervisors are encouraged to provide a physical location for the work environment that allows the Investigator to conduct discreet Investigations.

- *Work flexibility* – Commanders and Supervisors are encouraged to allow flexibility for Investigators and others who are exposed to Images (e.g., frequent breaks, having an open-door policy, etc.).

- *Educating colleagues* – Commanders and Supervisors are encouraged to teach their colleagues that the viewing of Images is serious and restricted.

- *Work with Mental Health Providers (MHP)* – In compliance with their agency guidelines, Commanders and Supervisors are encouraged to work with MHP to make recommendations for care of Members and to provide education and training designed to minimize the impact of Images.

- *Training* – Commanders and Supervisors are encouraged to share or seek out best practices for minimization of the impact of Images and to promote attendance at trainings regarding methods used to minimize said impact.

## 5. Training

5.1 Carefully-managed Investigations conducted by well-trained Investigators are among the most effective techniques available to law enforcement for addressing Crime.

5.2 All national training curricula supported by ICAC resources shall be conducted consistent with the Standards and shall be approved by OJJDP.

5.3 Commanders shall ensure that nominees to attend any ICAC-sponsored national in-person training are current Members.

5.4 Task Forces may develop and deliver Task Force training. This training shall comply with the Standards and shall be approved by the Commander. All costs to develop and deliver the training shall be the responsibility of the Task Force or Affiliate providing the Task Force training.

## 6. Case Management

6.1 Commanders and Supervisors are responsible for determining Investigative priorities and selecting cases for Investigation in their respective agencies. Those determinations shall include an assessment of victim risk, jurisdiction, known offender behavioral characteristics, and the likelihood of securing the information necessary to pursue each Investigation.

6.2 Conventional boundaries often are meaningless in today's digital world where the usual constraints of time, place, and distance lose their relevance. These factors increase the possibility of Lead and/or Affiliate Agencies targeting other law enforcement personnel, Investigating the same target, or inadvertently disrupting an ongoing Investigation. To foster effective case coordination, collaboration, and communication, each Member shall make every effort to Deconflict all active Investigations.

6.3 Lead and Affiliate Agencies shall be subject to their respective agency's incident reporting procedures and case supervision systems. At a minimum, a unique identifier shall be assigned to each case.

## 7. Task Force Reporting Requirements to OJJDP

7.1 The reports described below do not replace the semi-annual progress report required by the Office of Justice Programs' Financial Guide.

7.2 Commanders shall compile and submit a Task Force Monthly Performance Measures Report to the OJJDP-designated location before the end of the following calendar month.

> 7.2.1 Affiliates shall report their activity to their respective Commander by the 10th of each month using the ICAC Monthly Performance Measures Report.

7.3 Commanders shall compile and submit an annual report which details each of their Affiliates. The report shall be submitted in a method determined by OJJDP and shall include the following information:

> 7.3.1 The name of each Affiliate Agency.
>
> 7.3.2 The staffing level of each Affiliate including the number of Investigators, prosecutors, education specialists, and forensic specialists dedicated to Investigating and prosecuting Crime.
>
> 7.3.3 This ongoing annual report shall be submitted within 30 days of the end of the calendar year.

## 8. Investigations

8.1 Investigations shall be conducted in a manner consistent with applicable laws and constitutional requirements.

8.2 Only Sworn Personnel shall conduct Investigations.

8.2.1 Authorized Personnel acting under the direction and supervision of Sworn Personnel may participate in Investigations.

8.2.2 Members shall not approve, condone, encourage, or promote cyber-vigilanteism by private citizens. As such, Members shall not use unauthorized private citizens to proactively seek out Investigative targets.

8.2.3 The above section (8.2.2) shall not preclude the use of information related to a Crime provided by victims or public citizens who discover evidence (e.g., CyberTip reports, mandated reports from professionals, computer repair shop complaints, parental complaints, et cetera). Nor does it preclude the use of authorized over-hears or other similar investigative methods designed to further an Investigation.

8.3 Investigations shall be documented. Any departures from this provision due to unusual or exigent circumstances shall be documented in the relevant case file and reviewed by the Supervisor.

8.3.1 The retention, storage, security, and disposal of Investigative or case information shall be consistent with the subject agency's policies and federal and state law regarding same.

8.3.2 Access to Investigative case files shall be restricted to Authorized Personnel.

8.4 Members shall not electronically upload, transmit, or forward any Images.

8.4.1 Section 8.4 shall not prohibit the transfer of evidence between Investigators as provided for by sections 8.9 and 8.10 of these Standards nor shall it prohibit the submission of Images to CVIP as provided for by section 10.1 of these Standards.

8.5 Visual depictions of any identifiable person used to represent an investigative persona or any identifiable minor, shall be only those of an Employee who has given his or her written consent and only if that Employee was at least 18 years old at the time of consent. Further, the depictions themselves may be of that Employee under the age of 18.

8.6 Absent prosecutorial input to the contrary, during online dialogue, officers shall allow the Investigative target to set the tone, pace, and subject matter of the online conversation

8.6.1 The above section (8.6) shall not be construed to prohibit Investigators from performing any of the following activities when initiating or conducting an Investigation: (a) posting information including visual depictions (image or video/printed or digital) to establish an online presence, (b) placing advertisements or posts, or (c) sending messages.

8.6.2 Members shall familiarize themselves with relevant state and federal law, including but not limited to those regarding the defense of entrapment, and should confer with relevant prosecutors for legal consultation, as needed.

8.6.3 Members planning large-scale (multi-target) operations shall advise the Commander and shall consult relevant prosecutors regarding the operation.

8.7 The examination of digital storage devices shall be performed consistent with the subject agency's protocol.

8.8 Images shall be maintained pursuant to the subject agency's policy.

8.8.1 Absent a court order specifically ordering otherwise, evidence containing Images shall not be released to any defendant or representative thereof.

8.9 Absent exigent circumstances, all Members' case referrals between jurisdictions shall include:

- Notification to and acceptance by the Commander(s) of both jurisdictions that are involved in the referral;
- A secure (i.e., digitally-protected) copy of the case file;
- An official Investigative report or affidavit containing case details; and,
- Documentation, preferably the original, of all legal process conducted and all compliance with same, especially those documents related to the issue of jurisdiction and identification of suspect(s).

8.10 The transfer of evidence containing Images among law enforcement shall be done in a secure manner.

## 9. Work Environment

9.1 ICAC Equipment shall be reserved for the exclusive use of its Members, and shall be used in accordance with their respective agency's policies.

9.2 When practicable, Equipment which might be used in undercover aspects of an Investigation shall be purchased covertly.

9.3 No personally-owned Equipment shall be used in Investigations.

9.4 Software shall be properly acquired and licensed.

9.5 Investigations shall be conducted in an approved work environment as designated by a Commander or Supervisor.

## 10. Victim Identification

10.1 Identifying child victims of Crime is a critical element of the ICAC Program. DOJ and OJJDP require the Lead Agencies and Affiliates to submit Images to CVIP as a means to improve child victim identification. Absent exigent circumstances, Images shall be sent to CVIP pursuant to NCMEC's standards regarding same. In addition, Lead Agencies and Affiliates are encouraged to collaborate with NCMEC in their effort to identify children depicted in Images.

10.2 Absent exigent circumstances, victim-identifying information shall be protected from public disclosure pursuant to the protections set forth in federal and state law.

10.3 Lead Agencies and Affiliates shall adhere to local, state, and federal laws regarding mandated reporting, victim notification, and victim assistance.

## 11. Public Awareness and Community Outreach

11.1 Public awareness activities and community outreach are a critical component of ICAC. Lead and Affiliate Agencies shall foster awareness and shall provide practical relevant guidance to children, parents, educators, and others concerned with child safety.

11.2 Presentations to school personnel, parents, and community groups are excellent ways to promote awareness. These presentations shall not depict identifiable victims nor shall they use pornographic or sexually explicit images. Presenters shall not discuss confidential Investigative techniques.

11.3 Members shall not endorse any product or service without the express written consent of an OJJDP Program Manager. While making public presentations, Members may indicate a preference for a product or service, but, where done, shall avoid an implicit endorsement and shall include alternatives in the presentation.

11.4 Materials and presentations shall be consistent with ICAC's mission and background, as enumerated in Section 2 of these Standards.

## 12. Media Relations and Media Releases

12.1 Media releases relating to prosecutions, Crime alerts, or other matters concerning ICAC operations shall not include information regarding confidential Investigative techniques, and shall be coordinated, when applicable, with the law enforcement agencies involved with the subject Investigations, in a manner consistent with sound information management and sound media relations practices.

12.2 Commanders and Supervisors may speak to members of the media about their own agency's ICAC-related activities per the terms of their agency's policy on such media relations. No individual affiliated with ICAC may speak on behalf of the national ICAC Program without the express written consent of OJJDP.

12.3 Commanders shall inform their OJJDP Program Manager if approached by national media outlets about the national ICAC Program (as opposed to media seeking information about local activities) so that a coordinated national response can be prepared by OJJDP.

12.4 Information provided by Task Forces to the media shall be consistent with ICAC's mission and background, as described in Section 2 of these Standards.

**End of ICAC Standards**